<pre>
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF ARIZONA

 3   United States of America,      )
                                    )
 4               Plaintiff,         )  CR 18-00032-001-JAS(EJM)
                                    )
 5          vs.                     )
                                    )  Tucson, Arizona
 6   Anthony Delbert Jones, Jr.,    )  September 19, 2018
                                    )  9:23 a.m.
 7   _____Defendant.   __)

 8

                        TRANSCRIPT OF PROCEEDINGS
 9                   MOTION TO SUPPRESS HEARING

10

               BEFORE THE HONORABLE ERIC J. MARKOVICH
11                 UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:
          Angela Woolridge
14        U.S. Attorney's Office
          405 West Congress Street, Suite 4800
15        Tucson, AZ 85701

16   For the Defendant:
          Jorge Leonardo Costales
17        Jordan Malka
          Federal Public Defender's Office - Tucson
18        407 West Congress Street, Suite 501
          Tucson, AZ 85701-1310

19

20

21   Transcribed by:
          Cindy J. Shearman
22        405 West Congress Street, Suite 1500
          Tucson, AZ 85701
23        520-205-4286

24             Proceedings were digitally recorded
               Transcript prepared by transcriptionist
25
</pre>

I N D E X

WITNESS                                                    PAGE

JACK LANE
Direct examination by Ms. Woolridge                          8
Cross-examination by Mr. Costales                           17
Redirect examination by Ms. Woolridge                       23

PETER HERMANSEN, JR.
Direct examination by Ms. Woolridge                         25
Cross-examination by Mr. Costales                           62
Redirect examination by Ms. Woolridge                       78

CHRISTOPHER BULLOCK
Direct examination by Ms. Woolridge                         87
Cross-examination by Mr. Malka                             103
Redirect examination by Ms. Woolridge                      121

MARTIN PESQUEIRA
Direct examination by Mr. Malka                            125
Voir dire examination by Ms. Woolridge                     135
Direct examination continued by Mr. Malka                  143
Voir dire examination by Ms. Woolridge                     153
Direct examination continued by Mr. Malka                  157
Cross-examination by Ms. Woolridge                         163

CLOSING ARGUMENTS
By Mr. Costales                                            174
By Ms. Woolridge                                           185
By Mr. Costales                                            199


E X H I B I T S

| IDENTIFIED | OFFERED | ADMITTED |
| --- | --- | --- |
| Gov 3 | 11 | 11 |
|  |  |  |
| Def 50 | 147 | 151 |
| Def 53 | 71 | 72 |
| Def 54 | 132 | 132 |
| Def 55 | 63 | 63 |
| Def 68 | 18 | 18 |

UNITED STATES DISTRICT COURT

```
1                    P R O C E E D I N G S
2              (Call to order of court, 9:23 a.m.)
3              CLERK:  CR 18-32, United States of America versus
4    Anthony Delbert Jones, Jr., before the court, evidentiary
5    hearing, motion to suppress.
6         Counsel, please state your appearance.
7              MS. WOOLRIDGE:  Good morning, Your Honor.  Angela
8    Woolridge appearing on behalf of the United States.
9              THE COURT:  Good morning.
10             MR. COSTALES:  Good morning, Your Honor.  Leo Costales
11   and Jordan Malka appearing for Anthony Delbert Jones, who's
12   present in court in custody.
13             THE COURT:  Okay.  Good morning to everybody.  Okay.
14   So we're on for the motion to suppress.  Do you all want to
15   invoke the rule of exclusion of witnesses?
16             MR. COSTALES:  Yes, Your Honor.
17             THE COURT:  Okay.  So, it looks like we have -- the
18   government has two witnesses?
19             MS. WOOLRIDGE:  We have -- we'll likely call two, Your
20   Honor, although we may be calling telephonically one of the
21   defense witnesses who they have arranged to appear by telephone
22   just to start the hearing, but the other two witnesses are here
23   present in the courtroom.  I also have my case agent who we may
24   call as a witness but I would ask that he be permitted to
25   remain in the courtroom.
```

```
 1              THE COURT:  Okay.  And, Mr. Costales, your witness
 2    is --
 3              MR. COSTALES:  Apart from the custodian of records, it
 4    would be Martin Pesqueira, our investigator.
 5              THE COURT:  Okay.  And did you want to -- him to be
 6    able to remain in the courtroom?
 7              MR. COSTALES:  I would designate him as our case
 8    agent.
 9              THE COURT:  Okay.  So Mr. Pesqueira can stay in the
10    courtroom.
11        So let's have Mr. Hermansen and Mr. -- well, those are your
12    two witnesses?
13              MS. WOOLRIDGE:  That's correct, Your Honor.
14              THE COURT:  Come on up to the podium, gentlemen, and
15    we'll get you sworn in and then I'll explain the rule of
16    exclusion to you.
17        Allison, do you want to administer the oath to these
18    gentlemen?
19    PETER HERMANSEN and CHRISTOPHER BULLOCK, WITNESSES, WERE SWORN.
20              THE COURT:  Okay.  So, gentlemen, the rule of
21    exclusion has been invoked.  What that means is that while --
22    after you testify or while another witness is testifying, you
23    have to remain out of the courtroom.  You can't speak with
24    anybody except the attorneys, you can't speak with each other
25    or anybody but the attorneys involved in the case.
```

1          Do you both understand that?

2          (Simultaneous positive responses from the witnesses.)

3               THE COURT:  Okay.  And, Ms. Woolridge, which witness

4      are you going to call first?

5               MS. WOOLRIDGE:  Well, Your Honor, again, for

6      scheduling purposes, we will call Mr. Lane, one of the

7      defendant's witnesses, who's only available by telephone

8      until -- he has a meeting at 10:00 o'clock.

9               THE COURT:  Okay.

10               MS. WOOLRIDGE:  So I agreed that we would take him out

11      of order.

12               THE COURT:  Okay, great.  So, gentlemen, I'll kick you

13      out now and we'll come get you.  Okay.  Thank you.

14          Okay.  Allison will get Mr. Lane on the phone and then

15      we'll swear him in.

16          (A phone call was placed.)

17               THE COURT:  Morning, Mr. Lane.  This is Eric

18      Markovich.  I'm the judge at today's hearing.  How are you?

19               THE WITNESS:  I'm good, Your Honor.  How are you?

20               THE COURT:  Good.  So you're going to testify

21      telephonically so what I'd like you to do is, the clerk is

22      going to read the oath to you, okay?

23               THE WITNESS:  That would be fine.

24               THE COURT:  Okay.  Go ahead, Allison.

25

1            JACK LANE, WITNESS, WAS SWORN.

2            THE COURT:  Okay.  Thank you.  Mr. Lane, we can hear

3    you very well.  If you have trouble hearing the attorneys or

4    me, please let us know.

5            THE WITNESS:  I will, Your Honor.

6            THE COURT:  Okay.  Thank you.

7        So, Mr. Costales or Mr. Malka, do you want to start your

8    questioning of Mr. Lane?

9            MR. COSTALES:  Well, Your Honor, our purpose -- just

10   briefly before we address Mr. Lane, our purpose for calling

11   Mr. Lane was very brief and I understand that Ms. Woolridge

12   might have wanted to call him as a witness independently of

13   ours.  For the purpose of our case, we -- all we have is an

14   affidavit prepared by Mr. Lane, which I believe is

15   self-authenticating under the rules and I don't think

16   Ms. Woolridge is challenging on authenticity grounds.

17           THE COURT:  What exhibit is that?

18           MR. COSTALES:  Exhibit 68, Your Honor.  Your Honor, we

19   were trying to reach a stipulation about the admissibility but

20   we were not able to.

21           THE COURT:  Okay.  So are you moving the admission of

22   this document?

23           MR. COSTALES:  I move the admission of this document

24   before questioning based on Rule 902(1).

25           THE COURT:  And then, Ms. Woolridge, do you have an

1    objection to the admission of this document?

2            MS. WOOLRIDGE:  No, no, I don't, Your Honor, and I

3    apologize for any misunderstanding.  Mr. Costales and I talked

4    about this yesterday and I think I also confirmed in an email

5    that I would stipulate to the admissibility of this document; I

6    don't challenge its authenticity.

7        My concern with regard to this document is the relevance of

8    it and to the extent that the court should consider any

9    information in it.  I don't -- I do not have an objection to

10   its admission but I would like to question Mr. Lane to

11   establish some of the information about this exhibit.

12           THE COURT:  Okay.

13           MS. WOOLRIDGE:  And that is the purpose for calling

14   this witness.

15           THE COURT:  Okay.

16           MR. COSTALES:  Your Honor, if I may respond briefly.

17   I did understand that as well that Ms. Woolridge would be

18   objecting to the introduction on relevance grounds, that's why

19   I did not release Mr. Lane from subpoena.

20       Now, if Ms. Woolridge has questions for him beyond the

21   introduction of this affidavit, I believe that she should -- he

22   should be treated as her witness and then we'll move to

23   cross-examine if relevant.

24           THE COURT:  Okay.  That's fine.

25       So, Ms. Woolridge, do you want to ask Mr. Lane some

 1    questions?

 2              MS. WOOLRIDGE:  Certainly.  Thank you, Your Honor.

 3              MR. COSTALES:  And, Your Honor, I'm sorry.  Have we

 4    ruled -- have you -- has the court ruled on the admission?

 5              THE COURT:  Well, let me just hear from Mr. Lane and

 6    then we'll rule on that.

 7              MR. COSTALES:  Oh, thank you.

 8              MS. WOOLRIDGE:  May I proceed, Your Honor?

 9              THE COURT:  Yes.  Thank you.

10              MS. WOOLRIDGE:  Thank you.

11                           DIRECT EXAMINATION

12    BY MS. WOOLRIDGE:

13    Q.  Good morning, Mr. Lane.

14    A.  Good morning.

15    Q.  Could you please -- I believe you've already stated your

16    name for the record when you were sworn in but could you tell

17    us what your current occupation is?

18    A.  I'm currently the executive director for the Arizona Peace

19    Officers Standards and Training.

20    Q.  And for those of us who aren't familiar with the Arizona

21    Peace Officers Standards and Training board, what does this

22    organization do and, as executive director, what are your

23    general responsibilities?

24    A.  Our organization is responsible for the -- setting minimum

25    standards as well as conduct standards concerning all Arizona

1   peace officers that are certified under our state statutes, and

2   my responsibility is basically oversight of the -- there's

3   several functions here concerning minimum standards for basic

4   academy training, we have advanced training, and then we have

5   what we call our compliance unit where we conduct audits of all

6   background investigations for all peace officers for Arizona,

7   and then also we handle misconduct cases that come to our

8   attention that are brought before the board for sanctions

9   concerning their certification.  Probably the best analogy I

10  can draw is we're kind of the state bar for the police officers

11  in Arizona.

12  Q.  All right.  So as your position as executive director, are

13  you familiar with the various regulations and Arizona state

14  statutes that govern the conduct of peace officers as well as

15  organizations such as police departments, sheriff's

16  departments, and the like?

17  A.  Correct.  And we really -- we don't have oversight over an

18  organization's policies, per se, but we certainly have

19  oversight of each individual peace officer's certification in

20  the state, and I am familiar with the statutes associated as

21  well as the administrative code that we operate.

22  Q.  Just by way of background, sir, do you, yourself, have any

23  experience as a peace officer?

24  A.  I do.  I had four years as a military police officer,

25  35 and a half years with the Arizona Department of Public

```
 1    Safety, and so a total of about -- with the four years
 2    experience in the military, that's about almost 40 years of
 3    experience in law enforcement.
 4    Q.  And when you -- I imagine you retired from the Arizona
 5    Department of Public Safety before taking your current
 6    occupation?
 7    A.  I actually came over to the Arizona Peace Officers cert --
 8    Standards -- I'm sorry -- Arizona Peace Officers Standards and
 9    Training as a compliance manager, so I had oversight over the
10    investigators concerning the audits and the misconduct cases.
11    And then I was elevated to the executive director's position
12    approximately two and a half years ago.
13    Q.  So I apologize for perhaps my misstatement there.  I meant
14    then are you still -- do you still carry the, I guess, title of
15    a peace officer then?
16    A.  No, I am no longer considered certified by the state.  I'm
17    in what's called my certification has lapsed.
18    Q.  Okay.  And what position did you hold with DPS prior to
19    coming over to the peace officers standards and training board?
20    A.  Over the 35 years I ranged all the way from a beginning
21    officer and worked narcotics, I was a supervisor in both
22    narcotics as well as training academies.  I elevated to a
23    lieutenant's position where I was a higher patrol commander and
24    I handled a lot of the criminal investigations districts when
25    -- throughout the state and then was elevated to command level
```

1  position and at one point I was actually the chief of the

2  higher patrol for five years prior to retiring.

3  Q.  And in your current position, you mentioned that you are

4  familiar with some of the laws and regulations that apply to

5  the certification and the standards for peace officers who

6  serve in the state of Arizona.  As such, are you familiar with

7  specifically Arizona Revised Statute Section 13-3875?

8  A.  Yes, I am.

9  Q.  And can you just give us a brief overview of what that

10  statute encompasses?

11  A.  Well, the statute allows for each of our county sheriffs to

12  cross-certify federal peace officers and it establishes their

13  ability to do that.  And it gives -- I believe there's a

14  one-year term when they do that cross-certification, and then

15  there's -- there is a -- they are -- they are supposed to send

16  us then a list of those people that they have cross-certified.

17  Q.  All right.

18        MS. WOOLRIDGE:  Your Honor, for the court, I have

19  provided as an exhibit a copy of ARS 13-3875, and I would move

20  at this point to introduce it to provide it to the court and

21  ask the court to take judicial notice.

22        THE COURT:  Okay.  Any objection to that?

23        MR. COSTALES:  None at all.

24        THE COURT:  Okay.  That will be admitted.  Does that

25  have an exhibit sticker on it?  Is that your one --

```
 1              MS. WOOLRIDGE:  It's Exhibit 3, Your Honor.

 2              THE COURT:  Exhibit 3, okay.

 3              MS. WOOLRIDGE:  We're going a little out of order

 4    here, I apologize.

 5              THE COURT:  That's okay.

 6    BY MS. WOOLRIDGE:

 7    Q.  Mr. Lane, could you please explain to us what the

 8    requirements are for a federal peace officer to become

 9    certified by a sheriff's department?

10    A.  Right.  Well, it's my understanding they had to have at

11    least completed their law enforcement academy or training

12    required for their federal job and then I believe they make the

13    request to the sheriff for cross-certification for the state,

14    and then the sheriff handles that from his end by, I'm

15    assuming, I've never been there but I'm assuming the sheriff at

16    some point provides them documentation so that they receive

17    some cross-certification, I don't know that for a fact, but

18    then -- and then the last, I believe the last requirement is

19    just that they send us notification of who they have

20    cross-certified.

21    Q.  Okay.  So when you say -- when you say they send -- they

22    send you, I imagine you're talking about the peace officers

23    standards and training board?

24    A.  Yes, I'm sorry.  Yes, you're correct.

25    Q.  And just for sake of brevity and because I'm more familiar
```

1   with it, the organization as its acronym, may I -- would it be

2   all right if I refer to it as AZPOST?

3   A.   That would be fine.   Thank you.

4   Q.   Okay.   And so as far as your involvement, AZPOST's,

5   involvement, do you have any other involvement in certifying

6   federal peace officers as cross-designated with the sheriff's

7   department other than maintaining the records that are sent to

8   you by the sheriff's department that are certified -- to

9   document the certified peace officers?

10  A.   No, there's no other requirement by Arizona POST, they just

11  retain the actual letters themselves.   We don't even keep a

12  database.

13  Q.   So when you say you retain only the letters, is that just

14  the physical letter?

15  A.   Yes.

16  Q.   You don't have any sort of electronic documents or

17  electronic database of anyone who's ever been cross-certified?

18  A.   No, we don't.

19  Q.   Do you regularly purge these documents after the

20  cross-certification has expired?

21  A.   Yes, they're normally purged after a one-year term because

22  that's how long their cross-certification is by statute

23  allowed.

24  Q.   Have you ever had an issue with a sheriff's department in

25  the state of Arizona not providing you the records of federal

 1   peace officers that were cross-certified by that sheriff's

 2   department?

 3   A.  Yeah, we have had some sheriff's departments who would not

 4   provide us that information.

 5   Q.  Was that at Pima County Sheriff's Department, to your -- in

 6   any of your experience?

 7   A.  I've never experienced a problem with the Pima County

 8   Sheriff's Department.  Actually, they're probably one of the --

 9   I would portray them as one of the better agencies of notifying

10   us.

11   Q.  Now, let's talk about those -- those other counties or

12   another county that may not notify you.  Without naming names

13   or counties, what happens when a sheriff of a county does not

14   provide you the documentation of the cross-certification?  Does

15   that invalidate the cross-certification of any of those federal

16   peace officers?

17            MR. COSTALES:  Objection, Your Honor, asks for a legal

18   answer, ultimate answer a legal conclusion.

19            THE COURT:  I'll overrule it.

20            THE WITNESS:  Could you state the question one more

21   time?  I'm sorry.

22   BY MS. WOOLRIDGE:

23   Q.  Sure.  So -- so, let's say a sheriff of a particular county

24   doesn't send in these documents, and specifically just for

25   reference we're referring to 13-3875(E), I believe, that says

1    that essentially AZPOST shall maintain records of all federal

2    peace officers that are certified as peace officers in this

3    state, correct?

4    A.   That's correct.

5    Q.   So let's say a sheriff, a local sheriff of a county, does

6    not comply with that provision and does not send you the

7    records of an individual who has been, or individuals, peace

8    officers who have been cross-certified in that county.  Would

9    those federal peace officers then not be cross-certified by the

10   failure of the sheriff to send in those records?

11          MR. COSTALES:  Your Honor, I'd object to this line of

12   questioning on speculation grounds.

13          THE COURT:  No, he can answer if he knows the answer.

14          THE WITNESS:  Well, my understanding of the statute,

15   that would not negate those federal peace officers having that

16   cross-certification.  That portion of the statute is just a

17   portion that deals with the records, it has nothing to do with

18   whether or not they actually have attained that

19   cross-certification through the sheriff.

20   BY MS. WOOLRIDGE:

21   Q.   Does the sheriff, him or herself, have the sole authority

22   to confer the cross-designation on the federal peace officers?

23   A.   Yes.

24   Q.   Does AZPOST have any authority to confer such designation

25   or to revoke such designation?

1    A.   No, we do not.

2    Q.   And I understand that you became involved in this case

3    because you were served with a subpoena asking for documents

4    specifically for the cross-certification records of peace

5    officers Peter A. Hermansen, Jr., and Christopher Bullock for

6    the State of Arizona under ARS 13-3875 specifically within Pima

7    County.  The cross-certification request was granted by Mark D.

8    Napier, sheriff of Pima County, on March 10, 2017.

9         Do you recall that subpoena?

10   A.   Yes, I do.

11   Q.   And do you recall your response to that subpoena?

12   A.   Yes, we responded with an affidavit of the custodian of

13   records, since that's also my position here with the agency,

14   that we did not have a -- any of those records here at our

15   office.

16   Q.   And what date were you served with that subpoena?

17   A.   It was Monday, about noon.

18   Q.   And just this past Monday, September 17th, 2018?

19   A.   That's correct.

20   Q.   Now, looking at the date of this document, specifically you

21   were asked for a cross-certification grant by Sheriff Napier

22   that was dated March 10th, 2017.  Would you expect that you

23   would still have records of a request that was granted on

24   March 10, 2017?

25   A.   No, we normally would not because it had already passed the

DIRECT EXAMINATION - JACK LANE

1    12-month period for the one year that the certification is good

2    for.

3    Q.   Okay.  So does this absence of documents suggest to you

4    that that cross-certification request was not granted?

5    A.   I would -- I wouldn't be able to say whether it was granted

6    or not because, like I said, we wouldn't -- you know, if we had

7    the record, I could have seen it but we probably purged that

8    record after the one-year period, so that would be something

9    more the sheriff could probably testify to.

10   Q.   Okay.  Sir, I don't have any more questions for you.  Thank

11   you for your time today.

12   A.   Thank you.

13              THE COURT:  Okay.  Mr. Costales?

14              MR. COSTALES:  Yes, sir, I do have cross.

15                        CROSS-EXAMINATION

16   BY MR. COSTALES:

17   Q.   Director Lane, can you hear me okay?

18   A.   Yes, I can.

19   Q.   Okay.  Let's just get the affidavit out of the way first.

20   You prepared an affidavit citing that there's no records of

21   cross-certification for Peter Hermansen and Christopher Bullock

22   within your custody or control; is that right?

23   A.   Yeah, we -- the affidavit actually states we were unable to

24   find any document related to those two individuals.

25   Q.   Sure.  And you prepared that affidavit and you notarized it

DIRECT/CROSS-EXAMINATION - JACK LANE

 1   and signed it with your seal?

 2   A.  Yes.

 3   Q.  Now, I don't know if you have a copy in front of you but I

 4   have a copy in front of me and --

 5          MR. COSTALES:  Your Honor, at this point, I know it's

 6   a little difficult with telephonic but at this point I would

 7   move for introduction of Defense 68.

 8          THE COURT:  Yeah, I'm going to admit that into

 9   evidence.

10   BY MR. COSTALES:

11   Q.  So, Director Lane, the government raised a couple of issues

12   -- the government raised a couple of issues that I'd like to

13   ask you some questions on.  Now, you mentioned that you had a

14   substantial experience as a state officer; is that right?

15   A.  That's correct.

16   Q.  Would you say it's easy to become a POST-certified state

17   officer?

18   A.  In Arizona?

19   Q.  Yeah.

20   A.  No, it's not easy.

21   Q.  You've got to take some steps, right?

22   A.  Yes.

23   Q.  Meet a standards board requirements?

24   A.  That's correct.

25   Q.  Training, certifications, that sort of thing?

1    A.  Yes.

2    Q.  So compared to what a state officer has to do to become

3    POST certified, it's a much higher standard than what a federal

4    officer has to do; is that right?

5    A.  I don't -- I don't know the answer to that.  I don't know

6    -- I've never been through a federal training academy.

7    Q.  Well, sure.  But you are familiar with 13-3875, right?

8    A.  Oh, I see what your question is.  On them becoming

9    cross-certified.

10   Q.  Uh-huh.

11   A.  Yes, I am familiar with it.  Yes.  I misunderstood your

12   question, sorry.

13   Q.  Oh, that's okay.  Do you have a copy of 13-3875 you can

14   refer to?

15   A.  Yes, I do.

16   Q.  Okay.  So the government mentioned there's certain steps a

17   federal officer has to take with the sheriff in order to become

18   cross-certified.  Is that your understanding as well?

19   A.  That's correct, yes.

20   Q.  So the first step, of course, is that they -- which is

21   13-3875(B)(1), that they submit a written request for

22   certification to the sheriff?

23   A.  Yes, that's what the statutes say.

24   Q.  The second step is that they have to submit evidence that

25   they've been certified as a peace officer, that they are

1   authorized by federal law to engage in or supervise the

2   prevention, detection, investigation, or prosecution of a

3   violation of federal law, and then, finally, that they're also

4   authorized by federal law to make arrests, serve warrants, and

5   carry firearms?

6   A.  That's section two, correct.

7   Q.  Okay.  And it's not an "or", they have to be -- they have

8   to submit evidence of all of those things?

9   A.  There is some "ors" in there, or supervise or prosecution.

10  You know, there are several ors in there, too.

11  Q.  But there is -- they are authorized to take -- by federal

12  law to make arrests, serve warrants, and carry firearms?

13  A.  That's correct.

14  Q.  Okay.  Well, I'm not going to ask you to interpret the

15  statute but obviously that's a lower standard than what's

16  required by state officers?

17  A.  Correct.

18  Q.  Okay.  And let me just keep referring to 13-3875 while

19  we're's on the topic.  You -- excuse me, POST, AZPOST, is

20  required under 13-3875(E) to maintain records of all peace --

21  federal peace officers who are certified as peace officers in

22  the state.

23      Am I reading the statute correctly?

24  A.  That's what it states, yes.

25  Q.  Okay.  And you just testified that your office generally

1    purges these after a year?

2    A.  That's correct.

3    Q.  Do you have to operate under records requirement -- records

4    retention laws as a custodian of records for POST?

5    A.  Yes.

6    Q.  What is the specific record retention law that allows you

7    to purge these records after one year?

8    A.  I'm not positive.  It was my understanding through our --

9    my legal advisor that we could purge them after one year.

10   Q.  But there's not a specific statute or regulation that

11   specifically states that?

12   A.  I couldn't quote you on that.  Like I said, I got legal

13   advice from my legal advisor through the attorney general's

14   office.

15   Q.  Are you aware of a specific statute or regulation that

16   would allow you to purge?

17   A.  I wouldn't be able to tell you; I don't know.

18   Q.  Well, I'm just asking if you're aware.

19   A.  No.

20         MS. WOOLRIDGE:  Asked and answered, Your Honor.  I

21   think he's --

22         THE COURT:  That's okay.  I think he's answered it.

23   And --

24         MR. COSTALES:  He said he's not aware.  Okay.

25      Okay.  Sorry, just give me one second.

1           THE COURT:  No problem.

2           MR. COSTALES:  Director Lane, thank you again for

3   fitting us into your schedule and I have no further questions

4   for you.

5           THE COURT:  I have a couple of questions.  Sometimes

6   it's just curiosity, but I'm just wondering why AZPOST is

7   charged with maintaining these records if you have -- it sounds

8   like you have no role in cross-certification?

9           THE WITNESS:  You know, Your Honor, I don't -- it's

10  the same question I've asked.  I don't know the answer to that;

11  I wish I did.

12          THE COURT:  Okay.  So we're both curious, okay.

13      And then, who's responsible for purging the records after

14  one year?

15          THE WITNESS:  I have an administrative assistant that

16  handles that.

17          THE COURT:  And then how timely does that occur?  Is

18  that something that she looks or he looks daily or monthly or

19  I'm just wondering how that's triggered?

20          THE WITNESS:  I'm not sure I could answer that.  She's

21  a very efficient employee so I'm sure she has some system in

22  place.  I'm not sure what that might be, though.

23          THE COURT:  All right.  That's all I have.  Again,

24  more curiosity than anything.

25      Any questions based on my questions?

1          MS. WOOLRIDGE:  Well, Your Honor, I would have liked

2     to have a very brief redirect examination.

3          THE COURT:  Oh, I'm sorry.  I forgot about that, yes.

4          MS. WOOLRIDGE:  That's quite all right.  It will be

5     brief, Your Honor, and if the court has any more questions,

6     certainly --

7                      REDIRECT EXAMINATION

8     BY MS. WOOLRIDGE:

9     Q.  Director Lane, are you aware of any laws that would prevent

10    you from being able to purge these records after a year?

11    A.  No, I'm not.

12    Q.  And just to clarify, you did consult with your legal

13    advisor and have received legal advice with regard to record

14    retention specifically with regard to this matter?

15    A.  Yes, I have.

16    Q.  I just want to look back at 13-3875 and clarify a question

17    defense counsel asked you.  I believe you testified that

18    13-3875 itself is perhaps less onerous than all of the

19    standards and all of the requirements for an Arizona peace

20    officer in the state of Arizona, correct?

21    A.  That's correct.

22    Q.  However, under 13-3875, any federal officer who applies for

23    cross-certification also must previously complete all of the

24    federal requirements to be a peace officer, correct?

25    A.  That's my understanding, yes.

1  Q.  So 13 -- just to clarify, 13-3875 isn't a substitute for

2  all of the federal requirements in training that is necessary

3  to become a peace officer, correct?

4  A.  That's correct.

5  Q.  In fact, it requires that it have been done in order to --

6  to -- to obtain the cross-certification, correct?

7  A.  That's correct, it's part of the statute.

8  Q.  So, an individual could not, for instance, have failed to

9  complete the training curriculum for a federal agency and still

10  obtain cross-certification, correct?

11  A.  That's correct.

12  Q.  Okay.  Thank you, sir.  Those are all the questions I have

13  for you.

14         THE COURT:  I have one more question.  So if a federal

15  police officer is cross-certified by a sheriff, does that

16  federal officer then have all the powers of a state law

17  enforcement officer, including to make traffic stops, for

18  instance?

19         THE WITNESS:  That's my understanding, Your Honor.

20         THE COURT:  Okay.  Okay.  Thank you.

21     Any other questions based upon my earlier premature

22  questions and the last question?

23         MS. WOOLRIDGE:  No, Your Honor.  Thank you.

24         MR. COSTALES:  No, Your Honor.  Thank you.

25         THE COURT:  Okay.  Sorry.  Curiosity got the best of

```
 1   me.

 2       Okay, Mr. Lane, thank you very much for being available.

 3       Mr. Lane can be excused as a witness?

 4           MS. WOOLRIDGE:  Yes, Your Honor.  Thank you.

 5           THE COURT:  Mr. Costales, I'm sorry.  Can Mr. Lane be

 6   excused?

 7           MR. COSTALES:  Oh, yes, of course.  Thank you.

 8           THE COURT:  Okay.  Mr. Lane, thank you very much.

 9   We're going to hang up now.  We appreciate your time.

10           THE WITNESS:  Okay.  Thank you, Your Honor.

11           THE COURT:  Okay.

12       (The telephone call was concluded.)

13           THE COURT:  Okay.  Ms. Woolridge?

14           MS. WOOLRIDGE:  Your Honor, as our next witness, the

15   government calls retired agent Peter Hermansen.

16           THE COURT:  Okay.  Thank you.  I heard you're retired

17   but I'm still going to call you Agent Hermansen.

18           THE WITNESS:  That's all right.

19           THE COURT:  So you've been sworn in, have a seat, and

20   then Ms. Woolridge will question you.

21       PETER HERMANSEN, WITNESS, WAS PREVIOUSLY SWORN.

22                       DIRECT EXAMINATION

23   BY MS. WOOLRIDGE:

24   Q.  Good morning, sir.  Could please state your name and your

25   current title?
```

1    A.  Yes, ma'am.  My name is Peter Hermansen, H-e-r-m-a-n-s-e-n.

2    I'm a retired Border Patrol agent and I currently work as a

3    SETA contractor -- science, engineering, and technical

4    advisor -- under the assistant secretary of defense for special

5    operations and low intensity conflict.

6    Q.  So that's quite a mouthful and I don't think I was even

7    able to fit it all on our witness list for today.  Can you just

8    give us a general overview of what your current -- to the

9    extent that I guess you're allowed to disclose it, what your

10   current position entails?

11   A.  Yes, ma'am.  We work unclassified and classified projects

12   for the soft community.  Because of my time in the Border

13   Patrol and my work with that organization and the combatting

14   terrorism technical support office, I was hired in as a border

15   expert and as a subject matter expert on the use of force and

16   liaison with law enforcement in supporting the soft community.

17   Getting them new equipment if they go out and do a mission and

18   have something and it doesn't quite work right, we'll work with

19   science and engineering and industry and build what they need

20   or we will go out and help them build that new product.

21   Q.  And how long have you been in that position?

22   A.  I started in June of last year.

23   Q.  Prior to that I believe you mentioned you were with the

24   Border Patrol; is that correct?

25   A.  Yes, ma'am, for just a little bit over 21 years.

1  Q.  Can you just summarize for us your law enforcement career?

2  A.  Yes, ma'am.  I served as a reserve officer for the city of

3  east Detroit, Michigan, for approximately three years and I

4  served as a United States Border Patrol agent for 21 years,

5  Douglas, Arizona; Tucson; Casa Grande; El Paso, Texas;

6  Washington, DC.  And then I also served with our national

7  tactical team, BORTAC, and served as the director of that

8  organization, SOG (phonetic), and I served over Central, South

9  America, and other places like that with the Border Patrol.

10 Q.  What was your position or your title when you retired from

11 Border Patrol?

12 A.  Patrol agent in charge, Tucson Sector intelligence.

13 Q.  And what does that mean?

14 A.  That means that I ran the sector intelligence program

15 basically for the state of Arizona.  We gathered all of the

16 information, synthesized the information, and produced

17 intelligence for the field to act on.

18 Q.  And with regard to day-to-day operations, did you have a

19 supervisory capacity or a management capacity over other

20 employees in the Border Patrol?

21 A.  I was in the leadership role.  I was probably five or six

22 levels removed from the agents in the field and I served as a

23 principal intelligence advisor to the JTF west director and the

24 chief of Tucson Sector.

25 Q.  Despite these very significant responsibilities, did you

1    still have an opportunity to get involved with the day-to-day

2    operations of what we call the boots on the ground operations

3    of the Border Patrol?

4    A.  Yes, ma'am.  I personally feel as a leader that's important

5    that you go out with the agents on the ground, see what they're

6    dealing with, see what they're encountering, and make sure that

7    they have not only the policy and the other things in place to

8    help them do their job but also the tools, we call it, to do

9    their job out in the field.

10   Q.  Has the Tucson Sector of Border Patrol ever requested or

11   been involved with a process called cross-certification with

12   the Pima County Sheriff's Department?

13   A.  Yes, ma'am, we do it with many sheriff's departments across

14   the state of Arizona when I was the agent in charge for Tucson

15   Sector intelligence, and the primary purpose of that was in

16   order to work cases with the state and county directly.

17   Q.  As seeking such cross-certification, are you trying to have

18   your agents enforce state laws?

19   A.  No, ma'am, that's not -- that's not the intent.  What --

20   what we did -- as a matter of fact, when we went in and we

21   started doing things with the counties, they would offer us:

22   Do you want ticket books?  Do you want to cite for Arizona

23   Revised Statutes?  And I specifically said, as the agent in

24   charge:  No, that is not what we want to do.  So --

25   Q.  What -- can you explain to us more what did you want to do?

1   How would this cross-certification help further the mission of

2   Border Patrol as opposed to enforcement of state statutes?

3   A.  So Border Patrol agents in Tucson, there's approximately

4   4,000 of them, and there's a lot of cases, a lot of cases come

5   forward and can impact the United States Attorney's Office.  So

6   our intent as part of task force assignments and as other work

7   that we did in the Border Patrol was to coordinate with state,

8   local, tribal law enforcement officers and coordinate cases

9   directly with them.  So the intent of that certification was in

10  order to work with those organizations.

11  Q.  And is that in furtherance of Border Patrol's mission,

12  Border Patrol investigation rather than some enforcement of

13  specifically local or state laws?

14  A.  Correct, that is -- that is the furtherance of our -- of

15  our primary mission, which is to defend the homeland.

16  Q.  Were you personally involved with the process of obtaining

17  cross-certification for both yourself and Border Patrol agents

18  that worked under your command?

19  A.  For myself, that would go to my boss who was the division

20  director, Tim York, and he would sign those memo certs.  I

21  would sign and request the memo certifications for the agents

22  that were assigned to task forces and within the intelligence

23  unit and at the station levels.

24  Q.  And what did you understand the process and the

25  requirements to be with regard to obtaining that

1  cross-certification?

2  A.  That we would fill out a memorandum, it would go over to

3  the sheriff's department, the sheriff would review it, and then

4  that sheriff would authorize the agents to come in and that

5  sheriff would swear the agents in that were going to do that

6  cross-certification duty.

7  Q.  Okay.  And can just anyone be cross-certified?  Do you --

8  does -- or are there -- first of all, does it have to be an

9  agent that is currently designated as a federal peace officer?

10  A.  Yes.  Sector restricted it and told me that what they

11  wanted was they wanted agents that were assigned to task forces

12  or agents in critical positions at stations that wanted to work

13  and interact with state, local agencies at the time.

14  Q.  And just to back up a little bit, in order to be a Border

15  Patrol agent, does one have to undergo any sort of training?

16  A.  Yes, ma'am.  It's a lengthy certification process to become

17  a Border Patrol agent.

18  Q.  Can you just summarize for us that lengthy certification

19  process?

20  A.  Yes, ma'am.  You attend an academy.  That academy when I

21  went through was in Glencoe, New Mexico.  We've had it in

22  Charleston, and it is now currently located in Artesia, New

23  Mexico.  Approximately five to six months in length, depending

24  on the course that was being taught at the time.  There were

25  changes to the course over the years.

1    And then that officer/agent would come back out to their

2  station and they would go through the FTU program, the field

3  training unit program, and they would also be required to go

4  through testing during that phase as well and get evaluations

5  from field training unit officers.

6  Q.  Once an agent completes that initial training, are they

7  essentially off the hook or do they have any other on-the-job

8  training, further education, anything of that matter?

9  A.  Yes, there's constant on-the-job training.  There's the

10 experience you learn from working with other agents in the

11 field, there's training that we go through not only just the

12 quarterly qualifying firearms and things of that nature, but

13 recertifications for other use-of-force tools, policies,

14 different things in the organization.  There's a plethora of

15 training that goes on in the organization on an annual basis.

16 Q.  And if you are going to submit an agent, a Border Patrol

17 agent, or include an agent in a memo that you submit to a

18 sheriff of a county sheriff's department within Arizona, will

19 you ensure that that person is, in fact, a federal peace

20 officer in good standing with the organization?

21 A.  Yes, ma'am, we do.  Not only do we do -- do we go through

22 the process of certifying that they are an agent but we vet

23 those names through our LER department and ensure that there

24 are no current disciplinary actions pending.

25 Q.  Okay.  And do you complete all this before you submit your

1  memo to, for instance, Sheriff Napier of Pima County?

2  A.  Yes, ma'am, that's correct.

3  Q.  Do you recall submitting such a memo to Sheriff Napier

4  before -- at some point before your retirement in 2017?

5  A.  I recall writing one.  I didn't write the memos, the agents

6  on the disrupt team wrote the memos, but I recall those memos

7  being drafted and I recall signing many of them, yes, ma'am,

8  not only for Pima County but for Pinal County, Maricopa County,

9  and Cochise County.

10  Q.  And do you review the memos before signing them and make

11  sure all of the information is correct as well as certifying

12  that all of the agents included in the memo are federal peace

13  officers?

14  A.  Yes, ma'am.

15         MS. WOOLRIDGE:  May I approach the witness, Your

16  Honor?

17         THE COURT:  Yes.

18  BY MS. WOOLRIDGE:

19  Q.  Sir, I've just handed you what's been marked as actually

20  the Defense Exhibit 53.  And if you can just take a moment and

21  look through this exhibit and let us know if you recognize it.

22  A.  Yes, ma'am.  The memo with the names attached to it is the

23  memo that I would draft through my team and send to the sheriff

24  requesting the cross-certification after the vetting process

25  and then the memo on the top that would come back would be --

1    we would get these from either AZPOST or we would get them from

2    the sheriff's department granting the authorization.

3    Q.  And specifically, what is the date of your letter or

4    memorandum to Sheriff Mark Napier?

5    A.  March 1st of 2017.

6    Q.  And how many agents do you require or do you -- I'm

7    sorry -- do you request the cross-certification in this memo?

8    A.  In this memo it's 60.

9    Q.  Does that include Deputy Patrol Agent in Charge Christopher

10   Bullock?

11   A.  Yes, ma'am, it does.

12   Q.  And in this memo, do you explain the -- the reasons for

13   your -- your requesting this cross-certification?

14   A.  Yes, ma'am.  Agents are assigned to TCA disrupt and working

15   with the intelligence program and we're requesting that -- to

16   seek state prosecution under ARS when circumstances, as I said,

17   inhibit prosecution via the United States Attorney's Office or

18   when it's in the best interest of the prosecution to work it

19   with the state.  What I mean by that is when we're working with

20   state and local officers, they have a vested interest in that

21   case as well and so working with them direct in order to

22   present those cases helps them bolster their case.

23   Q.  And is that directly in service of the Border Patrol's

24   mission?

25   A.  Yes, ma'am, it is.

1   Q.  Anywhere in this memo do you seek this cross-certification

2   to enforce state laws in lieu of the sheriff's department?

3   A.  No, ma'am.

4   Q.  And did you receive a certified copy of -- excuse me, not a

5   certified copy but a courtesy copy of a letter sent by Sheriff

6   Napier to Director Jack Lane at Arizona POST?

7   A.  They would come directed attention to me.  I would open

8   them and then I would pass them over to the TCA disrupt

9   supervisor at the time who was either Shannon McCormick or Dan

10  Mihalik or I would pass them to Chris in their absence and

11  Chris could pass them to them, and Chris is Deputy Patrol Agent

12  In Charge Bullock.

13  Q.  So in response to this particular memo dated March 1st,

14  2017, did you, in fact, receive cross-certification from

15  Sheriff Mark Napier, the sheriff of Pima County?

16  A.  Yes, we did.

17  Q.  And what was the date of that certification?

18  A.  March 10th of 2017.

19  Q.  And what is the date of the letter that you -- that you

20  received from Mr. Napier -- I'm sorry, from Sheriff Napier?

21  A.  I'm looking right at the top of this one here and it says

22  March 10th of 2017, ma'am.

23  Q.  I just wanted to make sure.

24  A.  Okay.

25  Q.  So -- and in that letter, did Sheriff Napier confer under

1   Arizona Revised Statute 13-3875 cross-certification to all of

2   the agents for which you submitted your memorandum for?

3   A.  Yes, that's correct.

4   Q.  I noticed that your name was not included in -- although

5   you signed the memorandum, your name was not included in the

6   addendum of the -- of the agents.  Why is that?

7   A.  We felt as an organization that leadership should make

8   those determinations and that -- and one individual should not

9   make that determination for themselves.  So if I ever requested

10  or wanted cross-certification for myself, I would do that

11  through my division chief, Tim York.

12  Q.  Do you know whether you requested cross-certification at

13  the same time frame?

14  A.  For three counties, for Pima County, Pinal County, and

15  Maricopa County.

16  Q.  And was that on the same date, March 1st, 2017?

17  A.  I do not recall if that was the same date, ma'am, I don't.

18  Q.  Do you know whether at the date of March 31st, 2017, you

19  had an active cross-designation from Pima County?

20  A.  Yes, it's my understanding that I had cross-certification

21  from Pima, Pinal, and Maricopa County at that time.

22  Q.  And from your -- based on your recollection, was that cross

23  -- did you maintain that cross-certification and renew it as

24  needed throughout that time period?

25  A.  Yes, I would do that through Shannon McCormick.

1   Q.   Okay.   So I mentioned the date of March 31st, 2017.   I

2   would like to talk to you about some events that occurred on

3   that date.   Do you recall being involved in an investigation

4   that was later turned over to the Bureau of Alcohol, Tobacco,

5   and Firearms on March 31st, 2017?

6   A.   Yes, ma'am.

7   Q.   Specifically, can you give us some background about the

8   type of investigation you and the Border Patrol were conducting

9   that led you to the events that occurred on March 31st, 2017?

10  A.   So, as this memo states, we have a disrupt team and those

11  disrupt teams go out in the community and look for crime and

12  illegal activity in the communities.   And it usually comes to

13  us through either verbal reporting or intelligence-type

14  information.

15       In these particular instances, we were receiving

16  information -- and when I say "we", myself specifically -- at

17  meetings that I was attending with senior leadership from Pima

18  County, from South Tucson Police Department, and from the

19  Tucson Police Department, and in those events telling me that

20  there was a lot of activity in those areas in relation to

21  aliens and narcotics.

22  Q.   And is illegal activity with regard to aliens and narcotics

23  something that is the, I guess, direct concern of the United

24  States Border Patrol?

25  A.   Yes, ma'am, those are our two primary mission focuses under

1    our -- under our mission statement.

2    Q.  Does your authority to investigate these cases only apply

3    to areas that are abutting the international borders?

4    A.  No, ma'am.

5    Q.  Does it extend into our communities, such as Pima County,

6    Tucson, and South Tucson?

7    A.  Yes, ma'am, it does.

8    Q.  Does alien smuggling activity and narcotics activity

9    permeate our -- our local communities as well as the areas

10   surrounding the border and the desert areas?

11   A.  Yes, ma'am.  After transiting the international border,

12   many individuals seek domicile in urban centers in order to

13   abscond and hide in those locations and then be furthered into

14   the country.

15   Q.  Do your investigations -- and by "your", I mean the

16   investigations of the Border Patrol -- often take you and other

17   agents into city limits to further your mission to disrupt and

18   -- and stop these crimes?

19   A.  Yes, ma'am.

20   Q.  So how was it, then, that this information that you

21   received at this meeting or briefing led you to a particular

22   area?

23   A.  So, multiple meetings occurred where we were told of this,

24   and I advised Chris that I wanted to go out there and take a

25   look, and the reason I wanted to do that is because of the

DIRECT EXAMINATION - PETER HERMANSEN

1    nuances in the communities where Border Patrol is seen at times

2    in a negative light.  I don't believe that we are -- should be

3    seen in a negative light but we are, unfortunately, seen in a

4    negative light.  And so I wanted to go into those areas first

5    with Chris before I started sending agents into those areas

6    because of those nuances.

7    Q.  And when you say "Chris", just for the record, are you

8    referring to Deputy Patrol Agent In Charge Christopher Bullock?

9    A.  Yes, Chris -- so in the infrastructure the way I ran my

10   unit, I handled division of the unit and I handled interactions

11   with senior leadership, the chief, the deputy, and those folks

12   at the sector level.  Chris ran the day-to-day operations of

13   the unit.

14   Q.  All right.  And did he report, then, I would imagine,

15   directly to you?

16   A.  Correct, yes, ma'am.

17   Q.  Do you often work with him on a very close basis in

18   enforcing the Border Patrol mission?

19   A.  Yes, ma'am, I do.

20   Q.  All right.  So did you and Deputy Patrol Agent in Charge

21   Bullock then do anything with regard to addressing those

22   concerns in this particular area in order to assist you to

23   safely conduct further investigation of this information that

24   you had received multiple times and from multiple sources?

25   A.  Yes, ma'am.  We went out into the area, took a look at the

1    activity that was potentially in the area, and actually made

2    arrests prior to this arrest of illegal aliens in that area.

3    Q.  Okay.  And can you just describe for us what area are we

4    talking about?

5    A.  South Tucson.

6    Q.  Is there a specific neighborhood or specific, you know,

7    general area that you were in?

8    A.  Just a general area, in that area around that park.  I

9    don't recall the name of the park but there's a park there that

10   the other law enforcement folks that were telling me about it

11   referred to, and that was that general area that we would just

12   take a look at it.  It was almost from -- I'm trying to think

13   of the name of that hotel on I-10, the one that's all run down

14   and has been in a dilapidated state for quite a while there.

15   Q.  I'm sorry.  I'm sorry.  You're going to have to be a little

16   bit more specific.  There are a lot of hotels on I-10.  I

17   apologize.

18   A.  It's a big one that's got like a circular front to it that

19   somebody just took over.  It's got a big fence around it.  I'm

20   just drawing a blank on it right now.  And from there all the

21   way over into that area behind it.  And that park is right in

22   behind it there.

23   Q.  And perhaps I can assist you in this regard.  Did you

24   create a report to document your involvement in this

25   investigation?

1    A.  Yes, ma'am, I did.

2           MS. WOOLRIDGE:  May I approach the witness, Your

3    Honor?

4           THE COURT:  Yes.

5    BY MS. WOOLRIDGE:

6    Q.  Sir, I've just handed you what's been marked as

7    Government's Exhibit No. 1.  Do you recognize this document?

8    A.  Yes, ma'am, it's a G166(c), a supplemental report that I

9    drafted.  The date of it is April 3rd, 2017.

10   Q.  And does it reflect your involvement in this particular

11   part of the investigation, the reason we're here today?

12   A.  Yes, ma'am.

13   Q.  Specifically, does it refresh your recollection as to the

14   name of the park that you were in the general vicinity of where

15   you're conducting your investigation?

16   A.  Yeah, Curtis and Euclid Streets here, Santa Rita Skate

17   Park.

18   Q.  All right.  And so were you conducting surveillance along

19   with Deputy Patrol Agent in Charge Christopher Bullock on

20   March 31st, 2017?

21   A.  Yes, ma'am.

22   Q.  About what time of day?

23   A.  It looks like it's probably about in the afternoon, early

24   afternoon time frame, 1300 hours here, but we'd probably been

25   out there for an hour, half an hour, hour.

1   Q.  And so just to -- just for civilian time, that's around

2   then 1300 hours would be 1:00 o'clock?

3   A.  1:00 p.m. in the afternoon, yes, ma'am.

4   Q.  And you mentioned had you been there for about an hour

5   previous?

6   A.  Uh-huh.

7   Q.  And just for the record, that's yes?

8   A.  Yes, ma'am.

9   Q.  Can you describe the area, March of around noon to one, are

10  there other people out and about or is this like a deserted

11  area?

12  A.  No, ma'am, it's a residential area with a park near it,

13  people walking around, stores, businesses on some of the roads,

14  and vehicular traffic in the area as well, too, light on some

15  streets but heavier on others.

16  Q.  Did you see any sort of behavior that -- that drew your

17  concern as a law enforcement officer?

18  A.  Yes, ma'am.  We had slowed down to take a look at some

19  subjects in the park and a vehicle approached from behind us

20  here and honked its horn and then sped around us.

21  Q.  All right.  So just to clarify, were you, yourself, in a

22  vehicle?

23  A.  Yes, ma'am, I was in a vehicle with Mr. Bullock.

24  Q.  And which of you were driving?

25        MR. COSTALES:  Objection, Your Honor.  I have no

1   objection to Agent Hermansen refreshing his recollection.  I

2   would object to him reading directly from the report.

3            THE COURT:  Oh, yeah.  So, Agent Hermansen, just try

4   to testify from what you remember and then if you need to refer

5   to the report, Ms. Woolridge can allow you to refresh your

6   recollection.

7            THE WITNESS:  Oh, yes, sir, yes, sir.

8            THE COURT:  Thanks.

9   BY MS. WOOLRIDGE:

10  Q.  Sir, do you recall who was driving the vehicle, you or

11  Agent Bullock?

12  A.  Agent Bullock.

13  Q.  And can you describe the vehicle that -- the particular

14  vehicle you were driving?

15  A.  We were in an unmarked Tahoe, Chevrolet Tahoe.

16  Q.  And can you tell us a little bit about the use of the Tahoe

17  in the law enforcement community in southern Arizona?

18  A.  So, again, understanding the nuances and at the time the

19  light that law enforcement was seen in the area, specifically

20  Border Patrol in Tucson, we used an unmarked vehicle.

21  Q.  And is a Tahoe a common law enforcement vehicle in various

22  both federal and state or local agencies in Arizona?

23  A.  Yes, ma'am.

24  Q.  Were you, yourself, in any sort of undercover or disguise

25  or anything like that when you were riding in the -- in this

1  vehicle?

2  A.  I was in plainclothes, Mr. Bullock was in plainclothes.  He

3  had a Border Patrol vest on and I had a jacket on that said

4  "CBP" with a badge on the front and "police" across the back.

5  Q.  And so you mentioned that there was a vehicle that drew

6  your attention while you were looking at some other individuals

7  in the Santa Rita Skate Park, correct?

8  A.  Yes, ma'am.

9  Q.  And was there an activity by this vehicle that was so

10  concerning that it drew your attention away from the other

11  individuals that you had been paying attention to?

12  A.  As we moved forward on the road that we were on from the

13  park, came to a cross street, either two or four lanes, I don't

14  recall exactly how many lanes, but that vehicle then slowed at

15  the stop sign but immediately sped across that road and that

16  piqued, that piqued a concern for us as it was going through

17  there because it was either attempting to evade us or

18  attempting to get out of the area.

19  Q.  Was this after or before the vehicle honked its horn behind

20  you?

21  A.  This was after that.

22  Q.  Okay.  So do you mind if we can just back up?  Just take us

23  through, if you don't mind, the course of events from the first

24  time your attention was drawn to this vehicle.

25  A.  Yes, ma'am.  So the vehicle sped around us, honked its horn

```
 1   as we were looking into the skate park area, and Chris and I
 2   both said:  That's interesting.  And we sped up and started
 3   following that vehicle in order to catch up and get the license
 4   plate.  As it sped across through the stop sign, we were able
 5   to get up behind it and get the license plate from the vehicle
 6   and I ran that via 8-60, which is our radio control, and it
 7   came back as a rental vehicle.
 8        We continued to attempt to follow that vehicle which, as it
 9   crossed the street there, it moved over into a residential area
10   and was traveling at a higher rate of speed, approximately
11   40 to 45 miles an hour in that area, and also continuing to go
12   through stop signs.
13   Q.  When you mentioned that this vehicle sped through a stop
14   sign, did it come to a complete stop at the stop sign?
15   A.  No, ma'am.
16   Q.  Did it -- do you have any idea about how fast it was going
17   through the stop sign?
18   A.  I couldn't estimate the speed of it at that time, no,
19   ma'am.
20   Q.  Was it kind of a rolling or a California stop as we
21   sometimes hear it or was it at full speed?
22   A.  It was a rolling stop and then it was acceleration, so it
23   did not fully come a stop and then accelerated through the
24   intersection.
25   Q.  And you mentioned that it also was going at -- driving at
```

```
1    excessive speeds?

2    A.  Uh-huh.

3    Q.  Do you know what that posted speed limit was there?

4    A.  25 miles an hour in the residential area and we were doing

5    40 to 45 and having a tough time catching up to the vehicle.

6    Q.  Did it -- the vehicle, as you were trying to catch up to

7    it, then, fail to stop at any additional stop signs?

8    A.  Yes, ma'am.  It went through multiple stop signs.

9    Q.  Do you have any concerns, just overall safety concerns, at

10   this point based on this vehicle?

11   A.  Yes, ma'am.  We're in a residential area and there were

12   people in that residential area and people in other areas in

13   that area so concern for public safety as well.

14   Q.  As a law enforcement officer, do you have any sort of

15   responsibility when it comes to protecting public safety?

16   A.  Yes, ma'am, absolutely.

17   Q.  Can you explain to us what -- what that responsibility

18   means to you?

19   A.  Well, that responsibility is just because we're federal

20   agents and we enforce immigration law and enforce narcotics law

21   doesn't mean that we're not responsible for the safety of the

22   public at the same time so if someone is causing actions or

23   doing something that's endangering that public at the time,

24   it's our job to either act through our own actions or through

25   notifying someone else.
```

1    Q.  Now, is that at all tied to your cross-certification with

2    the local sheriff's department?

3    A.  That's just a general public law enforcement feeling or

4    sentiment.

5    Q.  Had you not had any cross-certification, would you still

6    have this duty or this responsibility to protect public safety?

7    A.  Yes, ma'am.

8    Q.  Had you not had a cross-certification at the time this

9    occurred, would you still be concerned based on the actions of

10   this vehicle?

11   A.  Yes, ma'am.

12   Q.  You were in quite a significant role of leadership within

13   the organization.  What do you expect of the agents that work

14   for you when it comes to ensuring the public safety?

15   A.  I expect the same exact thing from them and I communicate

16   that to them at the meetings that I would have with the teams.

17   Q.  And is -- is this duty, this responsibility, something that

18   you routinely act upon in the course of your -- in your career

19   as a Border Patrol agent?

20   A.  Yes, ma'am.

21   Q.  Have you had occasions where you have, for instance,

22   stopped a vehicle based on endanger -- what you felt was

23   endangerment to public safety?

24   A.  Yes, ma'am, either driving erratically or driving at

25   significant speeds, things of that nature, either attempting to

1  call or solicit other fellow law enforcement officers at the

2  state or local level or acting and then waiting for them to

3  respond.

4  Q.  Okay.  Did you see any other concerning behavior from this

5  particular vehicle as you attempted to catch up to it?

6  A.  Yes, ma'am.  A significantly quick U-turn and travel

7  straight back at us and then quick attempts to turn left and

8  right and evade us in the vehicle.  And then also the subject

9  that was in the vehicle making furtive movements, movements

10  behind, movements to the side, looked like he was attempting to

11  hide something.  And then also being very focused on us.  And

12  my experience as a law enforcement officer, most people take a

13  general glance at you and then continue on, they don't maintain

14  visual contact with you while they're driving the vehicle.

15  Q.  I just want to talk about that U-turn.  Was that U-turn in

16  a designated U-turn zone or was it --

17  A.  It was either -- it was at the end of a -- at the end of a

18  street like a T intersection, flipped around, and come straight

19  back out of that T intersection.

20  Q.  And did the vehicle continue to fail to stop for stop signs

21  and travel at a high rate of speed during this time?

22  A.  Yes, ma'am, it did.

23  Q.  You mentioned you were not the driver.  Did Agent Bullock

24  do anything in attempt to stop this vehicle?

25  A.  Ultimately, the emergency equipment was activated on our

1   vehicle.

2   Q.  When you say "ultimately", about how long were you -- did

3   you observe this driving behavior by the vehicle until Agent

4   Bullock attempted the emergency equipment?

5   A.  Probably about three to five minutes.

6   Q.  And during that time, were there other individuals in the

7   neighborhood?

8   A.  There were people in the neighborhood, yes, ma'am.

9   Q.  Were you concerned for the safety of the people in this

10  neighborhood?

11  A.  Yes, I was.

12  Q.  Were you concerned for the safety of the traffic -- other

13  vehicles on the street?

14  A.  Yes, ma'am.

15  Q.  Did you see any -- I know that you mentioned as a -- even

16  with your cross-designation, you are not looking to enforce

17  local laws.  I would imagine that that would -- would include

18  traffic laws.  But were you aware of any traffic violations

19  that you observed while following this vehicle?

20  A.  Yes, ma'am.

21  Q.  Can you just summarize what those were?

22  A.  Failure to stop, speeding, driving recklessly.  All of the

23  actions of the vehicle would have been categorized as driving

24  recklessly based on my experience of talking to other law

25  enforcement officers.

1  Q.  And also based on your experience, was there anything,

2  aside from the traffic violations, that was just suspicious to

3  you in a general investigative capacity?

4  A.  Yes, ma'am, the actions of the subject in the vehicle and

5  the continued eye contact and the attempt to see what we were

6  doing.

7  Q.  When you say the actions of the subject in the vehicle, are

8  you talking about the furtive movements to the side and to the

9  back?

10  A.  Yes, ma'am.

11  Q.  Have you encountered movements of that nature in your job

12  before?

13  A.  Yes, ma'am.

14  Q.  And what -- does that have a general indication to you of

15  anything?

16  A.  Yes, ma'am.  It has a general indication that someone's

17  trying to hide something.

18  Q.  And you mentioned that Agent Bullock eventually did, after

19  about three to five minutes, turn on his emergency equipment.

20  Did this vehicle stop right away?

21  A.  No, ma'am, it did not.

22  Q.  What happened?

23  A.  The vehicle continued to drive at a higher speed going

24  through stop signs and we had to pull alongside of it, we had

25  to activate our audible alert, and had to roll down the window

```
 1    and advise and instruct the subject to pull over to the side of
 2    the road.
 3    Q.  When you say your audible alert, what does that mean?
 4    A.  Siren.
 5    Q.  Okay.  And did the vehicle eventually pull over?
 6    A.  It did.
 7    Q.  What happened when the vehicle pulled over?
 8    A.  The vehicle pulled over, Agent Bullock and I called in to
 9    radio, advised that we were approaching the vehicle, Agent
10    Bullock approached the driver and I approached the passenger
11    side of the vehicle.
12    Q.  And, as you were approaching, were there any actions or
13    words on behalf of the driver or the passenger?
14    A.  The passenger was very animate as to why we were pulling
15    them over and I spoke with the passenger, Mr. Bullock spoke
16    with the driver.
17    Q.  Did you also note in your report -- and if you need to use
18    it to refresh your recollection, please just let us know --
19    that the driver also was yelling at that time?
20    A.  Yes, ma'am, I would need to look at the report.  Yes, they
21    -- they were both animated and yelling and we advised both to
22    calm down and we would explain to them what was occurring.
23    Q.  You mentioned that you saw some furtive movements while you
24    were following the vehicle.  Was this by the driver?
25    A.  Yes, ma'am.
```

 1   Q.  And, I'm sorry.  Just for clarification, do you see the

 2   driver in the courtroom today?

 3   A.  Yes, ma'am, I do.

 4   Q.  Can you describe what -- where he is sitting and what he is

 5   wearing?

 6   A.  He is sitting at the defense table and he has an orange

 7   shirt on.

 8            MS. WOOLRIDGE:  May the record reflect that the

 9   witness has identified the defendant?

10            THE COURT:  Yes, it will reflect that.

11   BY MS. WOOLRIDGE:

12   Q.  When you approached the vehicle, did you notice any other

13   sort of furtive or concerning movements by the driver, the

14   defendant?

15   A.  The driver was just very nervous and the female occupant in

16   the vehicle was very animated as well and was -- kept asking:

17   Why are you stopping us?  Why are you stopping us?

18   Q.  And did you ask the -- well, first of all, did you -- were

19   you concerned at all with regard to safety, both of the

20   occupants of the vehicle and your own safety?

21   A.  Yes.  As we approached the vehicle, we noticed there was a

22   small child in the back of the vehicle in a child seat and we

23   were -- we were then concerned also for our safety and the

24   safety of the occupants of the vehicle based on the furtive

25   movements of the driver.

1    Q.  And did you later determine that there were any sort of

2    weapons in the vehicle?

3    A.  So Agent Bullock took the driver of the vehicle out and

4    walked back to the back of the vehicle and began to converse

5    with the driver of the vehicle while I was talking to the

6    female occupant of the vehicle and getting her to calm down to

7    understand why we were stopping them.  At some point during

8    that conversation, Mr. Bullock advised me that there was a

9    weapon in the vehicle.

10   Q.  Okay.  And did you, yourself, search the vehicle and find

11   that weapon?

12   A.  I did, yes, ma'am.  It was in the back seat of the vehicle

13   underneath the seat.

14   Q.  Did you ask the defendant first for his permission to

15   search the vehicle to get -- to obtain the weapon?

16   A.  I did.

17   Q.  And did he consent and give you that permission?

18   A.  He verbally said yes.

19   Q.  Okay.  And where -- specifically, where did you find the

20   weapon?

21   A.  In the middle of the back seat of the vehicle.

22   Q.  Where was that in relation to the -- where the child was?

23   A.  Directly under the child seat.

24   Q.  And about how old would you estimate that child to be?

25   A.  Maybe a year or two.

DIRECT EXAMINATION - PETER HERMANSEN

1  Q.  And specifically do you recall what kind of weapon it was?

2  A.  It was a revolver.

3  Q.  Was it loaded with ammunition?

4  A.  Yes, it was.

5  Q.  Did you then have some further interaction with the

6  defendant?

7  A.  Yes, ma'am, both Agent Bullock and I talked to him.

8  Q.  Was there anything particular that you recall about his

9  demeanor while you were talking to him?

10  A.  He sat down for a while, I believe he smoked, he then got

11  back up and he -- he wanted the female of the vehicle, the

12  female occupant of the vehicle, to be able to leave.

13  Q.  Did he make any sort of statements about his, I guess,

14  state of mind or relevant to his condition at that time?

15  A.  Yeah, he just said that he was -- he was -- he was

16  extremely nervous and that he had been convicted of crimes

17  before and so I went over to run records checks on him via our

18  8-60 radio again to see what his criminal history was.

19  Q.  At some point, did he volunteer information to you that he

20  had drugs on him?

21  A.  Yes, ma'am, he did.

22  Q.  Can you explain to us that -- that encounter or that --

23  A.  Yes, ma'am.  So we were unable to completely ascertain

24  whether or not he was a convicted felon, which would have made

25  him a prohibited possessor of that weapon.  My concern was the

 1    weapon at that time.  People can own and carry guns in the

 2    state of Arizona.  So had that not been the case, that

 3    individual would have been released with that weapon but we

 4    needed to determine what the status of that was, and there was

 5    enough information to be concerned because there were numerous

 6    criminal convictions for him.

 7        And so I started talking to him and advised him that he was

 8    going to be coming back to the station with us in order to

 9    ascertain whether or not he was a prohibited possessor.  During

10    that conversation, he even said, you know, "Yes, I'm a

11    convicted felon" but I could not confirm that through 8-60

12    because of the length of the record and some of the disposition

13    of the charges on the record.

14        So we were taking him back to the office in order to

15    ascertain that and it was at that time that he advised me --

16    'cause I told him I would be patting him down again, and I say

17    again because I assumed Mr. Bullock had patted him down, and he

18    told me, he advised me, he said:  I have -- I have some drugs

19    on me.  I have heroin on me and there's also heroin in the

20    vehicle.

21    Q.  Did you find some substance that you believed to be heroin

22    on his person as well?

23            MR. COSTALES:  Your Honor, I'd object to the line of

24    questioning at this point.  We're getting well beyond the scope

25    of the motion.  So any questions about what the fruits actually

1    were are irrelevant to the actual dispositive issue here.

2          THE COURT:  Ms. Woolridge, you want to respond as to

3    the relevancy?

4          MS. WOOLRIDGE:  Your Honor, I believe there will be

5    evidence that the defendant had both drugs, used paraphernalia,

6    and made statements that he was high on drugs and coming off of

7    drugs.  I think that is relevant to the behavior that,

8    especially the driving behavior that the agents observed and

9    whether they saw -- we've heard testimony that that -- this

10   witness observed driving behavior that was very erratic, that

11   was very dangerous, and I think the fact that someone was

12   confirmed to be under the influence of a controlled substance

13   does, in fact, corroborate the testimony regarding the erratic

14   driving behavior.

15         THE COURT:  Mr. Costales?

16         MR. COSTALES:  Your Honor, any ex post confirmation or

17   any ex post observations made by the agents doesn't go to what

18   their objective reasonable basis was to pull him over in the

19   first place.  This -- the question is what they saw and what

20   they -- what they encountered before the stop and leading up to

21   the stop, not what confirmed or might have confirmed or

22   disconfirmed (sic) their statements afterwards or their

23   observations afterwards.

24         THE COURT:  Okay.  Well, I'm going to overrule the

25   objection.  I think it does go to driving behavior.  Also, I

1   think you raised the argument your client -- you raised the

2   argument of his state of mind, the fact that he was scared.

3       So you can either answer the question or ask the question

4   again if he doesn't remember it, Ms. Woolridge.

5           MS. WOOLRIDGE:  I don't recall my question so I'm

6   going to ask you what I think -- something along the lines of

7   what I think I asked you.

8   BY MS. WOOLRIDGE:

9   Q.  Did you find any substance that, from your experience,

10  appeared to be drugs on Mr. Jones', the defendant's, person?

11  A.  Yes, ma'am, it was in a small vial.  It was hidden in his

12  underwear, in his crotch area, and it was a small brown glass

13  vial.  And then in the vehicle there was a pill bottle that

14  contained a powdery substance as well, too.

15  Q.  And what did you believe those substances to be?

16  A.  I believed them to be heroin, and he advised me that they

17  were heroin.

18  Q.  Did he also make any statements to you of whether or not he

19  was under the influence of heroin at the time?

20  A.  Yes, ma'am.  He said that he was not feeling very well and

21  that he was going to, you know, to be getting dope sick.

22  Q.  What do you understand that to mean, "to be getting dope

23  sick"?

24  A.  That means that someone needs more -- more narcotics in

25  their system.

1  Q.  So is that -- is that just for, I guess, maybe more of a

2  layperson's term that they are coming down from the -- from the

3  use of narcotics?

4  A.  Yes, ma'am.  They're experiencing a withdrawal from the

5  high.

6  Q.  Did you see any behavior, any physical behavior, or was

7  there anything about the demeanor of the defendant that

8  confirmed recent -- from your training and experience,

9  confirmed recent narcotics use?

10 A.  Yes, ma'am, just how very nervous he was during the entire

11 stop until we got to the end and he knew that he was going to

12 be coming back with us to the station.

13 Q.  Sir, as the -- at the time, the patrol agent in charge

14 being in the supervisory and leadership capacity that you were,

15 and based on just your experience, your, at that time I

16 believe, over 20 years of experience with the Border Patrol,

17 would you have made the stop of -- would you have stopped this

18 vehicle even had you not had a cross-certification from Pima

19 County Sheriff Napier at the time?

20 A.  Yes, ma'am.

21      MR. COSTALES:  Objection, Your Honor, calls for

22 speculation.

23      THE COURT:  Yeah, I'm not sure how it's really

24 relevant, Ms. Woolridge.

25      MS. WOOLRIDGE:  Well, Your Honor, it's the

 1    government's position that the defense is challenging the

 2    legality of the stop and it's the government's position that

 3    this stop was legal for several reasons.  First, that the

 4    agents had the authority to -- to make the stop under the

 5    cross-certification but also because of their duties as peace

 6    officers, their duties and responsibilities to enforce public

 7    safety and also to the fact that they saw a number of

 8    suspicious behaviors that would have caused them, regardless of

 9    any cross-certification designation, to make that stop.

10         I think it's also very relevant, Your Honor, because it

11    appears to me, at least in the reply filed by the defense, that

12    the defense is even -- even if the court finds the

13    cross-certification to be valid in this case, which I would

14    submit that it is, that the defense is trying to challenge the

15    constitutionality of the entire process of cross-certification

16    and essentially saying that Border Patrol has no business being

17    cross-certified.

18         Your Honor, the importance, then, of this line of

19    questioning is that this agent, acting in furtherance of a

20    Border Patrol mission was, in fact, dutifully executing his

21    responsibilities under his responsibility to public safety in

22    conducting this stop, completely independent of any

23    cross-certification.  And I think it's very important in light

24    of the challenges that the defense is trying to raise.

25              THE COURT:  Okay.  Well, I'm to go sustain the

 1    objection.  I think what's relevant and important is what he

 2    did and why he did it, not what he would have done if he had

 3    not done what he did.  So -- which weird way of saying that

 4    it's sustained, let's just skip to that.

 5          MS. WOOLRIDGE:  If I may reword then because I don't

 6    -- I understand the speculative nature and I don't want you to

 7    speculate.

 8    BY MS. WOOLRIDGE:

 9    Q.  Did you make this stop or did you -- I guess you didn't

10    make the stop, it was Special Agent Bullock, but did you confer

11    with him and did you agree that stopping this vehicle was the

12    appropriate thing to do?

13    A.  Yes, ma'am.  And I believe I would have listed articulable

14    facts in my report stating that.

15    Q.  And were those articulable facts based on your

16    cross-certification authority?

17    A.  No, ma'am.

18    Q.  And what were those articulable facts?

19    A.  May I refer to the report?

20    Q.  Yes.  Exhibit 1?

21    A.  Okay.  So, if we go down about the middle of the first page

22    and where it says:  The sedan then turned left onto South

23    Highland Avenue and sped up again.  Right after that, that next

24    sentence starts the articulable facts as to why I would have

25    stopped the vehicle in the report:  Based on my previous

```
 1   experiences, the notoriety of the area --

 2           MR. COSTALES:  Your Honor, I object for the same

 3   reasons; he's reading from the report.

 4           THE COURT:  Yeah.  In terms of the report, if you

 5   can't remember, like all the facts as to why you stopped the

 6   vehicle, read through your report, refresh your memory, and

 7   then testify to it, okay, rather than just reading it.

 8           THE WITNESS:  Okay, sir.  It's just that each

 9   individual report are different.  There are different

10   articulable facts for each time I would conduct a stop.  So I

11   will read through it and just state what --

12           THE COURT:  Right, specific to this stop.

13           THE WITNESS:  Okay, okay.

14           THE COURT:  Just read through it and then you can

15   answer Ms. Woolridge's question.

16           THE WITNESS:  So the reasons are obviously the

17   notoriety of the area, the manner and travel of the vehicle,

18   the furtive movements of the subject, and the record checks

19   coming back to it being a rental vehicle, which is very common

20   in narcotics and alien smuggling events.

21   BY MS. WOOLRIDGE:

22   Q.  Did you also list -- and, again, if you have to refresh

23   your recollection, please -- please do so -- the failure to

24   observe posted speed limits and traffic signs, such as the stop

25   signs?
```

1   A.  Yes, ma'am.  That is common of alien smuggling subjects and

2   narcotics smuggling subjects to break the posted speed limits

3   and disobey traffic laws.

4   Q.  Thank you, sir.  Those are all the questions I have for you

5   at this time.

6   A.  Yes, ma'am.

7           THE COURT:  All right.  Mr. Costales or Mr. Malka?

8           MR. COSTALES:  It's my witness, sir.

9           THE COURT:  Okay, thank you.

10      There's probably some water there.

11          THE WITNESS:  Okay, sir.  Thank you.

12          MR. COSTALES:  Your Honor, I think we may have -- this

13   may have shut off.

14          THE COURT:  Yeah, technology is always challenging so

15   -- you know, let's take a five-minute break.  I could use a

16   comfort break so let's just take a break while you boot that

17   back up.  So five minutes if anybody needs to use the rest

18   room.

19          THE WITNESS:  Thank you.

20      (A recess was had.)

21          THE COURT:  Are we back on the record?

22          CLERK:  Yeah.

23          THE COURT:  Okay.  Just to let counsel know, I know

24   Agent Hermansen from years ago at the US Attorney's Office but

25   he probably -- I think it was when I was criminal chief and he

 1   probably didn't like the decisions I made so there's no -- but

 2   I was just congratulating him on his retirement which, although

 3   he's not really retired, anyway, so --

 4        All right, Mr. Costales, cross-examination?

 5              MR. COSTALES:  Thank you, Your Honor.

 6                         CROSS-EXAMINATION

 7   BY MR. COSTALES:

 8   Q.  So, Agent Hermansen, I think you testified earlier that you

 9   were with Border Patrol for a total of 21 years?

10   A.  Yes, sir.

11   Q.  That's a long time.

12   A.  Yes, sir.

13   Q.  And in your capacity as a supervisor, you would have to be

14   familiar with Border Patrol practices and policies, right?

15   A.  Correct.

16   Q.  Including the statutes and regulations denoting Border

17   Patrol's authority?

18   A.  Yes.

19   Q.  So you're familiar with Title -- excuse me -- 8 of the Code

20   of Federal Regulations, 287.5?

21   A.  Yes.

22              MR. COSTALES:  Your Honor, permission to approach the

23   witness?

24              THE COURT:  Yes.

25

 1    BY MR. COSTALES:

 2    Q.  So, Agent Hermansen, if you'd like, you can take a look at

 3    this.  This should be a true and correct copy of 287.5, apart

 4    from my name stamped in the middle of the bottom.  But does it

 5    look like a true and correct copy?

 6    A.  Yes, sir.

 7              MR. COSTALES:  Your Honor, I'd move to introduce this

 8    code of -- 287.5 as Defense's 55.

 9              THE COURT:  Okay.  I'm sorry, go ahead.

10              MR. COSTALES:  And I'd ask the court to take judicial

11    notice of this regulation.

12              THE COURT:  And, Ms. Woolridge, any objection?

13              MS. WOOLRIDGE:  No, Your Honor.  Thank you.

14              THE COURT:  Okay.  So Defense Exhibit 55 will be

15    admitted.

16    BY MR. COSTALES:

17    Q.  So this is the code of regulation that denotes Border

18    Patrol's authority; is that right?

19    A.  Yes, sir.

20    Q.  Which includes authority to investigate and make

21    immigration arrests?

22    A.  Yes.

23    Q.  Execute immigration warrants?

24    A.  Yes.

25    Q.  Which of these codes allows a Border Patrol agent to stop

CROSS-EXAMINATION - PETER HERMANSEN                64

1    someone for a traffic violation?

2    A.   None of them.

3    Q.   And that's -- 'cause that's not something that Border

4    Patrol agents normally do?

5    A.   That's correct.

6    Q.   In fact, it's not something, I think, that you've testified

7    that you would be doing with your cross-certification?

8    A.   That's absolutely correct.

9    Q.   You didn't have a citation pad?

10   A.   That's correct.

11   Q.   No radar gun?

12   A.   That's correct.

13   Q.   Not your job?

14   A.   That's correct.

15   Q.   And just to be clear, I know this is probably obvious but

16   the Santa Rita Skate Park and the south side of Tucson are not

17   federal land, are they?

18   A.   No, they're not.

19   Q.   So you, at no point, had any intention of writing Mr. Jones

20   a speeding ticket?

21   A.   No.

22   Q.   Or a ticket for blowing through stop signs?

23   A.   No.

24   Q.   Or for making a U-turn?

25   A.   No.

1    Q.  You were never going to write him a citation or otherwise

2    penalize him for that?

3    A.  I was never going to write him a citation, no, sir.

4    Q.  You were never going to arrest him for that?

5    A.  No.

6    Q.  Have you ever cited someone for speeding as a Border Patrol

7    agent?

8    A.  No, sir.

9    Q.  Or for rolling a stop sign?

10   A.  No, sir.

11   Q.  Okay.  I want to talk to you a little bit about the safety

12   concerns the government raised in its direct examination.  Now,

13   you -- you initially encountered Mr. Jones when he pulled up

14   behind you and honked; is that right?

15   A.  Correct.

16   Q.  And you actually -- or I suppose Agent Bullock pulled over

17   to the side and let Mr. Jones pass?

18   A.  Correct.

19   Q.  And after that, Mr. Jones passed, and you essentially sped

20   up in order to get behind him?

21   A.  Correct.

22   Q.  Okay.  You would have had to get -- you would have had to

23   speed up faster than Mr. Jones in order to do that?

24   A.  Yes.

25   Q.  Okay.  And you said he was going about 40, 45?

1    A.  We were going about 40 or 45.

2    Q.  Okay, so you were going about 40 or 45?

3    A.  Uh-huh.

4    Q.  Is it generally safe to go 40 or 45 in a residential area?

5    A.  Not in general, no.

6    Q.  Okay.  What were you driving, the Tahoe?

7    A.  I'm sorry?

8    Q.  You were driving -- you were in a Tahoe?

9    A.  I was in a Tahoe, yes.

10   Q.  How big's a Tahoe, 5,000 pounds 5,500 pounds?

11   A.  I don't know the exact weight of a Tahoe.

12   Q.  It's a big car?

13   A.  Yes, sir.

14   Q.  Okay.  So you were driving a Tahoe through a residential

15   area?

16   A.  I was not driving, Agent Bullock was driving.

17   Q.  Excuse me.  Agent Bullock was driving the Tahoe through a

18   residential area to catch up to Mr. Jones?

19   A.  Correct.

20   Q.  Because at this point he had honked?

21   A.  He had honked as he went by, sped around us -- we slightly

22   pulled to the side of the road, sped around us, and then both

23   occupants of the vehicle were observing us as they passed by

24   for an extended period as they went by.  Normally, people would

25   just glance at you as they go by.  They took a long look at us

CROSS-EXAMINATION - PETER HERMANSEN

1   as they went by.

2   Q.  They took a long look at you as they sped by?

3   A.  Correct.

4   Q.  How long of a look?

5   A.  Maybe about five seconds.

6   Q.  How fast were they -- but -- okay.  So they went around

7   you?

8   A.  So they went around us and continued to look as they were

9   going past, at least the passenger in the vehicle did; I could

10  observe the passenger.

11  Q.  You were on the passenger's side?

12  A.  I was on the passenger's side, yes.

13  Q.  And you had a look at the passenger of the -- within the

14  Camry?

15  A.  With a camera?

16  Q.  Excuse me.  Within the Camry, the car?

17  A.  Yes, yes, sir.

18  Q.  Okay.  If they got a good look at you, you must have gotten

19  a good look at them?

20  A.  I saw a good look at the passenger occupant of the vehicle.

21  Q.  What did she look like?

22  A.  She was a female.  She was an African-American female

23  probably in her 30s and heavier set.

24  Q.  Okay.  Did you see anyone else in the car?

25  A.  I saw a driver to the vehicle and that was it.

68

1    Q.   Okay.  So you also saw the driver?

2    A.   I saw a glimpse of the driver.

3    Q.   Okay.  So after -- after he honked at you, after he passed

4    you, you decided -- or you or Bullock or both?

5    A.   We both did.

6    Q.   -- decided to just pull up to find him?

7    A.   Yes, to get the license plate.

8    Q.   Speed up and catch up to him?

9    A.   Speed up, catch up to him, get the license plate of the

10   vehicle.

11   Q.   And what did Bullock say to you at this time?

12   A.   We both looked at each other and that seemed out of the

13   ordinary to us.

14   Q.   Do you recall what he said to you?

15   A.   I don't recall what he specifically said to me, no.

16   Q.   Do you recall what you said to him?

17   A.   I don't, just maybe something to the effect that that's

18   interesting or that's -- that's -- that's not normal.

19   Q.   Okay.  So you're following Mr. Jones' car and I'm assuming

20   you're still observing it?

21   A.   Yes.

22   Q.   Did you see anybody get in or out of the car?

23   A.   No.

24   Q.   I'm sorry.  Is it illegal to look at you while you're

25   stationed?

CROSS-EXAMINATION - PETER HERMANSEN

1    A.  I'm sorry?

2    Q.  While you're on duty, while you're driving, is it illegal

3    for somebody to look at you?

4    A.  No.

5    Q.  Okay.  Just making sure.

6        So Tucson is about 70 miles from -- Tucson is about

7    70 miles from the border; is that right?

8    A.  Uh-huh.

9    Q.  And Santa Rita Skate Park, the south side of Tucson, that's

10   a few miles from the highway; is that right?

11   A.  Yes, sir.

12   Q.  By the time -- so say someone's coming from the border.  By

13   the time they're in Tucson, they would have had to pass several

14   checkpoints already, right?

15   A.  Yes.

16   Q.  Okay.  Now, you ultimately did pull over Mr. Jones and I

17   think you testified that you radioed that in?

18   A.  That we radioed headquarters that we were making a vehicle

19   stop, yes.

20   Q.  Do you generally keep a log of those radios?

21   A.  Yes, as far as I know, we do.

22   Q.  Okay.  Would it be unusual for a radio log to be missing?

23   A.  Could be.

24   Q.  Do you purge the radio logs?

25   A.  I believe so.

CROSS-EXAMINATION - PETER HERMANSEN

1   Q.  After how long?

2   A.  I don't know.

3   Q.  You ultimately pulled over Mr. Jones and you pulled him

4   over near a business; is that right?

5   A.  We pulled him over at -- on a street in that residential

6   area.

7   Q.  That's about one block from Tucson Auto Rentals?

8   A.  Yes, sir.

9   Q.  And, in fact, while you were pulling over Mr. Jones, the

10  owner of Tucson Auto Rentals came out and took back his car?

11  A.  We called him and he came out and took back his car, yes,

12  sir.

13  Q.  He literally just walked out because his business is right

14  there?

15  A.  I don't know how he got there.

16  Q.  I'm assuming he didn't drive?

17  A.  Okay.

18  Q.  Okay.  And that's where the car was ultimately registered

19  to --

20  A.  Yes, sir.

21  Q.  -- Tucson Auto Rentals, which is right there in that

22  vicinity?

23  A.  Yes, that's correct.

24  Q.  Okay.  And just to confirm it, the Camry did not have

25  Mexican plates?

1    A.  No.

2    Q.  It had US plates?

3    A.  Yes.

4    Q.  So I'm going to approach you again with I think something

5    you just took a look at but I don't think was ever introduced

6    into evidence.

7              MR. COSTALES:  And, Your Honor, permission to approach

8    the witness?

9              THE COURT:  Sure.  And just for the future, you all

10   don't need to ask permission.

11             MR. COSTALES:  You already have it; it's the letter.

12             THE COURT:  Okay.  Thank you.  Is that Exhibit 53?

13             MR. COSTALES:  Defense's 53, yes.

14             THE COURT:  Okay.

15   BY MR. COSTALES:

16   Q.  And I believe, Mr. Hermansen, you've already confirmed that

17   you're aware of this letter?

18   A.  Yes.

19   Q.  And this is a correct and accurate copy of the letter?

20   A.  To my knowledge, it is.

21             MR. COSTALES:  Okay.  I would move at this time, I

22   would like to introduce this letter into evidence.

23             THE COURT:  Okay.  Ms. Woolridge, any objection?

24             MS. WOOLRIDGE:  No objection.  I apologize.  I had

25   meant to -- meant to do so, so I thought it was in evidence,

1    but no objection.

2           THE COURT:  It was a question I was going to ask

3    myself.  So, yes, 53 will be admitted.

4    BY MR. COSTALES:

5    Q.  So there's two letters here, is that right, Mr. Hermansen?

6    A.  Yes, sir.

7    Q.  There's a letter from you to Sheriff Napier?

8    A.  Correct.

9    Q.  There's also a letter purporting to be from Sheriff Napier

10   to Arizona POST?

11   A.  Correct.

12   Q.  Are you familiar with 13-3875?

13   A.  I'm not very familiar with it, no, sir.

14   Q.  Okay.

15          MR. COSTALES:  And, Your Honor, if I could, I would

16   move to recall that from Government's 3 and show that to the

17   witness.

18          THE COURT:  Sure.  Allison, do you have that?  No, I

19   have that -- I have that.

20          MS. WOOLRIDGE:  Otherwise, defense can use my copy as

21   well.

22          THE COURT:  So, Mr. Costales, we've given Agent

23   Hermansen Exhibit 3 and you gave him 53?

24          MR. COSTALES:  I'm sorry?

25          THE COURT:  Did you give him Exhibit 53 as well?

1          MR. COSTALES:  He already had it.

2          THE COURT:  Okay, good, good.

3          MR. COSTALES:  Because we're going to look at both

4   things.

5   BY MR. COSTALES:

6   Q.  So it will probably refresh your recollection, 13-3875 is

7   the Arizona law relating to cross-certification of federal

8   peace officers.

9   A.  Yes, sir.

10  Q.  Do you remember having reviewed this now?

11  A.  Yes, sir.

12  Q.  So certain steps are required for a federal agent to be

13  cross-certified by a sheriff, and one of those includes writing

14  the sheriff a letter, and you wrote the letter pursuant to

15  that; is that right?

16  A.  That's correct.

17  Q.  So step two is that you have to submit evidence that you've

18  been or you or your agent who is being certified has been

19  certified as a federal peace officer; is that right?

20  A.  Yes, that's correct.

21  Q.  Also have to submit evidence that you have been authorized

22  under federal law or supervise the prevention and detection --

23  to engage in or supervise the prevention, detection,

24  investigation, or prosecution of a violation of federal law;

25  and as finally, that the agent is also authorized by federal

1    law to make arrests, serve warrants, carry firearms?

2    A.  That's correct.

3    Q.  Now, I want to refer back to the letter that you wrote to

4    Sheriff Napier.  Within this letter, you identified certain

5    agents you were hoping to have cross-certified?

6    A.  Yes, sir.

7    Q.  Is this all you sent to get your agents cross-certified?

8    A.  On this letter, yes.

9    Q.  Did you send anything else?

10   A.  There were many other letters for cross-certification, not

11   only to Pima but to other organizations.  This is one of many

12   letters that have gone out from my office.

13   Q.  Oh, okay.  So you're saying you've sent other letters to

14   other agencies?

15   A.  Other letters to other agencies and other letters

16   potentially to Pima with other lists of names because this

17   primarily here are agents that were assigned to intelligence

18   and other things of that nature and may not have been from some

19   of the stations.  There may be another subsequent letter that

20   went over for station personnel or things of that nature.

21   Q.  Okay.  And I understand what you're saying.

22   A.  Yes, sir.

23   Q.  Just to clarify my question, in relation to the

24   certification of these listed agents, was this all you sent?

25   A.  Yes, sir.

CROSS-EXAMINATION - PETER HERMANSEN                    75

1   Q.  Okay.  So you sent no other evidence along -- no other

2   information along with these -- this letter?

3   A.  No, sir.

4   Q.  Okay.  Okay.  So nowhere on this -- on this did you

5   actually submit any evidence that, let's say, Agent Bullock, is

6   authorized to make arrests?

7   A.  I did not present any other evidence other than this

8   letter, no, sir.

9   Q.  So no evidence that he was authorized to serve warrants or

10  to carry firearms?

11  A.  Nothing other than this letter.

12  Q.  Okay.  And I'm getting repetitive, but no evidence that he

13  was authorized by federal law to engage in or supervise the

14  prevention, detection, investigation, or prosecution of a

15  violation of federal law?

16  A.  Other than the fact that he's a federal agent and he's

17  assigned on this letter.

18  Q.  But no evidence apart from this letter?

19  A.  No, sir.

20  Q.  Okay.  And you indicated that you might have been certified

21  in a different letter?

22  A.  Correct.

23  Q.  Do you have that letter?

24  A.  I don't.

25  Q.  Okay.  And who would you expect to have that letter?

1  A.  Either my organization, AZPOST, the sheriff's department in

2  files.

3  Q.  AZPOST is required to keep the letter?

4  A.  Okay.  Yeah, I believe so.

5          MR. COSTALES:  One second, Your Honor.  May I take a

6  moment for counsel?

7          THE COURT:  Sure.

8  BY MR. COSTALES:

9  Q.  Mr. Hermansen, getting back to the point of when you

10 initially encountered Mr. Jones, how fast did he pass -- how

11 fast was he going when he passed your car, when you pulled

12 over?

13 A.  I couldn't tell you how fast he was going, all I could hear

14 was an acceleration of the engine.

15 Q.  Okay.  How fast were you going?  Did you ever come a

16 complete stop?

17 A.  We -- we came almost to a complete stop.  If we weren't

18 completely stopped, we were slightly moving.

19 Q.  Now, Agent Hermansen, you completed a report in connection

20 with this event; is that right?

21 A.  That's correct.

22 Q.  I think you were referring to that report quite a bit

23 earlier?

24 A.  A G166(e), yes, sir.

25 Q.  Yeah, that's the report you were referring to?

1   A.  Correct.

2   Q.  Nowhere in the report did you ever actually mention that --

3   your testimony that you made here today about Mr. Jones coming

4   down from drugs; is that right?

5   A.  That's correct.

6   Q.  Okay.  Generally you include all relevant information

7   within a report; is that right?

8   A.  As much as possible, yes, sir.

9   Q.  Okay.  But that's something you omitted?

10  A.  Correct.

11  Q.  And you didn't -- okay.  So to get back to the point, you

12  didn't see anybody get in or out of Mr. Jones' car?

13  A.  No, I did not.

14  Q.  Okay.  When you -- you encounter undocumented people, or

15  you encounter undocumented people in your capacity as a Border

16  Patrol agent; is that right?

17  A.  Uh-huh.

18  Q.  Undocumented people are generally from what countries you

19  encounter --

20  A.  Any country outside of the United States.

21  Q.  Who do you usually encounter in Tucson?

22  A.  Usually encounter Mexican nationals or other than Mexicans,

23  primarily from Central and South America.

24  Q.  And people generally identifiable as Hispanic?

25  A.  Correct.

1    Q.   Okay.  For the most part, most people you encounter who you

2    later identify to be undocumented aliens are not

3    African-American or not black?

4    A.   Most, yes, that's correct.

5    Q.   Okay.  I think we've already moved to introduce the letter.

6    With that, I don't have any further questions.

7         THE COURT:  Okay.  Thank you.

8    Ms. Woolridge, I'm not going to forget this time.  Any

9    redirect?

10        MS. WOOLRIDGE:  Thank you, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MS. WOOLRIDGE:

13   Q.   Hello again, sir.  I'm going to actually go in reverse

14   order and begin where we left off and approach the difficult

15   subject of race here.  You had mentioned that most of the

16   individuals that you do encounter in your job, especially along

17   the Tucson border, who are undocumented aliens are Hispanic in

18   nationality or Hispanic in race, correct?

19   A.   Yes, ma'am.

20   Q.   Do you also investigate other border-related and

21   immigration-related offenses that involve suspects aside from

22   just the undocumented, illegal aliens themselves?

23   A.   Yes, ma'am.

24   Q.   Do you encounter individuals that are engaged in alien

25   smuggling?

1    A.  Yes, ma'am.

2    Q.  Are you -- do you -- are you involved -- do you encounter

3    individuals that are involved in narcotics smuggling?

4    A.  Yes, ma'am.

5    Q.  Are those individuals necessarily Hispanic?

6    A.  Not always, no, ma'am.

7    Q.  Can those individuals be any race?

8    A.  Yes, ma'am.

9    Q.  Can those individuals be African-American?

10   A.  Yes, ma'am.

11   Q.  Have you regularly encountered people who are of

12   African-American race that engage in alien smuggling?

13   A.  Yes.

14   Q.  Have you encountered individuals that are of

15   African-American race that engage in drug smuggling?

16   A.  Yes, ma'am.

17   Q.  Are those -- are those offenses within the purview of the

18   Border Patrol?

19   A.  Yes, ma'am, under Title 21 and cross-designated there and

20   also under Title 19.

21   Q.  Defense counsel asked you a little bit about Arizona

22   Revised Statute Section 13-3875.  Do you still have Exhibit 53,

23   your letter, in front of you?

24   A.  Yes, ma'am, I do.

25   Q.  In your letter to the sheriff, do you specifically request

1    designation pursuant to this statute?

2    A.  Yes, ma'am.

3    Q.  Do you cite this statute?

4    A.  Yes, ma'am.

5    Q.  Are you familiar with this statute?

6    A.  Not in its entirety but to some degree.

7    Q.  In submitting this letter, do you -- did you first certify

8    that or verify that all of these agents and the scope of your

9    request was in compliance with the statute?

10   A.  Yes, ma'am.

11   Q.  Now, I believe defense was asking you a number of questions

12   to suggest that by you and Agent Bullock speeding up -- and I'm

13   now going to the date of March 31st, 2017 -- to infer that you

14   and Agent Bullock in speeding up to catch up with the vehicle,

15   the sedan in this case, were -- were driving recklessly because

16   you did mention that you were driving at a speed of about 40 to

17   45 in a residential area to catch up with the vehicle.

18          MR. COSTALES:  Your Honor, I'd object at this time.

19   There -- the prosecutor is testifying for the witness at this

20   point.  This question -- open-ended, direct questions generally

21   do not require two paragraphs.  I think she's leading, she's

22   going to be leading the witness with this question so I object

23   to form.

24          THE COURT:  Okay.  I need to be really honest with you

25   all, I missed the start of that question 'cause I was looking

 1    at my notes, so maybe you can rephrase and not do a narrative.

 2            MS. WOOLRIDGE:  Certainly.

 3            THE COURT:  But I would -- let's -- let me hear you

 4    rephrase it and then I'll rule on any objection.

 5            MS. WOOLRIDGE:  Certainly, Your Honor.  I'll rephrase.

 6    BY MS. WOOLRIDGE:

 7    Q.  How was it, sir, that your driving behavior or Agent

 8    Bullock's driving behavior wasn't a danger to the public?

 9    A.  We are a trained --

10            MR. COSTALES:  This is leading, as well as the one

11    before it.  It's obviously the prosecutor wants the witness to

12    say it wasn't dangerous.

13            MS. WOOLRIDGE:  I can rephrase the question.

14            THE COURT:  Okay.  Why don't you rephrase it in a

15    nonleading way?

16    BY MS. WOOLRIDGE:

17    Q.  Sir, do you believe that the driving behavior by Agent

18    Bullock was dangerous?

19    A.  We are trained to drive sedans, Tahoes, all the different

20    vehicles, all the disparate vehicles that we have in our

21    inventory, and we are trained to drive those at speeds --

22    greater than normal speeds in order to effect our duties as

23    agents.

24    Q.  Do you believe that Agent Bullock's driving behavior at all

25    endangered the public on this -- during this event?

REDIRECT EXAMINATION - PETER HERMANSEN

```
 1   A.  No, ma'am.  I believe that our duty to catch up to the

 2   vehicle and ascertain what was going on with that vehicle was

 3   more important.

 4   Q.  Do you believe that Agent Bullock did anything that -- that

 5   put any member of the public in danger?

 6   A.  No, I do not.

 7   Q.  Do you believe that this vehicle, and as it turns out the

 8   defendant was driving the vehicle, did anything that put the

 9   public in danger?

10   A.  Yes.

11   Q.  What was that?

12   A.  The actions and the driving of the vehicle, the subject

13   that was driving the vehicle, the actions put the public at

14   danger.

15   Q.  And specifically what kind of danger were you concerned of?

16   A.  I was concerned with someone getting hit.

17   Q.  Defense counsel showed you Title 8 CFR Section -- I'm

18   sorry -- 287.5.  I don't know if you still have that in front

19   of you.

20   A.  Yes, ma'am, I do.

21   Q.  You testified that it does not allow traffic stops,

22   correct?

23   A.  It does not allow traffic stops for traffic violations.

24   Q.  Okay.  Are you allowed to make traffic stops for -- for

25   other violations?
```

1    A.  Yes, ma'am.

2    Q.  So can you make a traffic stop if you suspect, for

3    instance, a violation of a federal offense?

4    A.  Yes.

5    Q.  Do you have -- how was it that you could -- that you had

6    the authority to make the traffic stop this day on March 31st?

7    A.  Based on the articulable facts that I printed -- that I

8    presented in my written report and based on the public safety

9    issue.

10   Q.  You testified on cross-examination that was not your

11   intention to issue a traffic citation that day.  In fact, you

12   could not have, correct?

13   A.  That's correct.

14   Q.  Not -- could you -- you could not have because you lacked

15   the authority to do so?

16   A.  No, I could not have because we chose not to take the

17   ticket books from the counties.

18   Q.  What was your intention then?  If your intention was not to

19   cite for a traffic violation, what was your intention in

20   stopping the vehicle on March 31st?

21   A.  In stopping the vehicle, we initially identified ourselves

22   as immigration agents and our desire immediately was to stop

23   the actions of the vehicle to save the public but then it was

24   to ascertain if there were any federal laws being broken.

25   Q.  Thank you, sir.  That's all I have.

1    A.  Yes, ma'am.

2              THE COURT:  I have a couple of questions.  I'm kind of

3    fascinated by the cross-certification process generally.  Was

4    that March 10th letter requesting cross-certification, was that

5    a new request or a renewal from a prior request?

6              THE WITNESS:  They were all -- the ones that I filled,

7    sir, were all renewals.  We would follow the same format each

8    year.  It would expire and then the disrupt special operations

9    supervisor, Shannon McCormick, would come to me and get the new

10   letters prepped and ready to go over and we were following the

11   protocol that we'd had with both Pima, Maricopa, and Pinal for

12   quite some years.

13             THE COURT:  Okay.  And then do you know, so all

14   60 agents on that list, would they have all been a renewal?

15             THE WITNESS:  I don't know for sure if they would have

16   all been a renewal or a new one.  Anyone was also sworn so they

17   get sworn with the sheriff at the time as well, too.

18             THE COURT:  Would the -- do you know when the first,

19   like the original request would have been made to Pima County

20   for cross-certification?

21             THE WITNESS:  I don't, sir.

22             THE COURT:  Okay.  Would it have contained any more

23   information than your March 10th letter?

24             THE WITNESS:  Unknown to me, sir.

25             THE COURT:  Okay.  Were you ever given any guidance or

1    training on what -- regarding this section, Arizona statute

2    13-3875, in terms of what to submit to the sheriff's department

3    to obtain the cross-certification?

4            THE WITNESS:  Just this letter, sir.

5            THE COURT:  Okay.  You ever -- you or -- you ever --

6    have you -- is your request or have you ever heard of a request

7    made by your agency having been rejected by a sheriff?

8            THE WITNESS:  Not to my knowledge in my time with my

9    own unit.

10           THE COURT:  Prior to this incident, have you ever

11   stopped somebody for a -- when the basis was essentially a

12   traffic violation?

13           THE WITNESS:  No, sir.

14           THE COURT:  Are you given any or are you or your

15   agents given any training on Arizona traffic infractions,

16   including how to judge someone's speed?

17           THE WITNESS:  No, sir.

18           THE COURT:  Okay.  Have you ever -- you've never cited

19   -- I take it you've never issued a traffic citation?

20           THE WITNESS:  That's correct, sir.

21           THE COURT:  Ever hear of a Border Patrol agent who

22   has?

23           THE WITNESS:  I've heard of agents in Michigan that

24   have issued failure to provide ID, which is not a specific

25   traffic violation itself but it is a state certifiable

```
1    infraction and they had ticket books up there and they would

2    actually write tickets in Michigan for those things.

3              THE COURT:  Okay.  But ostensibly, because you chose

4    not to take the citation books, if you stop somebody for a

5    traffic -- traffic infraction, it's going to always -- is it

6    always going to amount to a warning or is there something else

7    you could do?

8              THE WITNESS:  No, it would -- it would always amount

9    to that and it wouldn't even be so much, it would be so much

10   more the immigration, narcotics piece of it and then at the

11   end:  Hey, you know, that's very poor driving, you're

12   endangering the public, please watch your driving.  So a

13   warning like you said, sir.

14             THE COURT:  Okay.  All right.  That's all I have.

15      Any questions based upon my questions?

16             MS. WOOLRIDGE:  No, Your Honor.  Thank you.

17             MR. COSTALES:  No, Your Honor.  Thank you.

18             THE COURT:  Okay.  Can Agent Hermansen be -- can he

19   step down and be excused?

20             MS. WOOLRIDGE:  Yes, Your Honor.

21             THE COURT:  Okay.

22             THE WITNESS:  Leave these here?

23             MS. WOOLRIDGE:  I imagine a number of them have been

24   admitted so --

25             THE COURT:  Yeah, why don't you hand them to the
```

1    attorneys and they can sort out whose is whose or, actually, I

2    guess we'll give them back to Allison, at least the ones -- the

3    ones that have been admitted.  His report hasn't been, so --

4            THE WITNESS:  Okay.  Thank you, Your Honor.

5            THE COURT:  Thank you, sir.  3, 53, and then that CFR

6    provision, which is 55, I don't know if that's --

7            MR. COSTALES:  Your Honor, you have a copy of that

8    already?

9            MS. WOOLRIDGE:  Yeah, I know you already have a copy.

10           THE COURT:  Okay.  Ms. Woolridge, you want to call

11   your next witness?

12           MS. WOOLRIDGE:  For the record, Your Honor, the

13   government calls Deputy Patrol Agent in Charge Christopher

14   Bullock.

15           THE COURT:  Okay.  Come on forward, Mr. Bullock,

16   you've already been sworn in so you can just take a seat and

17   Ms. Woolridge will start her questioning.

18        CHRISTOPHER BULLOCK, WITNESS, WAS PREVIOUSLY SWORN.

19                        DIRECT EXAMINATION

20   BY MS. WOOLRIDGE:

21   Q.  Good morning, sir.  Could you please state your name and

22   occupation for the record?

23   A.  Good morning.  Christopher Bullock, Deputy Patrol Agent in

24   Charge, US Border Patrol, Tucson Sector intelligence unit.

25   Q.  How long have you been employed with the United States

DIRECT EXAMINATION - CHRISTOPHER BULLOCK

1    Border Patrol?

2    A.  Over 20 years.

3    Q.  Can you take us through just generally a summary of your

4    employment with the Border Patrol, starting with any training

5    that you had to obtain before becoming a sworn patrol agent?

6    A.  In 1997 I was hired as a Border Patrol agent and assigned

7    to El Centro Sector in California.  I arrived at El Centro

8    Sector and was immediately sent to the Border Patrol academy at

9    that time was in Charleston, South Carolina.

10        I spent approximately 19 weeks at the Border Patrol

11   academy, returned to El Centro where I spent my first five

12   years as a young Border Patrol agent.

13        From El Centro, California, I accepted a transfer to south

14   Texas and was assigned to the Brownsville, Texas, Border Patrol

15   station for approximately three years, during which time I also

16   spent time at headquarters on a temporary assignment to the

17   commissioner's situation room.

18        After having spent three years in Brownsville, Texas,

19   permanently, I accepted a lateral transfer to Tucson, Arizona,

20   in 2005.  I spent approximately seven and a half years in

21   Tucson, during which time I promoted to the position of first

22   line supervisor and also second line supervisor.

23        In 2012, I was promoted to Deputy Patrol Agent in Charge of

24   the Imperial Beach, California, Border Patrol station.  That

25   was in November of 2012.

1      And in 2014, November specifically, I was transferred back

2   to Tucson Sector as a Deputy Patrol Agent in Charge of the

3   intelligence unit.

4   Q.  Okay.  And was that the position that you were holding back

5   in March of 2017?

6   A.  Yes, ma'am.

7   Q.  Were you -- are you aware of whether you had any sort of

8   cross-designation with any local law enforcement departments

9   within Tucson?

10  A.  Yes, ma'am.  Within Tucson, I was cross-designated as a

11  deputy sheriff with the Pima County Sheriff's Department.

12  Q.  And do you know whether that cross-designation was valid on

13  March 31st, 2017?

14  A.  Yes, ma'am, it was.

15  Q.  And do you know the purpose of obtaining that

16  cross-certification designation?

17  A.  So for us in intel, we have several agents who work with

18  other agencies in a task force capacity and frequently we find

19  ourselves exploring avenues for prosecution that are other than

20  federal avenues of prosecution.  So if it is more beneficial to

21  pursue a case through state prosecution, we do that with our

22  local partners, and it's easier for us to be able to work with

23  local prosecutors if we have that cross-designation.

24  Q.  Are you seeking to enforce violations of state law through

25  your cross-designation?

1    A.   No, ma'am.

2    Q.   What are you -- what type of offenses are you looking to

3    investigate and enforce in -- in obtaining this

4    cross-designation?

5    A.   So, the same type of offenses that we would look to

6    enforce, you know, with our -- in our federal capacity, and

7    also, you know, those that our, you know, local partners can

8    enforce, you know.  As part of a task force, you know, our

9    agents participate in those activities and prosecute for

10   offenses that our local partners are able to prosecute for.

11   Q.   Do you recall investigating some suspicions with regard to

12   some alien smuggling activity in March of 2017?

13   A.   Yes.

14   Q.   Specifically, were you made aware of any sort of reports or

15   concerns in a particular area in South Tucson?

16   A.   After communications with our local partners and on various

17   occasions, we were made aware that Tucson is notorious for --

18   for being a staging location for illegal aliens and narcotics

19   to be transferred to other locations.  So, yes, we were in the

20   area on that.

21   Q.   Well, how is that possible?  We just heard earlier that

22   Tucson is approximately 60 to 70 miles from the border.

23   A.   It's very possible.  It's the largest metropolitan area

24   near to the border and it's -- it's easy for transnational

25   criminal organizations to blend into the -- to the populace

1    here in Tucson to mask their illicit activities, not so much so

2    in the rural areas that they come from near the border.

3    Q.  But aren't there checkpoints between the border and Tucson?

4    A.  Yes, ma'am.

5    Q.  And so, again, how -- how can we then have any of this

6    activity going on in Tucson or South Tucson?

7    A.  Well, just -- just as the border is porous and we are at

8    times defeated on the border, our checkpoints are also defeated

9    by criminal organizations.

10   Q.  In your experience, have you had, as a Border Patrol agent,

11   have you been directly involved in investigations including --

12   involving immigration activity, drug smuggling, alien

13   smuggling, other immigration-related offenses happening right

14   here in Tucson as well as South Tucson?

15   A.  Yes, ma'am.

16   Q.  And do those investigations happen on a regular basis?

17   A.  Yes, ma'am.

18   Q.  So did you have information that brought you to the

19   specific area in South Tucson near the Santa Rita Skate Park?

20   A.  We didn't have any specific information that led us

21   specifically to that skate park but we, you know, through

22   talking with partners and even our own agents, had information

23   that, you know, Tucson, and especially South Tucson area, you

24   know, was notorious for illegal activity and stash houses as we

25   call them.  We had driven, you know, several areas, several

1    roads, and not all within the immediate vicinity of the skate

2    park.  We just happened to be at the skate park at that time on

3    that day.

4    Q.  And when you say "we", who were you with?

5    A.  Me and Patrol Agent in Charge Pete Hermansen.

6    Q.  And do you recall who was driving that day?

7    A.  Yes, ma'am.  I was driving.

8    Q.  And what were you -- what kind of vehicle were you driving?

9    A.  I was in an unmarked gold Chevy Tahoe 2012.

10   Q.  What was your purpose for being -- driving around that

11   general area with Patrol Agent in Charge Hermansen on that

12   date?

13   A.  The purpose, really, was to surveil the area, you know,

14   based on information that, you know, that we would get

15   continuously about illegal activity in the Tucson area.  And

16   based on our observations from having driven the area in the

17   past, we -- we suspected that area was susceptible to illegal

18   activity, and just the day prior we had actually arrested two

19   illegal aliens in that -- well, close by to that area.  So we

20   -- it -- we thought it would be a good idea to go back and see

21   what else we might see.

22   Q.  Based on those arrests and that information, did you

23   suspect a stash house being operated in that area?

24   A.  Suspected it was possible, yes, ma'am.

25   Q.  And specifically a stash house for immigration offenses?

1   A.  Yes, ma'am.

2   Q.  And, I'm sorry, I said on that date.  I don't know if I

3   ever clarified.  Do you recall what date this occurred on?

4   A.  March 31st, I believe, 2017.

5   Q.  All right.  And so while you were conducting surveillance

6   with Patrol Agent in Charge Hermansen in this general area, did

7   -- was there any activity that drew your attention to a

8   particular vehicle?

9   A.  Well, on that date, we -- as we were driving on a road

10  adjacent to the park, and I was probably driving slower than

11  the regular motoring public as, you know, we were looking

12  around, a vehicle approached from behind and honked his horn or

13  the driver honked the horn of the vehicle.  So knowing that I

14  was driving slow, I pulled to the side of the road and the

15  vehicle, as it passed us, passed very slowly and the driver and

16  passenger very obviously looked hard in our location as --

17  looked hard at me and Mr. Hermansen as they were passing, in my

18  opinion, in an apparent attempt to identify who we are.

19  Q.  Anything happen after the vehicle passed you?

20  A.  Immediately after it passed us, it accelerated

21  significantly, obvious acceleration, and, in my opinion,

22  immediately higher than the posted speed limit or the speed

23  limit for a residential area.

24  Q.  Did you follow the vehicle?

25  A.  Yes, ma'am.

1   Q.  Do you believe that you were driving safely or recklessly

2   while you were following this vehicle?

3   A.  I definitely had to exceed the speed limit in order to

4   catch up to the vehicle in order to acquire the license plate

5   to run the tag through dispatch.

6   Q.  And how was it -- did you feel that your -- your driving

7   behavior was dangerous at all?

8   A.  At that point, besides exceeding the speed limit, not --

9   not necessarily dangerous, no.

10  Q.  How about the vehicle's driving behavior, did you continue

11  to observe it?

12  A.  Yes, ma'am.  So, as we became closer or caught up to the

13  vehicle, the driver obviously made some furtive actions or some

14  nervous actions in the vehicle; we could see him leaning over,

15  at times looking in the mirror to see what we were doing, and

16  then accelerating through stop signs without stopping in an

17  apparent attempt to evade.

18  Q.  Did you also see any sort of change in travel directions

19  while you were behind it?

20  A.  Yes, ma'am.  There were times where it came to

21  intersections and made abrupt turns as if to have made the

22  decision to turn at the last moment prior to the turn, sped

23  through several stop signs, I couldn't tell you how many, and

24  made several abrupt turns, again, in my opinion, in an apparent

25  attempt to evade us.

DIRECT EXAMINATION - CHRISTOPHER BULLOCK

1   Q.  Do you recall ever seeing the vehicle make an unlawful

2   U-turn?

3   A.  Yes, ma'am.

4   Q.  And do you recall about the circumstances that that

5   happened?

6   A.  I'm not sure what you're asking when you say

7   "circumstances".  I remember that it was a residential area in

8   which he made the U-turn, that the intersection -- I don't

9   recall if there was a stop sign at that intersection but the

10  intersection was fairly wide for a residential area and he made

11  the turn very wide because he had to at the speeds he was

12  traveling.

13  Q.  Was the vehicle traveling at what you believe to be high

14  rates of speed throughout this driving behavior?

15  A.  Yes, ma'am.  In my opinion, the vehicle was traveling at a

16  high rate of speed and in a manner in which I would consider

17  reckless.

18  Q.  Did you have any concerns in witnessing this driving

19  behavior?

20  A.  Yes, ma'am.

21  Q.  What were your concerns?

22  A.  My concern was that he would lose control of the vehicle

23  and either strike a pedestrian, another vehicle, or even a

24  residence in the area, you know, by the speeds and manner that

25  he was driving.

1   Q.  You mention this is a residential area.  Were there people

2   around in these -- in and around these homes that you observed?

3   A.  As I remember, I mean, it wasn't -- there wasn't -- there

4   weren't excessive amounts of people out in front of the homes

5   during that time of day.  There were people in the park

6   adjacent to the residential area and occasionally you would see

7   a person at one of the properties, at the house, but there

8   weren't abundant amounts of people in the streets but, you

9   know, as he was traveling through the streets, there was no

10  telling when we would come upon a person on the sidewalk or

11  what have you.

12  Q.  Was there also other traffic in the general area that could

13  have been endangered?

14  A.  Yes, ma'am, there was vehicular traffic and, you know,

15  occasional bicycle traffic and pedestrian traffic in the area.

16  Q.  What do you feel or what do you believe is your

17  responsibility, if any at all, as a law enforcement officer

18  when observing the behavior that you believe may endanger the

19  public?

20  A.  My understanding -- I've always been trained or taught by

21  seasoned agents and my expectation of a law enforcement officer

22  or agent on duty with the ability to stop somebody from hurting

23  other people, my expectation is for that somebody to take

24  action in that case and stop that action.

25  Q.  In addition to the concern for the public from this driving

1    behavior, was there anything about the driving behavior that

2    you felt was concerning from an investigative standpoint?

3    A.  Yes, ma'am.  As I said, you know, that behavior is very

4    common when people are attempting to evade us either because,

5    you know, they -- they are involved in illegal activity or

6    there's something that they want to hide or, you know, a

7    various -- a variety of other reasons, outstanding warrants

8    that they don't wish us to discover about them.

9    Q.  You mentioned before in talking about your responsibilities

10   that if you see action and specifically driving behavior that

11   you believe is potentially dangerous to the public, that if you

12   have the ability to stop a vehicle, that -- that you must do

13   that.

14       Did you have the ability?  Did you have any sort of

15   equipment in your vehicle to conduct a traffic stop?

16   A.  Yes, ma'am.  I was on duty.  I had a vehicle that was

17   equipped with emergency lights and siren, red and blue, like

18   other law enforcement vehicles.

19   Q.  And did you, in fact, attempt to conduct a traffic stop?

20   A.  Yes, ma'am.

21   Q.  And what -- can you tell us what happened?  What did you do

22   and how did the vehicle respond?

23   A.  So after he made the U-turn in the residential area, I

24   decided that, you know, that his actions needed to be stopped

25   so I also made a U-turn and got behind him, activated my

1    emergency lights.  He did not immediately stop.  He continued

2    to drive erratically, running stop signs, making abrupt turns.

3    I continued to follow him with my emergency lights activated

4    and turning on my siren so, you know, he would obviously know

5    that I was trying to stop him.

6    Q.  Did he eventually stop after you turned on the siren?

7    A.  He eventually stopped but it was several -- it was a long

8    time.  He took a long time to stop even after I turned on my

9    siren.

10   Q.  In -- in total, how long do you believe that you were

11   observing this vehicle's driving, I should say problematic

12   perhaps, driving behavior until you -- until it finally

13   stopped?

14   A.  You know, it sounds like a lot, but it all happened

15   probably within a matter of a few minutes.

16   Q.  Okay.  And when you did stop the vehicle, did you have

17   contact with the individuals inside of it?

18   A.  Yes, ma'am.

19   Q.  How many individuals were there?

20   A.  Three total.

21   Q.  Okay.  And do you see one of those individuals here today?

22   A.  Yes, ma'am.

23   Q.  Can you -- first of all, is that individual a passenger, a

24   driver of the vehicle?

25   A.  He was the driver of the vehicle.

DIRECT EXAMINATION - CHRISTOPHER BULLOCK

1  Q.  And can you describe where he's in the courtroom and what

2  he is wearing?

3  A.  He's wearing the orange jumpsuit there in the defendant's

4  chair.

5          MS. WOOLRIDGE:  May the record reflect that the

6  witness identified the defendant?

7          THE COURT:  Yes.

8  BY MS. WOOLRIDGE:

9  Q.  And in initially stopping, did you see or hear the

10 defendant do or say anything?

11 A.  I remember the defendant and his front seat passenger just

12 yelling out of their open front door windows that they weren't

13 doing anything wrong and questioning why we were stopping them

14 and so that was immediately what I remember hearing them say.

15 Q.  And you mentioned that there was a third individual in the

16 vehicle?

17 A.  Yes, ma'am, a toddler or infant toddler in the back seat

18 that I hadn't noticed prior to the vehicle stopping.

19 Q.  What was the defendant's behavior like when you first

20 conducted the stop?

21 A.  His behavior was nervous.  Again, just repeatedly

22 questioning, you know, why he was being stopped and repeatedly

23 saying that he wasn't doing anything wrong and I remember that

24 he also, you know, appeared to be reaching for or hiding or

25 trying to hide something in between the seat and center

1    console.

2    Q.  And did you do anything in -- were you concerned about --

3    about that?

4    A.  I was concerned.  I didn't know what it was that he was

5    reaching for or might have been reaching for.

6    Q.  Okay.  And so did you ask him about or look for any -- any

7    -- anything in particular at that point?

8    A.  At that point, concern that it might have been a weapon, I

9    just asked him to step from the vehicle to remove him or

10   separate him from whatever might have been in there.

11   Q.  Okay.  And did he admit to you that he had a firearm in the

12   vehicle hidden, specifically hidden in the vehicle?

13   A.  Yes, ma'am, not immediately upon exiting the vehicle but

14   after we asked him to step toward our vehicle, I asked him if

15   there was any -- anything dangerous in the vehicle, firearms,

16   drugs, and he did admit to me that there was a firearm in the

17   vehicle.

18   Q.  And do you know where that firearm was hidden?

19   A.  Yes, ma'am, between -- underneath the rear seat cushion,

20   immediately under the toddler's seat that was in the back seat.

21   Q.  And was that location of the firearm consistent with the

22   furtive movements that you observed the driver make while the

23   vehicle -- while he was still driving the vehicle?

24   A.  It's possible that he reached back there, yes, ma'am.  He

25   -- I don't remember all of the different areas that I thought

DIRECT EXAMINATION - CHRISTOPHER BULLOCK

1    he was reaching but I could see him leaning over as he was

2    driving.

3    Q.  And after stopping the defendant, did you observe any

4    indications that the defendant was under the influence of

5    anything?

6    A.  He was just nervous the whole time.  He -- he spoke very

7    quickly and I remember asking him -- him asking to have a

8    cigarette and standing up and just kind of pacing around.  He

9    just seemed nervous.

10   Q.  Okay.  Did you -- are you -- were you aware of any

11   narcotics found in the defendant's vehicle or on his person?

12   A.  Later on, yes.

13   Q.  Okay.  And do you know -- do you know what those narcotics

14   were?

15   A.  It tested positive for having the properties of heroin.

16   Q.  Sir, you were the individual driving the law enforcement

17   vehicle, correct?

18   A.  Yes, ma'am.

19   Q.  Did you make the decision to conduct the traffic stop on

20   your own or as a result of any conversation with Patrol Agent

21   in Charge Hermansen?

22   A.  I am sure we had conversations and both agreed that that

23   vehicle needed to be stopped.  If I was on my own, I would have

24   stopped it regardless.

25   Q.  Why is that?

A.  Just this -- just the excessively reckless manner in which he was driving.  I -- I was very nervous that somebody was going to get hurt and get hurt in my presence and I was not comfortable with that.

Q.  Do you feel that you had a duty as a sworn federal law enforcement officer to stop that vehicle?

A.  Yes, ma'am.

Q.  Does that -- does that duty have anything to do with your cross-certification?

A.  No, ma'am.  I'd done it in the past without having been cross-certified.

Q.  And aside from the dangerousness of the driving behavior, is there anything else that contributed to your decision to make that traffic stop?

A.  We were building suspicion to stop the vehicle.  I mean, immediately when he passed us, after having honked at us, and he -- I call it a hard look.  He took a long look at us and being that I was wearing law enforcement vest with a big yellow badge on it and I assume he was able to see that and after seeing that, speeding off, it immediately made me suspicious that he may have been doing something that he didn't want me to know about.

    After that happening and us catching up to him and his driving pattern leading me to believe that he was continuously attempting to evade us, you know, made me more suspicious, so,

DIRECT/CROSS-EXAMINATION - CHRISTOPHER BULLOCK          103

1    yes.

2    Q.  Thank you, sir.  Those are all the questions I have for you

3    at this time.

4          THE COURT:  Okay.  Cross-examination?

5          MR. MALKA:  Yes, Your Honor.

6                      CROSS-EXAMINATION

7    BY MR. MALKA:

8    Q.  Sir, you mentioned on direct examination that one of the

9    purposes of being cross-certified was to initiate prosecution

10   through other avenues; is that right?

11   A.  Yes, sir.

12   Q.  One of those avenues not only being federal prosecution but

13   state prosecution; is that right?

14   A.  Yes, sir.

15   Q.  So to prosecute for state offenses, you have to be able to

16   articulate state violations; is that right?

17   A.  Yes, sir.

18   Q.  Okay.  I want to ask you briefly about your duties as a

19   patrol agent -- as a Border Patrol agent, specifically related

20   to Title 8, part 287.5.  Are you familiar with that chapter in

21   the Federal Code of Regulations?

22   A.  I don't recall exactly what that chapter says.

23          MR. MALKA:  Your Honor, may I approach?

24          THE COURT:  Yes.

25

 1   BY MR. MALKA:

 2   Q.  This is a copy of Title 8.  If you'd please look that over.

 3   Let me know if you need more time but does this section of the

 4   code lay out your authority as a Border Patrol officer?

 5   A.  Give me a minute to read it, please.

 6   Q.  Sure.

 7          MR. MALKA:  Your Honor, while the witness is looking

 8   this over, I just wanted to remind the court that this was

 9   admitted into evidence as Defense Exhibit 55.

10          THE COURT:  Okay.  Yes.  Thank you.

11          MR. MALKA:  Thank you.

12          THE COURT:  What we're going to do is, I'm just going

13   to take -- I need to use the rest room.

14          MR. MALKA:  Sure.

15          THE COURT:  Too much coffee, too much information, but

16   I'm going to let the witness read through this eight-page

17   document and I'll be right back.

18      (A recess was had.)

19          THE COURT:  So, let's note that my presence -- we're

20   back -- we'll be back on the record but let the witness finish

21   reading through Exhibit 55.

22          MR. MALKA:  All right.  Thank you.

23   BY MR. MALKA:

24   Q.  Sir, have you refreshed your recollection of 287.5?

25   A.  Somewhat, yes.

CROSS-EXAMINATION - CHRISTOPHER BULLOCK

1  Q.  And 287.5 is essentially where your authority as a Border

2  Patrol officer stems from; is that right?

3  A.  That is one of the authorities under Title 8 that our

4  authority stems from, yes, sir.

5  Q.  And when you were just reviewing, sir, you did see that it

6  gives you permission as a Border Patrol officer authority to

7  execute immigration warrants; is that right?

8  A.  Yes, sir.

9  Q.  Authority to execute immigration arrests?

10 A.  Yes, sir.

11 Q.  Sir, nowhere in the code does it give you authority to

12 exercise authority as a state peace officer; is that right?

13 A.  Correct.

14 Q.  Okay.  Sir, as a Border Patrol officer, how many traffic

15 citations have you issued?

16 A.  None.

17 Q.  Okay.  How many cases have you referred to prosecution for

18 traffic citations?

19 A.  For traffic citations, none.

20 Q.  In the present case, you did not call Tucson Police

21 Department or TPD to come issue a traffic citation; is that

22 right?

23 A.  That's correct.

24 Q.  You didn't call the Pima County Sheriff's Department to

25 come issue a traffic citation?

1    A.   No, sir.

2    Q.   You did call ATF though; is that right?

3    A.   Mr. Hermansen called ATF, yes, sir.

4    Q.   And ATF is not authorized to issue traffic citations; is

5    that right?

6    A.   I am unaware of their ability to issue traffic citations.

7    Q.   Okay.

8             MR. MALKA:   I apologize, Your Honor, I have to reboot

9    the overhead here.

10            THE COURT:   That's okay.   I don't know why it shuts

11   off like that.

12        Allison, can you put down the screen a little more?   Thank

13   you.

14   BY MR. MALKA:

15   Q.   Sir, are you familiar with the Pima County Sheriff's

16   Department policies on pursuits, their major policies manual?

17   A.   No, sir, I'm not familiar with what their policy says on

18   pursuits.

19   Q.   All right.   And you are a deputy sheriff, is that right,

20   cross-certified as a deputy sheriff?

21   A.   At that time, yes, sir.

22   Q.   All right.   I'm going to show you chapter 3 from the

23   Sheriff's Traffic Procedural Manual which states, this is page

24   3(a), it says:   The primary --

25            MS. WOOLRIDGE:   Your Honor, this has not been moved

1    for admission and if it's -- if it's -- and I would object,

2    first of all, to it being shown, to counsel testifying as to

3    the content of it, and to the relevancy of it.

4        First of all, there's not an issue of pursuit in this case,

5    and, second, the witness has testified that he's not familiar

6    with this policy.

7            THE COURT:  Okay.  So, let's do this, first,

8    Mr. Malka, I know it's a little unwieldy but you need to be by

9    a microphone so we can pick up the recording.

10           MR. MALKA:  Sure.

11           THE COURT:  But do you want to move for the admission

12   of this document and then be able to publish it and ask the

13   witness questions?

14           MR. MALKA:  Your Honor, if the government has conceded

15   that as a cross-certified deputy sheriff that Agent Bullock is

16   not familiar with the sheriff's manuals and guidelines and

17   policies, then I'm not going to ask any further questions about

18   it.

19           THE COURT:  Okay.  Okay.

20           MS. WOOLRIDGE:  I'm not agreeing to that concession

21   but I do object to the admission of the --

22           THE COURT:  Why don't you ask him if -- maybe just

23   show him this exhibit, which I think is 58, ask him if he's

24   ever seen it or been trained on it or has any familiarity with

25   it and then go from there?

1          MR. MALKA:  Sure.  May I approach, Your Honor?

2          THE COURT:  Sure.  And am I right, is this Exhibit 58?

3          MR. MALKA:  Let me double-check.

4          THE COURT:  Okay. Good.

5          MR. MALKA:  Yes, Your Honor, this is chapter --

6  chapter 3.

7          THE COURT:  Okay.  Thank you.

8  BY MR. MALKA:

9  Q.  Sir, you stated that you are not familiar with the

10  sheriff's department's policies on pursuits?

11  A.  That's correct.

12  Q.  Okay.  As a Border Patrol agent and equally as a

13  cross-certified deputy sheriff, are you required to radio in or

14  communicate, for example, location, speed, or direction of

15  travel of an individual that you're pursuing?

16  A.  Yes.

17  Q.  Okay.  Did you radio in the location, speed, and the car

18  that you were pursuing in this case?

19  A.  No, I did not.  Mr. Hermansen was handling the radio.  We

20  didn't immediately consider it a pursuit as we weren't always

21  right behind the vehicle.  Being that we were in an unmarked

22  vehicle, we wanted to be sure that he knew that we were law

23  enforcement before we actually called it a pursuit -- a

24  pursuit.

25  Q.  Did you use the radio at all in furtherance of following

CROSS-EXAMINATION - CHRISTOPHER BULLOCK

1    the Toyota Camry on this day?

2    A.  I don't recall using the radio myself at all.

3    Q.  Okay.  So even after the emergency lights had been

4    activated, the radio was not used; is that right?

5    A.  I don't know that that's true or not.

6    Q.  Okay.

7            MR. MALKA:  Your Honor, if I may have a brief second?

8            THE COURT:  Sure.

9    BY MR. MALKA:

10   Q.  Sir, it's not a crime to look at a law enforcement officer;

11   is that right?

12   A.  No, sir.

13   Q.  It's not a crime to look at a law enforcement vehicle?

14   A.  No, sir.

15   Q.  All right.  It's, in fact, generally not a crime to look at

16   someone; is that right?

17   A.  I would say that's right, sir, yes.

18   Q.  Okay.  You stated earlier that your Tahoe -- you were

19   traveling in a Tahoe; is that right?

20   A.  Yes, sir.

21   Q.  Okay.  It was not a marked law enforcement vehicle?

22   A.  Correct, it was not marked.

23   Q.  Okay.  And you just, in one of the previous questions I

24   just asked, you answered with you wanted to -- and I apologize.

25   I forgot what the question was.  You wanted to wait until the

CROSS-EXAMINATION - CHRISTOPHER BULLOCK

1   Camry would be able to recognize your presence as law

2   enforcement; is that right?

3   A.  Yes, sir.  As the lights are not immediately noticeable as

4   they are on marked vehicles, I wanted to ensure him enough time

5   to be able to see the red and blue lights and hear the siren.

6   Q.  So at first after the honk and after the Camry passes, the

7   lights were not activated?

8   A.  No, sir, not at first.

9   Q.  Okay.  You stated that the Camry then accelerates quickly

10  after it passes you; is that right?

11  A.  Yes, sir, after it passes, yes.

12  Q.  Okay.  And that's when you initiate your follow, right?

13  A.  That's --

14  Q.  Okay.

15  A.  -- yes, I start to follow him from there, yes.

16  Q.  And then, at that point, after you started following

17  closely, you didn't initiate your emergency lights; is that

18  right?

19  A.  Not immediately, that's right.

20  Q.  Okay.  Your report states that the Camry is going through

21  stop signs and driving above the speed limit, right?

22  A.  Yes.

23  Q.  So after the -- do you recall how many stop signs exactly?

24  A.  I don't recall, no.

25  Q.  Okay.  But there were a few?

CROSS-EXAMINATION - CHRISTOPHER BULLOCK

1    A.  More than one I would say.

2    Q.  Okay.  And after the first stop sign, you still had not

3    activated your emergency lights at this time?

4    A.  Not -- not yet, no.

5    Q.  What about after the second stop sign?

6    A.  I'm not sure exactly which number of stop signs that I

7    initiated the emergency equipment.

8    Q.  Okay.  It was -- just to make things clear, you reported

9    that the Camry was going through stop signs first and then made

10   a U-turn and it's then, after the U-turn, that you activated

11   your emergency lights?

12   A.  Correct.

13   Q.  Okay.  So going back to the car that you were driving, a

14   Tahoe is an SUV; is that right?

15   A.  Yes, sir.

16   Q.  And SUVs generally speaking are larger, they sit up higher

17   than sedans?

18   A.  I would agree.

19   Q.  Okay.  I do have one question.  How tall are you?

20   A.  Not very.  Five foot five inches.

21   Q.  Okay.  Now, Border Patrol, their Tahoes are specialized

22   SUVs, meaning they can go off road; is that right?

23   A.  They are not specialized but, yes, they can go off road.

24   Q.  Okay.  The particular model of the car that you were

25   driving had mud terrain tires on them; is that right?

CROSS-EXAMINATION - CHRISTOPHER BULLOCK                    112

1    A.  I believe so at the time, yes.

2    Q.  Okay.  So it's a -- those are not -- those are not tires

3    that come -- those are not factory tires, those are -- those

4    are tires that you, Border Patrol, had put on the car later in

5    order to --

6    A.  Yes.

7    Q.  -- be able to go off road?  Okay.

8    A.  Well, yes.

9    Q.  Sure.

10       So the day -- on the day of the incident, you were the

11   driver; is that right?

12   A.  Yes.

13   Q.  And you got honked at; is that right?

14   A.  Yes.

15   Q.  Okay.  So you moved your vehicle in which direction to let

16   the honker pass?

17   A.  Pulled to the right side of the road.

18   Q.  Okay.  How fast did you say you were driving at the time of

19   the honk?

20   A.  I don't remember exactly how fast, nor do I think I checked

21   exactly how fast I was going when he honked but I know that we

22   were drive --

23   Q.  Driving the speed limit?

24   A.  We were driving slowly so that we could observe activity in

25   the area.

1   Q.   Okay.

2   A.   Maybe even less than the speed limit.

3   Q.   So after the honk, you're moving your vehicle over to the

4   side of the road and simultaneously looking at the honker pass

5   you?

6   A.   I looked in my rearview mirror, yes.

7   Q.   Okay.  Oh, so it was through the rearview mirror that you

8   saw the Camry?

9   A.   Initially, yes, after the driver honked.

10  Q.   Okay.  When the Camry drives past you, it doesn't stop next

11  to you; is that right?

12  A.   Right.

13  Q.   It's moving?

14  A.   Yes.

15  Q.   And, at that time, your car is also moving?

16  A.   No, I came to a stop.

17  Q.   You came to a complete stop?

18  A.   Yes.

19  Q.   And, as you said, the Camry's a sedan, right?

20  A.   Yes.

21  Q.   So it sits much lower to the ground than your car?

22  A.   Yes.

23  Q.   Okay.

24  A.   It sits lower.

25  Q.   And so as -- I apologize.

CROSS-EXAMINATION - CHRISTOPHER BULLOCK                    114

1    A.   I'm sorry.   It does sit lower.

2    Q.   Okay.   So you're looking down at the car as it passes you?

3    A.   You could say that, yes.

4    Q.   All right.   And you said that the passengers in the Camry

5    looked at you as they passed?

6    A.   Yes.

7    Q.   So they must have been looking up to see you?

8    A.   Okay, yes.

9    Q.   Okay.   And you looking down, as you just said, to see them?

10        Your report -- is that right?

11   A.   My --

12   Q.   I apologize.   I cut you off.   You said that the Tahoe sits

13   higher up so you would be looking down as the Camry passes you?

14   A.   Yes.   Naturally, the level on the driver's window on a

15   Tahoe is higher than the window on the door of a Camry, yes.

16   Q.   Okay.   And, according to your report, your window was

17   partially open at this time?

18   A.   Yes.

19   Q.   Okay.   And your window is tinted, right?

20   A.   Yes.

21   Q.   Okay.   And the windows to the Camry are closed; is that

22   right?

23   A.   You know, I don't recall at that point if they were open or

24   closed.

25   Q.   Okay.   Nothing in your report suggested that they were open

CROSS-EXAMINATION - CHRISTOPHER BULLOCK

1  or closed, right?

2  A.  I can --

3  Q.  If you'd like to refresh your recollection, I'd be happy to

4  bring up your report.

5  A.  I remember that -- well, yeah, if you have the report to

6  refresh, then I'll look at it.

7  Q.  Sure.

8  A.  Thank you.

9       MR. MALKA:  Your Honor, may I approach?

10      THE COURT:  Sure.

11      THE WITNESS:  Thank you, sir.  Okay, sir, I'm sorry,

12  What was your question again?

13  BY MR. MALKA:

14  Q.  Nothing in your report suggests anything about the Camry's

15  windows being open or closed; is that right?

16  A.  No, I'm not finding anything that says definitively that

17  they were --

18  Q.  Okay.

19  A.  -- open or closed at that time.

20  Q.  Okay.  And, as you said, sir, it's not illegal to look at

21  people as you drive past them?

22  A.  Of course not.

23      MS. WOOLRIDGE:  I --

24  BY MR. MALKA:

25  Q.  Okay.

UNITED STATES DISTRICT COURT

 1          MS. WOOLRIDGE:  I was going to object to asked and

 2   answered but it's been answered again.

 3          THE COURT:  Okay.  And so can you just pull that

 4   microphone -- push it down a little bit, you're kind of

 5   soft-spoken.  I just want to make sure we're picking up

 6   everything on the record.  Thank you.

 7          THE WITNESS:  Yes, sir.

 8   BY MR. MALKA:

 9   Q.  After the Camry passed you, Agent Bullock, what did Officer

10   Hermansen say to you?

11   A.  I don't recall exactly what he said right after it passed

12   me.

13   Q.  Do you recall what you said to Officer Hermansen?

14   A.  No, there's no way I can recall exactly what was said

15   immediately after it passed.

16   Q.  Okay.  Sir, you said on direct that after you activated

17   your emergency lights, the Camry recognized your presence and

18   then pulled over; is that right?

19   A.  I'm not sure if that's exactly what I said but --

20   Q.  So please correct me if I'm wrong.  I apologize.

21   A.  At some point, yes, he did eventually stop after I

22   activated my emergency equipment.

23   Q.  Okay.  And can you remind me again from the time of the

24   honk up until the stop, how long did the entire incident take

25   place?

1   A.  I -- I don't know exactly how long it took but I don't

2   imagine it took more than a couple or a few minutes.

3   Q.  Okay.  So then would you say for the majority of the time

4   that you were following the Camry, you had not activated your

5   emergency lights?

6   A.  I -- I don't know that I could call it the majority.  I

7   don't know for sure.  Excuse me.

8   Q.  Well, we know for sure that there were a few stop signs run

9   and the U-turn made before the emergency lights were activated.

10  So you followed closely behind --

11          MS. WOOLRIDGE:  Objection, misstates testimony.

12          THE COURT:  Well, I think he's -- the witness can

13  correct him if the question -- if it's being summarized

14  inaccurately.

15  BY MR. MALKA:

16  Q.  So you followed closely behind after the stop signs were

17  run and after the U-turn was made and then you activated your

18  emergency lights?

19  A.  I don't know that I would say I was following closely

20  behind.  The only reason we ever got close to the vehicle is to

21  get close enough to read the license plate but after that we

22  were not closely behind him.  We were close enough behind him

23  but not so close that it would be dangerous for us.

24  Q.  Okay.  You did say that you ran the plates on the Camry; is

25  that right?

1    A.   Mr. Hermansen ran the plates, yes.

2    Q.   Were you aware that the car was registered out of Tucson

3    Auto Rental?

4    A.   Yes.

5    Q.   And you're aware that Tucson Auto Rental is located a few

6    blocks from where the stop occurred?

7    A.   I was not aware that it was a few blocks from there, no, at

8    the time.

9    Q.   From the time that you first saw the Camry, did you ever

10   see anyone entering or exiting the vehicle?

11   A.   From -- I'm sorry.  Say that again.

12   Q.   From the time that you first encountered the Toyota Camry,

13   did you ever see anyone entering or exiting the car?

14   A.   Not before it stopped, no.

15   Q.   Okay.  The car did not appear to be riding low on the

16   axles?

17   A.   To my recollection, no.

18   Q.   Okay.  Sir, when you approached the vehicle after the stop,

19   you went to speak to Mr. Jones, right?

20   A.   Yes.

21   Q.   He was the driver of the Toyota Camry, right?

22   A.   Yes.

23   Q.   Okay.

24        THE COURT:  Mr. Malka, I hate to interrupt you but

25   we're right at the lunch hour.  We probably should let

```
 1   everybody take a break and get some lunch.  Is -- it sounds

 2   like you're transitioning to a new subject area so is this --

 3             MR. MALKA:  Actually, Your Honor, I was getting close

 4   to finishing but I'm happy --

 5             THE COURT:  Oh, if you're -- if you're close to

 6   finishing, we can finish then.  I just didn't -- if you had

 7   some more, I was going to say let's just do it after the lunch

 8   hour.

 9             MR. MALKA:  Sure.  Do you mind if I confer with

10   counsel, please?

11             THE COURT:  Sure.  Why don't you talk and see.  If you

12   want to take a break, we can take a break and then come back.

13             MR. MALKA:  Just one last question, Your Honor.

14             THE COURT:  Okay.  That's a dangerous thing to say.

15   Okay.  Go ahead.

16             MR. MALKA:  One last line --

17             THE COURT:  One last subject area, okay.

18   BY MR. MALKA:

19   Q.  Okay.  Just to recap, you said you approached the Toyota

20   Camry after you pulled the Camry over, right?

21   A.  Yes, sir.

22   Q.  Okay.  And you went to speak to Mr. Jones, the driver?

23   A.  Yes, sir.

24   Q.  Okay.  Nowhere in your report does it mention that you

25   stated to Jones the reason for stopping him; is that right?
```

1    A.  One second.  In my report I do say that I asked if there

2    are any illegal people, drugs, or weapons within the vehicle.

3    Q.  Do you specifically tell Mr. Jones the purpose of the stop?

4    A.  I don't remember exactly what words I used but I -- I don't

5    say in my report that I told him the purpose of the stop is to

6    look for illegal people, drugs, or weapons.

7    Q.  Okay.  And then, I apologize, last question, you said on

8    direct when you found Mr. Jones, you said you just found him

9    nervous; was that right?

10   A.  My opinion, he was nervous, yes.

11   Q.  Okay.

12           MR. MALKA:  Thank you, Your Honor.  No further

13   questions.

14           THE COURT:  Okay.  Thank you.  Does 1:15 give

15   everybody enough time for lunch?  Okay.

16           MS. WOOLRIDGE:  That's fine, Your Honor.

17           THE COURT:  Okay.  So let's come back at 1:15 and you

18   can do your redirect.  We'll get -- well, we'll see if there

19   are other witnesses, okay?  All right.   So we'll see you at --

20   still, again, no talking with other witnesses, just

21   Ms. Woolridge or defense counsel, okay?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Okay.  Thanks, everybody.  See you about

24   1:15.

25       (A recess was had.)

1          THE COURT:  Okay.  Yeah, Agent Bullock, you want to

2   come back on up to the witness stand?

3          THE WITNESS:  Sure.

4          THE COURT:  Mr. Jones, you can have a seat.  Thank

5   you.

6       Okay, Ms. Woolridge, do you have redirect examination?

7          MS. WOOLRIDGE:  I do, Your Honor.

8          THE COURT:  Okay.

9                    REDIRECT EXAMINATION

10  BY MS. WOOLRIDGE:

11  Q.  Good afternoon, sir.

12  A.  Good afternoon, ma'am.

13  Q.  I have a few follow-up questions for you.  I won't quantify

14  the number for fear of being held to it but I have just a few

15  questions.

16      First of all, you mentioned on cross-examination that one

17  of the -- that basically the purpose of your

18  cross-certification is to be able to, for instance, pursue a

19  state prosecution and that that would be necessarily for a

20  state violation.  Does that -- am I accurately, I guess,

21  paraphrasing your -- your earlier testimony?

22  A.  Yes, ma'am.

23  Q.  Would those state violations still be within the, I guess,

24  overall mission of Border Patrol or are you conducting some

25  investigation of other state crimes outside of Border Patrol's

REDIRECT EXAMINATION - CHRISTOPHER BULLOCK

1    mission?

2    A.  No, ma'am.  Generally, if we pursue state violations, it's

3    related to border crime.  There are state statutes that relate

4    to smuggling and drugs and firearms and things of that nature.

5    Q.  Okay.  Is that the general use or the general purpose of

6    the cross-certification in this context then?

7    A.  Yes, ma'am.

8    Q.  Defense counsel also asked you about the Code of Federal

9    Regulations and specifically Title 8 Section 287.5.  You

10   qualified your answer to a question about the authority as it

11   being one authority for Border Patrol's law enforcement

12   abilities.  Are there other authorities that provide Border

13   Patrol with the ability to conduct its law enforcement duties?

14   A.  Yes, ma'am.  I couldn't rattle all the codes off to you

15   under, you know, the INA or immigration authorities and Title 8

16   but there are several.

17   Q.  And also within the cross-certification designation, do you

18   also have authority to then enforce state laws?

19   A.  Yes, ma'am.

20   Q.  Is -- are those state laws -- is that authority to enforce

21   state laws limited to particular state laws or is it -- or is

22   it -- is it the general ability to enforce state laws?

23   A.  When we are cross-designated, we are not given a set of

24   limitations.

25   Q.  Defense counsel asked you if -- asked you a number of

REDIRECT EXAMINATION - CHRISTOPHER BULLOCK

1  questions about the height of your vehicle, the height of the

2  sedan or the Camry in this case.  Did you have any problems

3  seeing the occupants of that Camry as it went by you?

4  A.  No, ma'am.

5  Q.  And when you are driving your Tahoe, do you generally have

6  any difficulty seeing other vehicles?

7  A.  No, ma'am.  I just adjust the seat.

8  Q.  Have you ever had an issue with your vehicle being so high

9  off the ground that you can't, for instance, see a sedan or a

10  lower vehicle that may be nearby?

11  A.  No, ma'am.

12  Q.  And, finally, we were talking about the reason for the stop

13  or talking to the defendant about the reason for the stop.  I

14  believe your recollection was that when you stopped him, the

15  first thing that you asked is if he had any illegal narcotics,

16  people, firearms, things of those nature, correct?

17  A.  Yes, ma'am.

18  Q.  And do you recall that being the -- essentially the

19  immediate conversation or the subject of the immediate

20  conversation you had with him?

21  A.  Yeah.  I can't honestly tell you that I recall that those

22  were the first words out of my mouth but, generally speaking,

23  we make that a common practice as Border Patrol agents to first

24  ask about immigration and take it from there.

25  Q.  And I guess you kind of led into my next follow-up question

REDIRECT EXAMINATION - CHRISTOPHER BULLOCK                    124

```
 1   there.  Are those things that you're asking about all matters
 2   within the purview or the mission of the Border Patrol?
 3   A.  Yes, ma'am.
 4   Q.  All right.  Thank you, sir.  That's -- those are all the
 5   questions I have for you.
 6               THE COURT:  Thank you.  I just have -- did you talk
 7   with the -- with Mr. Jones at all about the traffic infractions
 8   that you had witnessed, do you recall?
 9               THE WITNESS:  Sir, I don't recall any specific
10   questions that I asked Mr. Jones about the traffic.  I can tell
11   you I thought about it a lot, I just don't recall asking him a
12   specific question about his driving.  I would -- based on my
13   recollection today, I would assume that he knew, you know, how
14   he was driving.
15               THE COURT:  Okay.  Thank you.
16      Any follow-up questions?
17               MR. MALKA:  No, Your Honor.
18               THE COURT:  Okay.  All right.  Agent Bullock, thank
19   you.  May Agent Bullock be excused?
20               MS. WOOLRIDGE:  Yes, Your Honor.  Thank you.
21               MR. MALKA:  Yes, Your Honor.
22               THE COURT:  Okay.  Thank you very much, sir.  If you
23   have any exhibits, would you just hand them to the attorneys so
24   they can sort those out?
25      Okay.  Ms. Woolridge, do you have any other witnesses?
```

1          MS. WOOLRIDGE:  I don't, Your Honor.  The government

2     rests at this time.

3          THE COURT:  Okay.  And then, Mr. Costales, Mr. Malka,

4     you have some witnesses or a witness?

5          MR. COSTALES:  Yes, Your Honor, Mr. Malka's witness.

6          MR. MALKA:  Your Honor, at this time, we'd like to

7     call Mr. Martin Pesqueira.

8          THE COURT:  Okay, come on forward, sir.  Okay.  Come

9     on up and you have not been placed under oath yet so just come

10    on up here and just remain standing while the court clerk

11    administers the oath to you.

12          MARTIN PESQUEIRA, WITNESS, WAS SWORN.

13          MR. MALKA:  May I proceed, Your Honor?

14          THE COURT:  Yes, please.  Thank you.

15          MR. MALKA:  Thank you.

16                      DIRECT EXAMINATION

17    BY MR. MALKA:

18    Q.  Sir, where do you work?

19    A.  I'm a criminal investigator for the Federal Public

20    Defenders.

21    Q.  How long have you worked there?

22    A.  Three and a half years now.

23    Q.  And what does your job entail?

24    A.  I am -- I investigate different crimes, everything from

25    homicides to drugs, every -- any federal crime that any

1    attorney requests my assistance in involving interviewing,

2    looking at different paperwork, whether it's reports,

3    documentation that the clients might have or anything

4    associated with the crime that was committed they've been

5    accused of.

6    Q.  Great.  Prior to your employment at the Federal Public

7    Defender's Office, what were you doing?

8    A.  I was a Tucson police officer.

9    Q.  How long were you a Tucson police officer?

10   A.  25 years, three months.

11   Q.  And what precinct or unit did you belong to while you

12   worked for TPD?

13   A.  The majority of my time I did operations division south,

14   which is all the south side of the city of Tucson.  I did one

15   year in particular for the DUI squad which was based out of the

16   downtown division but I was -- 90 percent of my DUI work down

17   in the south side of the city of Tucson.

18   Q.  And I'm sorry if I asked you, what was your official

19   position?

20   A.  Police officer, patrol.

21   Q.  Patrol officer, okay.  What training or certification did

22   you undertake to become a TPD officer?

23   A.  I attended a pre-academy, Tucson police academy, which used

24   to be on Grant and Silverbell area, it was on north Silverbell,

25   it was about four weeks.  After that I attended what was back

1   then known as ALETA, Arizona Law Enforcement Training Academy.

2   As a matter of fact, I was certified as a police officer after

3   living there for 16 weeks by Jack Lane, the person who

4   testified earlier.  He was my sergeant who certified me as a

5   police officer.

6   Q.  All right.  I want to now focus on the present case before

7   the court.  What's your connection to the present case before

8   the court?

9   A.  I was assigned this case on March 26th, 2018, almost a year

10  after the incident.

11  Q.  And what did you do in furtherance of your investigation of

12  the case?

13  A.  The first thing I did, the next day, the 27th of March, I

14  went to the scene and tried to determine the length of time it

15  would take to drive the entire course by -- I hadn't spoken to

16  the client yet, Mr. Jones, I had only gone by the paperwork,

17  the reports that were turned in, that were given to us and,

18  going by those reports, I started documenting how long it would

19  take for the entire course from approximately 600 block of east

20  20th Street, which is about Jacobus and 20th Street, to the

21  final stop of 21st Street and Fremont.

22  Q.  And when you're speaking of "the course", you're talking

23  about the route traveled in this case by the Camry and the

24  Tahoe, the Border Patrol vehicle?

25  A.  Yes, that's actually a better word, route.

```
 1   Q.  Okay.  Yes.  What else did you research during the course
 2   of your investigations?
 3   A.  After I did that, I then went and met with Mr. Jones,
 4   explained to him what I do, how I did it, showed him what I had
 5   done.  He -- he disagreed a little bit with the route by one
 6   block.  He had the same route that was pretty much in the
 7   reports, his was just short by one block compared to theirs.
 8         After that, I went back, of course, reviewed all the
 9   reports -- so we got a couple of additional reports, reviewed
10   those, went back and redid the course multiple times, timing
11   it, filming it, and just trying to see what -- what the time
12   would be in doing all this and the traffic stop and where the
13   traffic devices being, the traffic device being a speed limit
14   sign or stop sign, yield sign, taking -- looking where
15   everything is at in this route.
16   Q.  Essentially recreating the stop?
17   A.  To the best of my ability from what limited stuff I had,
18   yes.
19   Q.  Did you also research Tucson Auto Rental and their
20   business?
21   A.  I researched -- I was familiar with them but, yes, I had
22   researched them also.
23   Q.  And did you also, during the course of your investigation
24   for this case, look up cases of cop impersonations in Tucson?
25   A.  Yeah, I was aware of them and I did some research, some
```

DIRECT EXAMINATION - MARTIN PESQUEIRA

1   more.  At the time, there had been quite a problem with people

2   dressing or putting their cars as police cars, pulling people

3   over and at the time when this was going on, it was a little

4   rash in Tucson going on at the time what I was investigating,

5   not the time that the incident, which was about a year apart.

6   Q.  Okay.

7   A.  At the time that I was investigating, there was a big rash

8   of them going on during that time and I was bringing those up

9   to what was happening in the city of Tucson at that point

10  involving traffic stops by bogus police officers.

11  Q.  All right.  So what I want to do is I want to, now that

12  we've covered what you covered during your investigation, I

13  want to ask you specific questions about each of those topics.

14  So we just -- you just mentioned you drove the area, you

15  essentially recreated the stop to the best of your abilities.

16  So I want to talk about that.

17      Are you familiar with the area where the stop in this case

18  occurred?

19  A.  Very much so.

20  Q.  How are you familiar with that area?

21  A.  Before I was a police officer, I actually grew up at

22  17th Street and Jacobus, which was three blocks away from where

23  the original driving area, the traffic route began.

24  Q.  Okay.  Is this the -- are we looking at the city of Tucson

25  or the city of South Tucson?

1   A.  This is the city of Tucson.

2   Q.  Just south -- the south side of the city of Tucson?

3   A.  Well, it depends who you ask.  If it's to the police

4   department, it's actually downtown division.

5   Q.  Okay.

6   A.  When I was a -- when I became a police officer in 1989,

7   operations division south went all the way to 18th Street.

8   Later on it got moved to 22nd Street and then it got moved on

9   south.  The city of South Tucson, which is a different city in

10  the middle of the city of Tucson, so basically, I guess it

11  would be 40 -- it would be 39th Street where basically I-10 at

12  Sixth Avenue.  The city of South Tucson is one square mile

13  where it's from the railroad tracks to the east to

14  approximately I-10, I-19 to the west, 24th, 25th Street, the

15  alley between there to the north, I-10 to the south.  It's one

16  square mile.

17      So they kind of -- because it was -- we were having such a

18  problem getting calls, if you were at 43rd and Sixth Avenue and

19  you're beeped, you have to go to Sixth Avenue and 22nd, you

20  basically ran lights and sirens through the city of South

21  Tucson and the city of South Tucson was getting upset about why

22  are you running lights and sirens --

23  Q.  Sure.

24  A.  -- through our city so they changed the boundaries further

25  south, that way we didn't have that problem, a different

 1  division took over so now it's officially known as the downtown

 2  division.

 3  Q.  I understand.  I do want to show you a picture.

 4          MR. MALKA:  Your Honor, may I approach?

 5          THE COURT:  Sure.

 6          MR. MALKA:  Thank you.

 7  BY MR. MALKA:

 8  Q.  This is Defense Exhibit 54.  Do you know what this is a

 9  picture of?

10  A.  It's a Google maps picture of the area covering the route

11  and a little bit more of the area.

12  Q.  Did you get this picture from Google maps?

13  A.  I -- I found it and I printed it and --

14  Q.  Does the picture accurately show the map of the area where

15  the incident in question occurred?

16  A.  Yes, it does.

17  Q.  And did you alter the picture whatsoever?

18  A.  The only -- I'm not sure I'd call it an alteration, it's

19  just where I put the GPS location that was listed at the stop.

20  The only thing different, if you look at the computer, is the

21  location dot, which is at the Fremont and 21st Street.

22  Q.  Yes.

23  A.  That little red dot would be the only thing that I would

24  have added to it, which was added 'cause I placed in the GPS

25  location.  Other than that, everything else is the way it came

 1    off Google maps.

 2              MR. MALKA:  Your Honor, at this time, we'd like to

 3    move Defense Exhibit 54 into evidence.

 4              THE COURT:  Okay.  Any objection, Ms. Woolridge?

 5              MS. WOOLRIDGE:  No, Your Honor.  Thank you.

 6              THE COURT:  Okay.  So Defense Exhibit 54 will be

 7    admitted.

 8              MR. MALKA:  Okay.  Your Honor, what I was planning on

 9    doing is asking the witness to mark on the map.  I imagine

10    since there is no computer on the witness stand that the

11    witness would have to come up here and use the overhead.  Would

12    that be --

13              THE COURT:  That's fine with me as long as -- as long

14    as while you're testifying, you do it into that microphone.

15              MR. MALKA:  I can turn this.

16              THE COURT:  Sure.  As long as you even don't mind

17    standing next to Mr. Malka.  Okay.

18              THE WITNESS:  Take this one or a different one?

19              MR. MALKA:  You can bring that one.

20    BY MR. MALKA:

21    Q.  All right.  Would you be able to show on the map where the

22    honk occurred?

23    A.  From my investigation, the honk happened somewhere between

24    the area of the end of the skate park, which would be basically

25    just east of Jacobus and 20th Street, right about where the

1    railroad tracks are at, and I'm going to make an X or what

2    would you like me to --

3    Q.  If you could write "honk" right there.

4         MS. WOOLRIDGE:  You know, Your Honor, I'm going to

5    object to the foundation of this.  This witness wasn't there,

6    and I would like to voir dire the witness if the court intends

7    to introduce any -- any of these conclusions.

8         THE COURT:  Okay.  Do you want Mr. Malka to lay a

9    little foundation before you do that or do you --

10        MR. MALKA:  Your Honor, I'm sorry.  I don't mean to

11   interrupt.  I can lay a foundation.  I thought that I asked

12   Mr. Pesqueira what he relied on to find the map and then to --

13   what he relied on during the course of his investigation to

14   recreate this stop and that's -- that's to the extent of the

15   questions that I had for him.  But I'm happy to ask further

16   questions about that.

17        THE COURT:  Okay.  Well, why don't you just -- if you

18   want to lay a little foundation as to how he ascertained where

19   the honk occurred, and then if, Ms. Woolridge, if you're not

20   satisfied, you can voir dire at that point.

21        MS. WOOLRIDGE:  Thank you, Your Honor.

22        THE COURT:  Sure.

23   BY MR. MALKA:

24   Q.  Okay.  How about, sir, would you please be able to or what

25   did you rely on to recreate this stop?

1   A.  From the police reports that were given to us, which talked

2   about the north side of the skate park --

3   Q.  Okay.

4   A.  -- and speaking to Mr. Jones, who talked about it happened

5   right about where the railroad tracks are.  That's the general

6   area where the skate park, the northeast end of it, and the

7   railroad tracks, it's probably 50 feet, somewhere between,

8   where it began.  And being that much by the tracks, you've got

9   Euclid there.

10  Q.  Okay.

11  A.  That's where the stop sign is, but they were referring to

12  the stop signs.  It's in that general area.

13  Q.  Okay.  So then would you, instead of asserting exactly

14  where you believe the honk took place, would you make a circle

15  around the general area where you believe the honk took place?

16  A.  (The witness complied.)

17  Q.  Okay.

18          MS. WOOLRIDGE:  Your Honor, again, if I -- I have some

19  concerns about -- about this because I believe it -- I still

20  believe that the foundation is lacking for this witness to make

21  this determination.

22          THE COURT:  Okay.  Well, why don't we do this, Mr. --

23  is it Pescaria?

24          THE WITNESS:  Pesqueira.

25          THE COURT:  Pesqueira.  Why don't you come back up to

 1   the witness stand and we'll let Ms. Woolridge do a voir dire?

 2   And then maybe since it sounds like he's going to be

 3   identifying different areas on the maps, maybe, Ms. Woolridge,

 4   you can, if you think that you're going to -- if that's going

 5   to happen, maybe you can just ask generally about some of these

 6   -- some of these other anticipated areas.

 7            MS. WOOLRIDGE:  Sure.

 8            THE COURT:  Okay.

 9                      VOIR DIRE EXAMINATION

10   BY MS. WOOLRIDGE:

11   Q.  Good afternoon, sir.

12   A.  Good afternoon.

13   Q.  I imagine you had an opportunity to go over the reports

14   prior to testifying here today as well, and specifically

15   talking about the reports of Mr. Hermansen and Mr. Bullock who

16   we heard testify today, correct?

17   A.  Yes, I did.

18   Q.  And nowhere in the reports did they say that the honk

19   occurred in the northeast corner of the Santa Rita Skate Park,

20   did they?

21   A.  Not in those words, no.

22   Q.  No.  In fact, they never even mentioned the east side of

23   Santa Rita Skate Park anywhere in the reports, do they?

24   A.  Well, they kind of do, and I'll have to explain more on

25   that.

1   Q.  Please do.

2   A.  What the reports very specifically said is that they pulled

3   off the roadway.  It is impossible to pull off the roadway if

4   you're on 20th Street north of the park.  You have to be east

5   of the park to pull off the roadway.  To go where that little

6   edge -- it doesn't have a name, I'm going to call it Jacobus

7   also, but there's the road from 20th Street to 22nd Street,

8   there's a strip of roadway there but that's the only place that

9   where it begins where you can pull off the roadway.

10       Then you have --

11            MS. WOOLRIDGE:  Your Honor, Your Honor --

12            THE COURT:  I'm sorry?

13   BY MS. WOOLRIDGE:

14   Q.  Thank you, sir.  You've answered my question.

15            MS. WOOLRIDGE:  May I approach the witness?

16            THE COURT:  Sure.

17   BY MS. WOOLRIDGE:

18   Q.  I'm going to show you, sir, Exhibits 1 and 2, which are the

19   reports, and I'd like you to point out to me where exactly they

20   said they pulled off the road rather than to the side of the

21   road.

22   A.  Okay.  Okay.

23   Q.  Okay.  So where, can you just point to me where -- where

24   either Special Agent Bullock or special -- I'm sorry, Deputy

25   Patrol Agent in Charge Bullock or Patrol Agent in Charge

VOIR DIRE EXAMINATION - MARTIN PESQUEIRA

1   Hermansen said that they pulled off of the road?

2   A.  So, Christopher Bullock:  I pulled to the shoulder of the

3   road to allow the vehicle to pass.

4   Q.  And what did Agent Hermansen say?

5   A.  The passenger stated:  Bullock yielded to the vehicle --

6   oh, actually, I just saw it right now.  Bullock yielded to the

7   side of the road in order to see what was causing the vehicle

8   to honk its horn.

9   Q.  So, again, neither report said that they pulled off the

10  road, did it?

11  A.  Shoulder.  There is no shoulder.  That is, the first

12  shoulder would be east of the park.

13  Q.  Sir, my question to you is:  Neither of these agents said

14  in their reports that they pulled off the road, did they?

15  A.  The shoulder to me means off the road.

16  Q.  Sir, again, I'm not asking you to speculate to what the

17  agents meant in their reports.

18  A.  Those -- the words you're saying, no, that word was not

19  used.

20  Q.  All right.  And also the honk would have necessarily

21  occurred before they pulled to the shoulder or the side of the

22  road, correct?

23  A.  I would assume so.

24  Q.  And you have no idea based on these reports how long it

25  took them, then, to pull off the -- to the side of the road?

VOIR DIRE EXAMINATION - MARTIN PESQUEIRA

1    A.   From their testimony, it almost seemed immediately.

2    Q.   Again, I'm not asking you to speculate because you're

3    saying you did your recreation based on the reports not the

4    testimony, correct?

5    A.   The reports and meeting with Mr. Jones.

6    Q.   Correct.  But you had not spoken with either Agent

7    Hermansen or Agent Bullock ahead of time to ascertain exactly

8    where these things occurred or exactly how much time had

9    transpired?

10   A.   That's correct.

11   Q.   And, therefore, you don't know exactly where the honk took

12   place, only based on the reports that it was adjacent to the

13   Santa Rita Skate Park in Tucson on east 20th Street, correct?

14   A.   Close, yes.

15   Q.   Okay.  Well, how -- where -- how does -- if you say that's

16   close, how does Special Agent Bullock describe in his report

17   the area that this occurred?

18   A.   The area?

19   Q.   Yes.

20   A.   In the south side of the city of Tucson and the city of

21   south -- adjacent to the Santa Rita park in Tucson.  That

22   portion or which -- I don't know which portion you're referring

23   to.

24   Q.   Exactly.  In his report, he describes the area or he

25   describes where they first saw the vehicle is eastbound on 20th

VOIR DIRE EXAMINATION - MARTIN PESQUEIRA

1    Street adjacent to the Santa Rita Skate Park in Tucson,

2    correct?

3    A.   Yes.

4    Q.   Never on the -- never on the east or northeast corner of

5    the Santa Rita Skate Park?

6    A.   Well, again, I'm just going by the shoulder of the road.

7    The first shoulder of the road is going to be actually at the

8    very end of the park.

9    Q.   I understand, sir, where you're going, but -- but I'm

10   talking about when they first noticed the vehicle, which you

11   conceded had to be some time before they pulled over, correct?

12   A.   Yes.

13   Q.   So, again, you don't know exactly where that occurred?

14   A.   Correct.  That's why --

15   Q.   You're speculating?

16   A.   Yes, the general area.

17   Q.   And, again, Agent Hermansen describes the area as the

18   vicinity of Santa Rita Skate Park, correct?

19   A.   Yes.

20   Q.   Right.  So, again, from that, you have -- you're

21   speculating as to making this decision of where the honk

22   occurred?

23   A.   Well, by speaking to Mr. Jones, he told me the exact

24   location.

25   Q.   And did Mr. Jones also tell you that he was under the

VOIR DIRE EXAMINATION - MARTIN PESQUEIRA

1  influence of heroin at the time this happened?

2  A.  I don't see that in the report either but, no.

3  Q.  And with regard to any other locations in this report and,

4  I'm sorry, in your conclusions, we do have a location from the

5  report of the GPS coordinates of where the actual stop

6  occurred, correct?

7  A.  Yeah, that we do have.

8  Q.  There are no other GPS coordinates, though, correct?

9  A.  That is correct.

10  Q.  So it's impossible to determine exactly where, for

11  instance, the honk occurred?

12  A.  That's also to the best of my ability, yes.

13  Q.  It's impossible to tell from these reports exactly where

14  the U-turn was made, correct?

15  A.  Well, it's -- it's one or the other.  It's either what the

16  agents said or where our client said.  It's approximately

17  60 yards apart.  It's one or the other.

18  Q.  And as far as the -- as far as the other -- other, you

19  know, locations, you have -- we have a general idea from the

20  reports and of course from what your client tells you but you

21  do not have any independent knowledge of where any of these

22  things occurred, correct?

23  A.  That is a fact, yes.

24  Q.  And there are several items in these reports where, again,

25  we have the general -- we have the general location but not,

1    for instance, the exact GPS coordinates or the exact cross

2    streets or anything like that, correct?

3    A.  I think we do have some exact cross streets.

4    Q.  For the stop as well as for the area of the U-turn,

5    correct?

6    A.  Yes.

7    Q.  But, again, no GPS coordinates?

8    A.  Correct.

9    Q.  No other exact information as to any of the other driving

10   behavior, correct?

11   A.  Well, because they did state stop sign violations, I know

12   where the stop signs are.

13   Q.  I understand you know where the stop signs in the general

14   area are, but you don't know the exact stop sign and the exact

15   time that that occurred, correct?

16   A.  Other than the reports at the time, and they did never

17   mention which stop signs were run, correct.

18   Q.  And specifically also there is no time estimate.  For

19   instance, that certain things occurred exactly at 1301 hours or

20   1303 hours or anything like that, correct?

21   A.  Correct.

22   Q.  You're just having to estimate about -- about the time

23   frame, correct?

24   A.  Yes.

25   Q.  There is actually no exact speed captured by radar or

 1  anything else, correct?

 2  A.  Not that you provided me, no.

 3  Q.  So we have no idea how fast either of these vehicles were

 4  going?

 5  A.  That is correct.

 6  Q.  So, really, all the best you can do is speculate as far as

 7  how long any of this could have taken place?

 8  A.  Yes.

 9       MS. WOOLRIDGE:  Thank you, Your Honor.  That's all I

10  have and I would submit there is not a proper foundation for

11  any conclusions based on location or time.

12       THE COURT:  Okay.  Well, I think I'm going to let the

13  investigator testify and mark on the map accordingly.  I mean,

14  it'll be given the weight that -- I mean, you've obviously

15  brought up these -- how he recreated it and you can do so

16  further on cross-examination.  You can also recall your agents

17  if you need to to clarify anything that's testified to or want

18  them to get more specific about where stop signs were placed

19  and so forth.

20     So if you -- you want your witness back down there to make

21  these markings?

22       MR. MALKA:  Yes, Your Honor.

23       THE COURT:  Okay.  And at least as to the honk, we're

24  kind of arguing about a half inch, right?  I mean, we know it

25  was near the Santa Rita Skate Park, so --

1          MR. MALKA:  Right.

2                    DIRECT EXAMINATION (Cont'd)

3   BY MR. MALKA:

4   Q.  All right.  All right.  Would you be able to circle on the

5   map where Santa Rita Skate Park is?

6   A.  (The witness complied.)

7   Q.  Would you mark on the map where Tucson Auto Rental and

8   Sales is located?

9   A.  (The witness complied.)

10  Q.  Okay.  All right.  Would you please talk us through from

11  the location of where the incident started to the pin that you

12  dropped on the Google map where the incident ended?  Would you

13  please trace and explain to us where we are and what is

14  happening?

15  A.  Well, from the area of Second Avenue and 20th Street, which

16  is the north side of Santa Rita Park -- I can't call it Santa

17  Rita Skate Park because I've always known it as Santa Rita Park

18  so I'll simply refer to it as Santa Rita Park.  From there

19  eastbound past the little -- the Jacobus, then you have the

20  railroad tracks which is eastbound.  Once you cross the

21  railroad tracks at 25 miles an hour, it takes you approximately

22  17 seconds to reach the first stop sign, which is Euclid.

23  Q.  You can mark it.

24  A.  That's a horrible stop sign but that's the best I can do.

25          MR. MALKA:  Your Honor, do you know how to adjust the

DIRECT EXAMINATION - MARTIN PESQUEIRA

1    brightness on this?  I'm sorry.

2             THE COURT:  No, I'm clueless.

3        Allison, do you know how to do it?

4             CLERK:  No.

5             MS. WOOLRIDGE:  I believe it's on the actual -- right

6    at your eye level.  There should be a knob perhaps there.

7             MR. MALKA:  Do you see the brightness knob?

8             THE WITNESS:  All I see is zoom, freeze, lamp, mode,

9    and iris.

10            MS. WOOLRIDGE:  Touch the lamp one.

11            MR. MALKA:  There we go.  Okay.

12   BY MR. MALKA:

13   Q.  Is it still clear --

14            THE COURT:  And, you know, if -- don't worry about me.

15   I have your exhibit in front of me so I can follow along, even

16   though I can't -- I can't read it anyway because I don't have

17   my distance glasses.

18   BY MR. MALKA:

19   Q.  Okay.  Would you please continue?  So the first stop, you

20   marked on the map where the first stop.  Would you please

21   continue to trace the route and advise us of where there are

22   any stop signs or yield markings?

23   A.  So you continue eastbound, you have Tyndall, which has no

24   traffic control devices for east/west, and then you have to

25   approach the stop sign at 20th Street and Park Avenue, that's

DIRECT EXAMINATION - MARTIN PESQUEIRA

1   the next stop sign.

2   Q.  Okay.  And after you cross Park Avenue, based off the

3   information that you collected from the agents' reports, where

4   did the pursuit continue to?

5   A.  It crossed Park Avenue, continued east, it passed Fremont,

6   it continued past Santa Rita, which is a -- and then the next

7   one, it's a T intersection of Mountain, and then you have

8   Highland.

9   Q.  You know, is that the T intersection where I believe --

10  well, it could be either/or but one of the agents stated that

11  it was at the T intersection where the U-turn occurred?

12  A.  Yes, they said -- he did say a T intersection.

13  Q.  Could you please mark on the map where the U-turn occurred?

14  A.  The T intersection, even though the road goes through here,

15  Kalil Bottling Company has a fence through there so Highland is

16  actually a T intersection because of Kalil's fence that blocked

17  it off so that actually, technically, becomes a T intersection.

18      Just east of there you have Curtis and Curtis dead ends.

19  And Curtis does go -- does go north and south and it's just off

20  here.  You can just barely see the portion of it where you're

21  actually going north/south.

22  Q.  So at Highland and at Curtis, when you drove this route,

23  did you see any signs that stated no U-turns?

24  A.  Absolutely not.

25  Q.  Okay.  Were there any other stop signs along the route or

1  just the two?

2  A.  It would just be on 20th at Curtis.

3  Q.  There is another one?

4  A.  There is a stop sign for eastbound traffic.  There is no

5  westbound traffic but there is one for eastbound at Curtis.

6  Q.  Okay.  Would you be able to circle the location of the --

7  where the arrest took place, please?

8  A.  (The witness complied.)

9  Q.  Okay.  And is Tucson Auto Rental, how many blocks

10 approximately is Tucson Auto Rental from where the arrest took

11 place?

12 A.  I measured about 120 yards.

13 Q.  Okay.  Based off of your experience as a Tucson Police

14 Department officer, is it against the law to honk your horn one

15 time?

16 A.  No.

17 Q.  Okay.  Is it against the law to make a U-turn when there is

18 no sign indicating no U-turns should be made?

19 A.  The only other time would be at a hill or crest that cannot

20 be seen in all directions for 500 feet.

21       THE COURT:  Mr. Malka, are we done with him marking on

22 the map right now?

23       MR. MALKA:  Yes, Your Honor.

24       THE COURT:  Okay.  I'd just ask that he have a seat.

25 It's more comfortable and so we can make sure we pick up your

DIRECT EXAMINATION - MARTIN PESQUEIRA

1    voice on the recording.

2    BY MR. MALKA:

3    Q.  Would you mind restating your answer again?

4    A.  U-turn can be committed -- can be done at anywhere that's

5    not posted and it cannot be -- and the only place it cannot be

6    done is if it's posted or if it's in a hill or crest that

7    cannot be -- is not visible in both directions 500 feet.

8    Q.  On the two streets, Highland and Curtis, that you were

9    speaking of, is there a crest or anything blocking the view of

10   the street to make a U-turn unacceptable at those streets?

11   A.  No.

12   Q.  Okay.

13        MR. MALKA:  Your Honor, we do have a video and I would

14   like to show Mr. Pesqueira the video to lay the foundation and,

15   if that's all right, may I have a few seconds to boot up this

16   computer?

17        THE COURT:  Sure, sure.

18        MS. WOOLRIDGE:  Your Honor, if defense is moving admit

19   the video at this time, we would object to foundation.  I'm not

20   sure how he can show the video.  I would -- without laying,

21   first laying the foundation.  I would imagine that this witness

22   would be familiar with the exhibit that he created but, again,

23   I don't believe that the foundation is -- is present in this

24   particular case.

25        THE COURT:  Is this a video of the route that the

UNITED STATES DISTRICT COURT

1   witness took?

2          MR. MALKA:  This is a video of the route and this is

3   also a video of cars passing by each other, one being an SUV

4   and one being a sedan.

5          THE COURT:  Okay.

6          MR. MALKA:  So having a perspective or point of view

7   from both cars.

8          THE COURT:  Okay.  Why don't you just elicit a little

9   testimony about the subject matter in the video and then we'll

10  see where we're at there.

11         MR. MALKA:  Okay.

12  BY MR. MALKA:

13  Q.  Sir, did you create a video during the course of your

14  investigation?

15  A.  Yes, I did.

16  Q.  What did you record?

17  A.  Because I did not have a 2012 Chevy Tahoe, which are,

18  according to the specifications on CarMax, the height of a

19  standard Tahoe is 76 inches height.  The closest I had in our

20  office was a 2017 Ford Explorer, which was 71 inches height.

21  That's the closest I had from the fleet that we had.  So I used

22  a 2017 Explorer, 71 inches high, to try to duplicate the

23  76 inches high of the 2012 Chevy Tahoe.

24  Q.  Now, why were you trying to record yourself or recreate a

25  video to show the difference in height between the sedan and

1    the Tahoe?

2    A.  I wanted to get the car, which was lower, so I can see

3    what, if I was Mr. Jones, what I could see into the -- the

4    Chevy Bla -- the Tahoe of what -- what they were referring to

5    with the staring and looking and if they're wearing a vest, a

6    police vest, I wanted to see what -- what Mr. Jones could or

7    could not see.

8    Q.  In order to -- you were trying to see if Mr. Jones could

9    see if the officers in the Tahoe were, in fact, officers?

10   A.  Yes.

11   Q.  Okay.  Who made the video?

12   A.  The video was done by myself and one of the paralegals,

13   Marcela Yescas.  We were in one vehicle and another

14   investigator from our office, another ex-Tucson police officer

15   and US Marshal, was in -- was in the vehicle replicating the

16   Border Patrol agents.

17   Q.  And, sorry if you've said this, who were you and Ms. Yescas

18   portraying to be in the video?

19   A.  Mr. Jones and his passenger.

20   Q.  Okay.  And what information did you rely on to make the

21   video?

22   A.  Reference the vehicles, Mr. Jones was driving a 2009 Toyota

23   Camry.  The specifications on CarMax showed it was 57 inches

24   high.  The closest I had from our fleet was a 2018 Chevy

25   Malibu, which was 57.6 inches high.  So that's as close as I

1   can get to Mr. Jones' vehicle.

2       Mr. Jones is five foot ten, I'm five foot ten.  So I

3   thought it would be the perfect height to see what he could

4   see, even though the other vehicle would have been five inches

5   shorter than the one that actually from the incident, if the

6   car hadn't been modified, which I do not know because I've

7   never seen the agents' vehicle; it was never shown to us.

8   Q.  The three of you, were any of -- were any of you wearing

9   specific clothing during the recreation?

10  A.  Yes.

11          MS. WOOLRIDGE:  Your Honor, you know what?  Just to

12  move things along, I'm just going to object to, before we even

13  get to the video, the entire line of questioning.  Based on the

14  testimony we've already heard that this was done to recreate

15  what Mr. Jones may have seen is completely irrelevant to the

16  determination of what the agents had reasonable suspicion to

17  conduct a traffic stop which is the inquiry that we are here

18  for today, Your Honor.

19      What Mr. Jones thought is completely immaterial.  Whether

20  he thought that the individuals in the Tahoe were law

21  enforcement, whether they were someone else, whether they were

22  impersonating law enforcement is of no moment.  This is not a

23  subjective belief of the defendant, Your Honor.  This is

24  whether the agents had articulable facts to support reasonable

25  suspicion and whether they had a legal authority to make the

1   stop.  What Mr. Jones thought is -- what Mr. Jones may have

2   seen or may have thought is not at issue here.

3       So just for the purpose -- I might as well raise my

4   objection now because I think that we are going down a road

5   that is completely irrelevant to the court's determination in

6   this -- in this matter.

7           MR. MALKA:  Your Honor, we do -- if I could briefly

8   respond?

9           THE COURT:  Yeah, sure.

10          MR. MALKA:  We do believe that this is material, one,

11  because the agents', the Border Patrol agents' Tahoe is an

12  unmarked Tahoe.  There was nothing indicating that Mr. Jones

13  was dealing with law enforcement.  And we -- well,

14  Mr. Pesqueira was trying to understand from what angle, if any,

15  Mr. Jones would be able to see any of what the officers both

16  testified they were wearing at the time of the incident.  And

17  so we -- Mr. Pesqueira used car specifications, closest

18  specifications possible to recreate that so that we would have

19  a visual of what the drive-by would look like.

20          THE COURT:  Okay.  Well, I'm going to -- I'm going to

21  allow it because, I mean, the agents testified that -- I think

22  obviously they couldn't testify as to what Mr. Jones saw but

23  they certainly were under the belief that he could see the

24  badge or vest that the agents were wearing so I'm going to

25  allow the -- I'm going to allow the admission of the video so

 1   if you want to get cued up.

 2            MR. MALKA:  Okay.

 3            THE COURT:  How long do you think that's -- you know

 4   what?  Let's just take a couple of minutes while you get that

 5   ready and then you can walk through the video with the agent,

 6   okay?  All right.  Thanks.  I'll be right back.

 7        (A recess was had.)

 8            THE COURT:  Okay.  So that that's Exhibit 50, so that

 9   will be admitted and we can play that and stop it as needed if

10   you want to ask questions.

11            MR. MALKA:  All right.  Thank you.

12                    DIRECT EXAMINATION (Cont'd)

13   BY MR. MALKA:

14   Q.  All right.  I'm going to play the video and periodically

15   stop it to ask you questions.

16        (Video played.)

17   BY MR. MALKA:

18   Q.  You know, this first scene right here, could you please

19   explain what's happening?

20   A.  We are on 20th Street between Second Avenue and Jacobus on

21   the north side of Santa Rita Skate Park.

22   Q.  And who's driving the vehicle?

23   A.  I'm the driver of the vehicle and behind -- and Marcela is

24   the passenger.  Robbie Salcido is the driver of the SUV in

25   front.

1    Q.   Okay.   I'm going to hit play.

2         (Video played.)

3    BY MR. MALKA:

4    Q.   So what's happening right now?

5    A.   Going over the speed bump.   We're going to start driving,

6    going toward the end of the park here where the park kind of

7    ends, then the railroad tracks are right there.   Honk my horn.

8    Q.   Okay.   So after the honk, what did you do?

9    A.   I went around the vehicle and sped up and I was trying to

10   see what the driver of the SUV was wearing.

11   Q.   Okay.   I'm going to show you that part again.

12        (Video played.)

13             MS. WOOLRIDGE:   Your Honor, again, may I voir dire the

14   witness?   I have some very -- some foundational concerns with

15   regard to this -- with regard to this exhibit now having for

16   the first time having a chance to see it.

17             THE COURT:   Okay.   All right.   You can do that.

18                          VOIR DIRE EXAMINATION

19   BY MS. WOOLRIDGE:

20   Q.   Sir, with regard to this -- the portion of the video

21   that --

22             MS. WOOLRIDGE:   You don't have to sit down, Jordan, as

23   long as it's okay with the court.

24             THE COURT:   That's fine, that's fine.

25             MS. WOOLRIDGE:   I'll just ask it here.

1    BY MS. WOOLRIDGE:

2    Q.  You did hear the testimony today I believe from Agent

3    Bullock that he estimated -- and perhaps it was Agent

4    Hermansen -- that one of them estimated it took about five

5    seconds for the Camry to drive around them, that it was driving

6    very slowly as -- after the honk?  Do you recall that?

7    A.  One of them, yes.

8    Q.  You would agree that in this video, the sedan passed the

9    SUV much quicker than five seconds, correct?

10   A.  Oh, it was much faster than five seconds, yes.

11   Q.  And so, therefore, you don't know whether that's an

12   accurate depiction of what an individual would see in the

13   speeds that the sedan in this actual case, when what actually

14   happened, which you weren't there for on March 31st, 2017, what

15   the occupants of that sedan would have seen because, at least

16   based on the testimony of one of the agents, the vehicle was

17   traveling much slower than as depicted in this vehicle?

18   A.  Well, based on 25 miles an hour, 25 miles an hour traveling

19   36.6 feet per second, I was trying to estimate for the -- first

20   I had heard this five seconds, I was trying to estimate where

21   today.  That would be almost 200 feet at 25 miles an hour.

22   It's close to 200 feet at 36.6 feet a second at 25 miles an

23   hour, which would probably put them close to where the stop

24   sign was at.

25   Q.  Now, where in either of these reports, Exhibit 1 by Agent

1   Hermansen or Exhibit 2 by Agent Bullock, does it say that the

2   vehicle, that the sedan was passing them at 25 miles per hour

3   after the honk?

4   A.  They said he sped up after -- after he went around him.

5   Q.  Correct.  That's after he went around.

6   A.  So at 25 miles an hour, I would --

7   Q.  Sir, sir, just hold on.  I want to make a distinction

8   between while he was going around and after he went around.  I

9   don't think there's any question that the vehicle sped up after

10  he went around, and I'm not trying to debate that with you.

11  But we heard testimony today in that the vehicle was traveling,

12  it took about five seconds for that vehicle to pass the SUV,

13  and nowhere in the reports do I see any estimation of 20 miles

14  per hour of the speed while the vehicle was passing the SUV.

15  So I'm wondering where you're basing this calculation of

16  20 miles per hour while it was passing the SUV?

17  A.  None of the reports stated it took five seconds to -- for

18  them to stare at them so I based it on going the speed limit.

19  Q.  But you have no -- you have no independent knowledge or any

20  information in the report to state that that vehicle was going

21  the speed limit at the time that it passed?

22  A.  Other than from Mr. Jones, correct.

23  Q.  And we heard from Agent Hermansen, I believe, and I

24  apologize, perhaps it was Agent Bullock, who was able to

25  describe the passenger's physical descriptions based on being

1   able to observe her as she -- as the vehicle passed.

2       Do you recall that testimony?

3   A.  I do recall that.

4           MS. WOOLRIDGE:  So, Your Honor, at this point, I would

5   again, I would move to exclude -- I know it's already been

6   admitted but I would move to exclude and strike any -- strike

7   any testimony about this video and exclude any further

8   testimony about this video as I believe it lacks the

9   foundation.

10      What it purports to show is what an individual in the sedan

11  would see at the -- as it passed the -- an SUV, a similar type

12  SUV.  In this, we heard testimony that the agents were able to

13  see the occupants of the vehicle, we heard testimony that it

14  took about five seconds for the vehicle to pass, and we heard

15  that one of the agents was able to get a physical description

16  of the passenger of the vehicle which, of course, would be the

17  closest individual to the law enforcement vehicle as it passed.

18      I believe that this -- this video that has the vehicle

19  passing at the speed limit of 25 miles per hour with absolutely

20  no foundation for such a speed and, in fact, contrary to the

21  evidence we've already heard in this case, that it does, in

22  fact, lack the foundation and it, therefore, is irrelevant and

23  immaterial to the court's determination.

24          THE COURT:  Okay.  Well, I'm going -- I'm going to

25  admit it and consider it for the weight that it should be

 1    given.  It was prepared from a foundational perspective based

 2    upon the reports.  The five seconds to pass came out during our

 3    hearing today.  And, obviously, I mean, I'll consider that

 4    testimony when looking at what weight should be given to the

 5    video.  And I'm sure it was a surprise to the defense in terms

 6    of the five seconds or they probably would have created a

 7    different video but, again, I just -- I think I can sort out

 8    what weight it should be given, so --

 9              MR. MALKA:  May I proceed?

10              THE COURT:  Yes.

11                       DIRECT EXAMINATION (Cont'd)

12    BY MR. MALKA:

13    Q.  All right.  I'm going to show you, sir, once again, the

14    image in the video of when your car passes Mr. Salcido's car.

15        (Video played.)

16    BY MR. MALKA:

17    Q.  Sir, you said you were traveling 25 miles an hour at that

18    time?

19    A.  Yes.

20    Q.  What did you see when you passed Mr. Salcido's car?

21    A.  A male in black.

22    Q.  Were you able to identify anything else going on in the

23    SUV?

24    A.  No.

25    Q.  Were you able to identify what Mr. Salcido was wearing in

1   the SUV?

2   A.   No.

3   Q.   Okay.   I'm going to hit play and I'm going to ask you

4   questions as we're going through.

5        (Video played.)

6   BY MR. MALKA:

7   Q.   At this point, where are you traveling right now?

8   A.   Still continuing eastbound, approaching Euclid Avenue.

9   Q.   What did you do with the camera at this point?

10  A.   It was turned backwards to show a vehicle behind.

11  Q.   Okay.   Does the traffic in the video while you're

12  recreating this reflect normal patterns of traffic for the

13  area?

14  A.   Yes.

15  Q.   Where are you?

16  A.   Past Tyndall Avenue there and approaching South Park

17  Avenue, which has the NAPA Auto Parts on the right and a tile

18  company, which I guess is about to become a bar right there on

19  the left side.

20  Q.   Was this area of Tucson a part of the area that you

21  patrolled while a TPD officer?

22  A.   Yes, it was.   At one point, yes, before it became a

23  different division.

24  Q.   Okay.   What is the traffic like on Park Avenue?

25  A.   Very busy.

DIRECT EXAMINATION - MARTIN PESQUEIRA

1  Q.  Okay.  And, in your opinion, could you roll through the

2  stop sign on Park Avenue?

3  A.  It would be very difficult.

4  Q.  Why?

5  A.  Because of the traffic northbound and southbound on Park

6  Avenue, either going north toward Broadway or going south

7  toward 22nd Street, it's a very busy street.

8  Q.  And how many times did you say you recreated these versions

9  of events or this version of events?

10  A.  Four times without a video.  I believe it was total -- it

11  was either six or eight times with the video.

12  Q.  And each time that you did it, were you able to roll

13  through Park Avenue?

14  A.  No.

15  Q.  Okay.  So where are you now?

16  A.  Now I'm the first car to cross Park Avenue on 20th Street.

17  So now I'm crossing Park Avenue.  There on the right's the only

18  posted speed limit sign, the 25 mile an hour speed limit sign,

19  approaching Fremont, passing Fremont, then we've got Santa

20  Rita, and then we've got Mountain -- Mountain Avenue and then

21  we've got -- I'd say that one was Mountain right there and then

22  we've got Highland right here.

23  Q.  And what are you doing on Highland right here?

24  A.  Doing a U-turn.

25  Q.  And -- all right.  Right now, which direction of travel are

1   you --

2   A.   Now I'm turning -- I went from eastbound to a U-turn and

3   then continued the U-turn to go southbound onto -- on Highland,

4   and approaching the stop sign at 21st Street, make the right on

5   21st Street.  Now I'm westbound passing Santa Rita -- actually,

6   Mountain.  Now it's a yield sign at Santa Rita and the very

7   next street will be Fremont where the traffic stop was done.

8   Q.   Okay.  And you were able to locate the precise location of

9   where the stop occurred because of GPS coordinates were

10  provided to you; is that right?

11  A.   Yes.

12  Q.   Okay.

13  A.   And then when I made the left and there's the Tucson Auto.

14  Q.   That was my next question.  How long did it take you to

15  drive from where the arrest took place to Tucson Auto Rental?

16  A.   About eight seconds, maybe less.

17  Q.   Did you map out online or on your phone the distance

18  between the location of the arrest site and Tucson Auto Rental?

19  A.   I measured it.  I believe it was about 119-point-something

20  yards.

21  Q.   Okay.  Are you familiar with Tucson Auto Rental as a

22  business?

23  A.   Yes, I am.

24  Q.   How?

25  A.   As a Tucson police officer, the location used to be on

1   Sixth Avenue and approximately 21st Street.  That's when it was

2   still in operation division south.  I took multiple GTAs or

3   grand theft auto reports from the business.  After this section

4   became operation downtown, it actually became actually west

5   first and then became downtown, the business moved to the area

6   of Fremont and 22nd Street and I was aware it was there but I

7   no longer took reports there because it was no longer in my

8   division.

9   Q.  To your knowledge, are they a legitimate business

10  registered under the Department of State?

11  A.  Yes.

12  Q.  Okay.  The last set of questions that I have for you are

13  about police impersonations.  During your time as an officer

14  did you come across police impersonation cases?

15          MS. WOOLRIDGE:  Your Honor, I will object to this line

16  of questioning as irrelevant.  There was -- there was certainly

17  no testimony on direct about police impersonations and, again,

18  this would go to the defendant's state of mind, which is not

19  relevant to the court's determination.

20          THE COURT:  Yeah.  Mr. Malka, what is the relevance of

21  that?

22          MR. MALKA:  Your Honor, I -- the reason why we want to

23  ask about police impersonations is because in this instance, an

24  unmarked car, not knowing who's following behind, we're trying

25  to get out how relevant, if at all, police impersonations are

1   in Tucson and I believe that Mr. Pesqueira, given his history

2   working at TPD, he'd be able to testify if he's come across any

3   of those types of cases.

4          THE COURT:  Okay.  But I think what Ms. Woolridge is

5   getting to is why is it relevant as to why -- I mean, I guess

6   at least in reading your pleadings, it seems like you're saying

7   that the officers kind of created this situation that led to

8   the traffic infractions but I guess I just don't see what -- if

9   there were infractions, I mean, I guess I'm just not connecting

10  the dots on there.

11         MR. MALKA:  Sure.  I guess bottom line, what we're

12  trying to get out here is if you're unable to decipher, to know

13  who is following closely behind you, how would you then know to

14  submit to the authority of law enforcement officers?  And, in

15  this instance, with unmarked cars.  But I see Your Honor's

16  point.

17         THE COURT:  Okay.  Yeah, I'm going to -- I'm going to

18  sustain the objection on that area of questioning.

19         MR. MALKA:  Okay.  Your Honor, may I speak to

20  Mr. Costales?

21         THE COURT:  Yeah, absolutely.

22         MR. MALKA:  Your Honor, no further questions.

23         THE COURT:  Okay.  Thank you.

24     Ms. Woolridge?

25         MS. WOOLRIDGE:  Thank you, Your Honor.

1                           CROSS-EXAMINATION

2    BY MS. WOOLRIDGE:

3    Q.  Good afternoon, sir.

4    A.  Good afternoon.

5    Q.  Again.  I have a few follow-up questions for you.  I

6    imagine as a Tucson Police Department officer, especially with

7    your length of experience, you have, in fact, been involved in

8    arrests for traffic or at least vehicle stops for traffic

9    infractions, correct?

10   A.  Yes.

11   Q.  And it is a traffic infraction to proceed through a stop

12   sign without coming to a complete stop, correct?

13   A.  Yes.

14   Q.  It is a traffic infraction to turn onto -- either make

15   either a right turn or a left turn without using a turn signal,

16   correct?

17   A.  No.

18   Q.  At an intersection?

19   A.  Traffic has to be affected for it to be a violation.  You

20   can turn without signalling without traffic being -- that is a

21   false pretense but, yes, if traffic's affected then, yes, you

22   are right.  But if it's not affected --

23   Q.  Good to know.  I'll have to keep that in mind.

24           THE COURT:  Yeah, I'd like an affidavit to that

25   effect.

1    BY MS. WOOLRIDGE:

2    Q.   Will you come to the side of the road if I ever have to

3    test that theory?

4    A.   Absolutely.

5    Q.   Okay.  I imagine in your experience as a Tucson police

6    officer you have had experience with vehicles that have tried

7    to evade you, correct?

8    A.   Yes.

9    Q.   And you would agree that behavior such as rolling through

10   stop signs without making a complete stop when a vehicle is

11   being followed could be considered evasive?

12   A.   In a marked vehicle, yes.

13   Q.   And you could -- you would also -- you would also believe

14   -- you also would agree, though, that could happen -- the

15   evasive behavior can happen even if being followed by an

16   unmarked vehicle.  For instance, you could take evasive

17   behavior to evade someone who you don't believe is a law

18   enforcement agent but that you just want to, for whatever

19   reason, want to get away from, correct?

20   A.   You can, yes.

21   Q.   And you could engage in evasive behavior also by making

22   abrupt turns?

23   A.   You can.

24   Q.   And in your experience as a -- as a Tucson Police

25   Department officer, based on the reports, at least from the

1   agents in this case, there were contained in those reports at

2   least some traffic violations that were observed?

3   A.  There were but locations are very important when

4   documenting those types of incidents.

5   Q.  Again, I'm not -- I'm not trying to debate that but my

6   question to you -- I know, it's tough sometimes to listen to

7   and just answer the question.  But that there were at least

8   contained in those reports documented traffic infractions?

9   A.  If that's the way it happened, yes.

10  Q.  Correct.  Assuming the truth of that.

11  A.  Yes, yes.

12  Q.  That there were traffic infractions?

13  A.  That would be 100 percent, yes.

14  Q.  Now, I don't mean to -- I know I asked you some questions

15  before about your recreation.  I don't mean to find any fault

16  in your recreation.  I wasn't there either so, quite frankly,

17  based on my knowledge, it could be a perfect recreation.  But,

18  that said, you weren't there either as well?

19  A.  You are correct.

20  Q.  So you don't know exactly how, for instance, exactly how

21  quickly the Camry passed the Tahoe after that initial honk?

22  A.  Correct.

23  Q.  You did see in Agent Hermansen's report though -- I just

24  want to make sure I get the verbiage right -- that when the

25  vehicle passed, specifically referring to the Camry, I noticed

CROSS-EXAMINATION - MARTIN PESQUEIRA

1  two occupants in the vehicle and both subjects took a longer

2  than normal look at us as they passed by us.

3  A.  Yes.

4  Q.  Now, again, you were -- as not being there that day, you

5  don't know, then, when that Tahoe began following the Camry,

6  how close behind or far away it was?

7  A.  Correct.

8  Q.  So, in your video, when we -- when the camera was turned

9  around at the SUV behind it, again, that's your best estimation

10  of where the vehicles might have been in relation to each

11  other?

12  A.  By the report saying 40 to 45, I imagine they'd have to,

13  40 to 45 to catch the vehicle in 25, so that's how I kind of

14  estimated.

15  Q.  Not about speed but just talking about the fact that when

16  we saw that image of where the vehicle was, that is just an

17  estimation of the distance?

18  A.  That is correct, yes.

19  Q.  Same with the speed.  We don't know exactly the speed the

20  vehicles were traveling?

21  A.  Correct.

22  Q.  And the traffic, for instance, again, not being there that

23  day, we can just go on what's normal traffic for that area?

24  A.  Yes.

25  Q.  And we did see in the video a number of cars passing in the

CROSS-EXAMINATION - MARTIN PESQUEIRA                167

1    intersection or going the opposite way, correct?

2    A.  Yes.

3    Q.  You would -- you would agree that this is a residential

4    area with quite a bit of traffic, quite a bit of people around

5    there?

6    A.  It started with residential and ends up almost in a

7    business district.

8    Q.  Okay.  So, but it was a business who would also have

9    traffic and people as well?

10   A.  Yes, yes.

11   Q.  In any event, all these things involve people and cars?

12   A.  Yes, yes.

13   Q.  Not a desolate, you know, deserted area?

14   A.  Right.

15   Q.  And now, you mentioned that it's very difficult to roll

16   through Park Avenue.  Of course, not knowing how difficult it

17   may have been at a little after 1:00 p.m. on March 31st, 2017,

18   where -- maybe I'm missing something, but where in the reports,

19   when it's talking about the vehicle not stopping, did it say --

20   specifically say it rolled through Park Avenue as opposed to

21   other intersections?

22   A.  Well, because they were talking about multiple stop signs,

23   I just wanted to say, since there was only three stop signs

24   total in the whole course, I wanted to eliminate either Park

25   Avenue to see if -- it's almost impossible to run through there

1    so the most he could have possibly ran, if he did run them, was

2    two, because no one's going to run Park and 20th Street; Park

3    and 20th Street, it's almost suicidal.

4    Q.  Right.  So you talk about the one -- the one busy street,

5    that you don't believe it ran through that one, but actually

6    there was a stop sign on 20th Street and Euclid that

7    Mr. Hermansen specifically stated in his report that the

8    vehicle ran?

9    A.  That he stated, yes.

10   Q.  And -- and that -- you didn't testify that it was

11   impossible or very unlikely to be able to run that stop sign,

12   correct?

13   A.  Well, actually, I may correct it.  He never gave the

14   address, the location, the street name.  He said the stop sign,

15   so I was assuming that one but he never stated which -- which

16   stop sign.  I don't think he ever said Euclid.

17   Q.  Okay.  So let me refer you to -- do you still have

18   Exhibit 1 in front of you?

19   A.  Which one, 1?  Yes.

20   Q.  Yeah.  So let me refer you to the third paragraph.

21   A.  Uh-huh.

22   Q.  Beginning of the third paragraph of page 1 of Exhibit 1.

23   Do you see, "The vehicle slowed for a posted stop sign at 20th

24   Street and South Euclid and just slowed down and then sped

25   across South Euclid without stopping"?

CROSS-EXAMINATION - MARTIN PESQUEIRA

1    A.  On the third -- oh, I'm sorry, I was on the fourth.  I'm

2    sorry.  Slowed -- yes.

3    Q.  Okay.  So that is actually an intersection that he stated

4    that the vehicle --

5    A.  Yeah, I was referring to his testimony when you said his

6    testimony but the report yes, but his testimony, he didn't say

7    Euclid.

8    Q.  Okay.  And you're not testifying here today that it would

9    be impossible to have done that, that it would have been

10   impossible to have proceeded through that intersection without

11   -- failing to stop at the stop sign?

12   A.  That one is possible, yes.

13   Q.  Okay.  So you are -- you are not contesting that that --

14   that the defendant may have proceeded through the stop sign at

15   20th Street and South Euclid without stopping?

16   A.  The defendant was adamant during my investigation --

17   Q.  Again, sir, I'm not asking what the defendant said, and

18   that would be an improper basis for your testimony.  So I would

19   just ask that you listen to my question.  You're not

20   contending, based on your investigation, that it would not have

21   been possible for the defendant to have proceeded through that

22   intersection and failed to stop for the stop sign?

23   A.  Was that a statement or question?  What was the question?

24   Q.  I'm asking you --

25   A.  What's the question?

CROSS-EXAMINATION - MARTIN PESQUEIRA

1   Q.  Are you contending that it would not have been possible for

2   the defendant, as Agent Hermansen observed in his report, which

3   you said you relied on --

4   A.  Yes.

5   Q.  -- are you saying that it would not have been possible for

6   the defendant to have proceeded through 20th Street and South

7   Euclid and to have failed to have stopped for that stop sign?

8   A.  It's possible.

9   Q.  So you don't contest that part of the report based on your

10  observations?  Again, not talking about what the defendant may

11  have told you but based on your observations and investigation,

12  which is your testimony?

13  A.  I'm going to disagree with that.  I'm going to disagree

14  with that.

15  Q.  I'm sorry?

16  A.  I disagree with that.

17  Q.  So you think that -- you don't think that it's possible to

18  go through that intersection and fail to stop for the stop

19  sign?

20  A.  The question being during my investigation.  So which one

21  is it?  Is it possible to run that stop sign?  Yes, it is.

22  Q.  Okay.  That's -- we'll leave it at that then.

23  A.  Okay.

24  Q.  Because I'm not sure what else you're trying to answer.

25       All right.  You mentioned that the vehicle -- the video

CROSS-EXAMINATION - MARTIN PESQUEIRA

1  that we saw was essentially the entirety of what you believed

2  the route to be?

3  A.  Yes.

4  Q.  And we saw that the vehicle (sic) was three minutes and

5  26 seconds?

6  A.  I believe that's about right.  I thought it was a little

7  less but I think that was right.

8  Q.  So if the time stamp of the vehicle -- time stamp, I'm

9  sorry, of the video was, in fact, three minutes and 26 seconds,

10  would you agree that that is consistent with the testimony that

11  we heard today of the estimation by Agent Bullock that the

12  entirety lasted a couple of minutes and Agent Hermansen that

13  the entirety lasted about three to five minutes?

14  A.  Yes and no because the -- I would have to look at the

15  beginning of the tape when I started recording it, when we're

16  stopped and it's already recording and we got into position and

17  then we went forward.  I don't know if it was five seconds, I

18  don't know if it was 40 seconds.  I would have to look at that

19  to give you -- but I believe the whole course took under three

20  minutes in totality.

21  Q.  In any event, it definitely took a few minutes?

22  A.  Yes.

23  Q.  Okay.  And, again, you don't know, of course, exactly what

24  either the defendant or his passenger would have seen when

25  passing the vehicle, when passing the Tahoe because we don't

CROSS-EXAMINATION - MARTIN PESQUEIRA                    172

```
 1    know the exact, for instance, the exact specifications of the

 2    vehicles, the exact speed in which they were traveling, the

 3    exact, really the exact positions of the vehicle, how close one

 4    was to another.  This is just your best estimation based on the

 5    information that you have?

 6    A.  That is correct.

 7    Q.  Thank you.  That's all I have.

 8              THE COURT:  Mr. Malka, do you have redirect?

 9              MR. MALKA:  Nothing further, Your Honor.

10              THE COURT:  Okay.  Sir, what time of day did you shoot

11    that video?

12              THE WITNESS:  I believe that one was done at

13    11:00 a.m.

14              THE COURT:  Okay.  Did you -- you had a passenger in

15    your vehicle, right?

16              THE WITNESS:  Yes.

17              THE COURT:  Did you ask the passenger what she or --

18    he or she could see as you passed the SUV?

19              THE WITNESS:  Yes.

20              THE COURT:  What did she say?

21              THE WITNESS:  She said she could not see what the

22    driver was wearing.

23              THE COURT:  Okay.  Thank you.

24        Any other questions?

25              MS. WOOLRIDGE:  No, Your Honor.
```

```
 1              MR. MALKA:  No, Your Honor.

 2              THE COURT:  Okay.  All right.  Thank you, sir.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  If you don't mind giving those reports

 5     back to whoever gave them to you.

 6         Okay.  Does the defense have any other witnesses?

 7              MR. COSTALES:  No, Your Honor.  That's it for us.

 8              THE COURT:  Okay.  So do you all want to argue the

 9     motion right now and, if so, do you need a little time to

10     gather your thoughts?

11              MS. WOOLRIDGE:  Your Honor, I actually rescheduled a

12     grand jury hearing based on the estimation of, I believe, four

13     hours from the defense.  I am fine -- I would prefer that we

14     proceed with argument at this time.  I think the court is

15     obviously aware of the parties' positions and I will keep my

16     argument and my summation quite brief.  So I would request that

17     we perhaps just proceed with that at this time so that we can

18     conclude the hearing.

19              THE COURT:  Okay.  And, Mr. Costales?

20              MR. COSTALES:  I'm ready to go, Your Honor.

21              THE COURT:  Okay.  Let's go.  So, I guess, well, who

22     wants to go first?

23              MS. WOOLRIDGE:  Your Honor, I believe it's -- because

24     it's a defense motion --

25              THE COURT:  Yeah.
```

1          MS. WOOLRIDGE:  -- it's their argument.

2          MR. COSTALES:  Do you mind if I do it here or at the

3   podium?

4          THE COURT:  Yeah, wherever you're more comfortable,

5   that's fine.

6          MR. COSTALES:  I'd like to argue standing and it's

7   hard to look it up, no offense, sitting.

8          THE COURT:  Yeah, no problem, no problem.

9          MR. COSTALES:  Your Honor, the overarching issue here

10  in this case is pretty clear.  It's whether or not there was

11  reasonable suspicion for these two agents to pull over

12  Mr. Jones.

13     Now, there's two main branches of analysis that we have to

14  consider in figuring out -- figuring that out because there's,

15  firstly, the obvious branch.  These are Border Patrol agents,

16  they're tasked with enforcing immigration law.  Arguably,

17  perhaps, with drug trafficking offenses.  But apart from that,

18  their authority as Border Patrol agents comes from the INA, it

19  comes from the Code of Federal Regulations, and it's already

20  delineated within the evidence that's been introduced to the

21  court.

22     They are Border Patrol agents, they have the authority to

23  do immigration inspections, they have authority to do roving

24  immigration inspections, under Brignoni-Ponce within 100 miles

25  of the border.  Now, we're not contesting that Tucson is not

1    100 miles from the border but we are contesting -- what we are

2    contesting is whether or not they had the authority to stop

3    Mr. Jones for immigration-related reasons.

4        Now, we have a lot of testimony on the record.  There was

5    no -- Agent Bullock has testified that the car was not riding

6    low on the axles.  Both agents testified that no one entered or

7    exited the car while they were -- while it was moving.  Both

8    agents testified that -- well, not that they need to testify to

9    it but both Mr. Jones and, of course, his passenger were not

10   Hispanic, they're both black, which is a factor in

11   Brignoni-Potts.  It is relevant and it is sometimes used to

12   support an immigration stop.

13       Apart from those factors -- so there's nothing really

14   indicating that Mr. Jones was committing an immigration

15   infraction either for himself or for -- on behalf of someone

16   else.  There's no evidence that he was alien smuggling, there's

17   no evidence that he was trafficking drugs.  To the extent that

18   the agents noted that he may have been evasive, it's worth

19   noting that the agents themselves were in an unmarked car.

20       Now, we kind of got into the issue of is that relevant

21   because is that something that Mr. Jones would have seen or is

22   that something that is only relevant what the agents would have

23   seen.  I submit to the court that something that reasonable

24   objective -- reasonable facts the agents should have been aware

25   of is something that's relevant.

1          Agents are aware that within unmarked cars, people are

2     going to perceive them differently, and I believe there's

3     testimony that the windows were tinted, the car was high off

4     the ground.  To the extent that that video, that the court was

5     able to see the video, and I know that the court will weight

6     that video appropriately, it's also important to note that the

7     car would have been high off the ground and agents were aware

8     of that.  I think on redirect, the government mentioned just

9     how high off the ground this car was.  They would have no

10    trouble seeing something but it was an unmarked car.  It was

11    for the purpose of intelligence gathering.

12         So it's relevant, especially when the issue comes up that

13    these agents, based on a honk, based on a look, then chose to

14    follow them and chase Mr. Jones and his passenger down the road

15    in an unmarked car.

16         Now, again, right now I'm just talking about the

17    immigration issues.  I think it's pretty clear that there is

18    not -- the evidence gathered in this case did not give rise to

19    agents to allow them to pull over Mr. Jones for

20    immigration-related reasons.  And I think that's clear from the

21    government's responses, too, because the government stated that

22    arguably there's also immigration-related grounds here.  I

23    would argue that there's absolutely not immigration-related

24    grounds here to stop Mr. Jones.

25         So it brings us to our other lines of inquiry, and I think

1    the more interesting legal line of inquiry is whether this

2    notion of cross-certification is something that's valid and

3    whether it's something that was properly exercised here in this

4    case.

5        Now, we have some evidence and we've submitted a letter

6    that Patrol Agent in Charge Hermansen ordinarily submitted on

7    behalf of the agents, including Agent Bullock.  But we also

8    have evidence in the record, and I think the court's taken

9    judicial notice of 13 -- Arizona Revised Statute 13-3875,

10   exactly what it requires.  Agent Hermansen also testified he

11   did not submit any evidence in addition to the evidence or to

12   the information he submitted on that report on behalf of

13   Christopher Bullock.

14       That means that he did not submit any of the evidence

15   required under 3875, including the authority to make arrests,

16   authority to carry firearms, and other required statements.

17   It's not enough to say that he himself did the inquiry, the law

18   requires that he has submitted the evidence to the sheriff.

19       Because if it's -- and it makes sense if these agents are

20   purported to be able to get law enforcement authority from the

21   state, using a sort of a lower level of inquiry than state

22   officers would be required, it makes sense that the sheriff

23   would have to review that evidence before signing off.  So,

24   Your Honor, that's -- that's one point.

25       Of course, we did not see Officer Hermansen's letter.  We

1   requested that from the government; we did not receive that.

2   So I'm not sure what Officer Hermansen's letter is but I think

3   here, if the proponent is proposing to prove that agents had

4   authority beyond federal authority, I think that there needs to

5   be a burden of proof on that proponent to show that they, in

6   fact, did have that authority.

7        Now, the government argued earlier about whether it's

8   relevant that POST kept those records or whether they have

9   those records.  Now, the POST custodian stated that he believed

10  that it was appropriate to purge records after a year but was

11  not able to provide any records reflecting that.  Again, I

12  understand the position that the absence of evidence is not

13  necessarily the evidence of absence but we're in a position

14  where, again, it should be the proponent that shows that they

15  were properly and dutifully certified pursuant to state law.

16       Now, assuming they are, Your Honor, we run into an issue

17  where we have to question just the legality of that

18  certification, whether that's something that's appropriate,

19  lawful, and constitutional.  It's -- it's a new area and in

20  part because it's something that I don't think would have been

21  cognizable at the time when the constitution was enacted that

22  federal agents, agents of a limited federal government, would

23  seek to exert their influence and authority into the state

24  domain and then, of course, the state has police powers and has

25  general authority as opposed to limited authority.

1          Is it appropriate -- these agents were acting within their

2     official duties and both Hermansen, Agent Hermansen and Agent

3     Bullock acted -- testified that they were acting as part of

4     their investigation gathering for the Tucson Border Patrol.  Is

5     it appropriate that when they were acting in that capacity they

6     were expending federal resources essentially to investigate

7     state crimes?  And whether or not that's appropriate, does that

8     fall within <u>Whren</u>?  The government cited heavily to <u>Whren</u>

9     within their response to the issue that <u>Whren</u>, as long as

10    there's a reasonable suspicion to stop someone for a traffic

11    stop, it might be reasonable to investigate other issues.

12         But, Your Honor, there's a reason we usually only see <u>Whren</u>

13    in context of state prosecutions.  For the most part, federal

14    agents don't do the things -- and I'm not faulting the agents

15    for doing them, but for the most part federal agents usually do

16    things federal agents are expected to do.  They don't pull

17    people over for traffic violations as the government mentioned

18    in its response.  It's -- but when they do, we have to analyze

19    does this fit into the <u>Whren</u> framework.

20         <u>Whren</u> assumes that an officer pulling someone over has the

21    authority to do the things, the pretext that they're claiming

22    they have the authority to do.  Agent Bullock, Agent Hermansen

23    both testified -- well, Agent Hermansen with some

24    specificity -- that they did not have citation pads.  Neither

25    of them had ever cited someone for speeding or for any state

```
 1    traffic infraction.  I think Agent Hermansen stated he was not
 2    aware of anyone in Arizona having done ever that, any Border
 3    Patrol agent.  I think there's some tangential question about
 4    has it happened in Michigan but if we're stretching to
 5    Michigan, I think we're stretching the issue.  Either these
 6    agents have the intent, authority, or ability to actually
 7    enforce the state traffic violations that the government's
 8    claiming justify the stop.
 9        So that's -- that's -- that's extremely troubling and I
10    think that, for that reason, it does not fit into the Whren
11    framework.  If -- if these agents were dutifully
12    cross-certified, they did not or were not capable of exercising
13    the authority to actually cite Mr. Jones for a traffic
14    violation.
15        And, again, I don't want to harp too much because I think
16    my briefing deals with this -- my pleadings deal with this
17    quite a bit but federal agents have to be agents of limited
18    authority.  They derive their authority from the federal
19    government and the constitution.  They have to derive their
20    authority through a balanced statutory and constitutional basis
21    and, as I mentioned within my pleading, the appropriations
22    clause, the purpose of that, both state that federal resources
23    must only be expended on federal purposes, and whether or not
24    the government's trying to tie this back in and say that stat
25    state (sic) traffic violation enforcement might somehow fit
```

1   into immigration purposes, I point the court again, and there

2   obviously is not a factual issue so we didn't come up through

3   here but I'll cite the DOJ's own opinions on its own issue,

4   whether or not -- whether or not ancillary state proceedings

5   like, for example, the FBI opinion about whether FBI was

6   entitled to investigate police officer killings involving only

7   state law or, for example, whether ATF is able to be deployed

8   after disaster reliefs, whether -- whether or not those issues

9   might fit some kind of federal purpose, they must be authorized

10  by federal statute.  And that's what we're at.  There's no

11  authority for Border Patrol to pull people over for speeding.

12  There's no authority for Border Patrol to pull people over for

13  running stop signs or arguably making unlawful U-turns.

14       And whatever happened after he was pulled over, the fact

15  remains that, either under immigration inspection grounds,

16  under -- and certainly under traffic violation grounds, there

17  was no valid basis, no lawful basis for the -- for these agents

18  to pull over Mr. Jones.

19       And, Your Honor, for that reason, I think the only proper

20  remedy here is suppression, suppression of the fruits of that

21  stop.

22            THE COURT:  So just so I'm clear, on the

23  cross-certification issue, you're challenging the

24  constitutionality of even the ability of that to happen?

25            MR. COSTALES:  If we get to that issue, Your Honor.

1          THE COURT:  Okay.

2          MR. COSTALES:  Because I think -- I think if the court

3    rules that it didn't happen here because of -- because of the

4    issues that we mentioned, that they did not take the proper

5    steps, we don't have to get to that issue but if the court --

6          THE COURT:  Well, that's the second issue.  You're

7    saying the sheriff messed up in this cross-certification

8    because they didn't -- the Border Patrol didn't comply with the

9    statute.

10         MR. COSTALES:  Yes.

11         THE COURT:  And present evidence that these were

12   federally certified, armed, and, you know, whatever the statute

13   says.

14         MR. COSTALES:  The evidence required by the statute,

15   yes, Your Honor.

16         THE COURT:  Yeah, that's a tougher argument, I think,

17   just because, you know, even if, you know, there's kind of this

18   good faith reliance type argument, too, that Border Patrol

19   agents based on that letter certainly believed that they had

20   the authority and were cross-certified.  But I just mention

21   that as an aside.

22      In terms of the constitutionality -- I think on both

23   issues, it would be helpful if you can find some cases that are

24   -- I mean, obviously there's nothing on point 'cause you would

25   have cited it.  And I've done some research as well.  On the

1    constitutionality point, I started looking into the litigation

2    involving Arpaio where state agents were, I think, certified to

3    enforce the immigration laws.  I didn't really get to read

4    through a lot of those opinions but I just mention that in the

5    event that you want to explore that area and provide some

6    supplemental authority on that.

7            MR. COSTALES:  Well, yes, Your Honor, and I'm actually

8    pretty familiar on that issue, too, because we had -- back when

9    I was an attorney in Louisiana, we had a similar issue and our

10   office litigated a similar issue in State versus Sarrabea,

11   which is a Louisiana Supreme Court case.  But to the extent --

12   and, of course, as Your Honor knows, those state actions were

13   ultimately unlawful for field pre-emption grounds because the

14   federal government has the authority, sole authority, to just

15   basically do anything related to immigration and to enforcement

16   related to immigration.

17       But the issue here I think is the reverse.

18           THE COURT:  Right.

19           MR. COSTALES:  And it's something we see perhaps less

20   often but it's something of equal importance because what we

21   have is essentially a federal officer which, although federal

22   agencies nowadays, we tend to equate them with somebody

23   overarching with quite a bit of authority because perhaps of

24   the Supremacy Clause, but ultimately a federal agent and a

25   federal government is a government of limited authority.

1        So we're in a situation here, and granted, with Arizona's

2    consent, Arizona's attempting to give federal agents this

3    enormous amount of authority that they are not constitutionally

4    or statutorily entitled to under federal law.  So it's deeply

5    troubling.

6        And the reason I cited some of those opinions from the DOJ

7    is that's about as close as I could find as far as this having

8    happened or having attempted to have happened before.  And the

9    DOJ have examined this issue pretty -- pretty thoroughly

10   because, you know, it's something that's come up in the context

11   of emergency relief, it's something that's come up in the

12   context of whether it's proper for the FBI to extend into these

13   reaches and the answer has resoundingly over and over been no,

14   it's not proper, even if the state wants to, even under

15   explicit -- even if the state is requesting that federal agents

16   do it.

17       In the case of the FBI issue, which is one of my exhibits,

18   even if the president himself direct the agents to go out and

19   do it.

20       And I don't know that necessarily, Your Honor, that the

21   good faith reliance issue necessarily resolved this because

22   there's -- it's -- the federal -- both -- both Bullock, Agent

23   Bullock and Agent Hermansen were supervisors, they were not

24   line agents.  They were supervisors who were kind of expected

25   to know a little bit more about the situation than a line agent

1   would and they both did Border Patrol training, they both did

2   -- are familiar with the regulations or Bullock, Agent Bullock,

3   after some prompting, familiar with the regulations.  It's

4   nowhere within the regulations that enacts their agency that

5   it's proper for them to pull people over for speeding.  And

6   especially when both state that they were never actually going

7   to intend to enforce this issue.

8       I think the good faith thing nec -- might just go out the

9   window because it's not just a pretext of the Whren context,

10  it's a true pretext.  They were never -- or it's not even a

11  pretext.  They were never going to cite him for traffic.  They

12  were just going to use that for a reason to stop and supposedly

13  enforce immigration objectives.

14      So, Your Honor, that's what I would respond to the good

15  faith issue.  It's not one I've analyzed necessarily yet but

16  I'll do some analysis and I'll submit supplemental briefing on

17  it.

18          THE COURT:  Okay.  All right.  Thank you.

19          MR. COSTALES:  Thank you.

20          MS. WOOLRIDGE:  Thank you, Your Honor.  The stop in

21  this case is valid for three reasons, and I'd like to address

22  each of them.  First of all, the defendant committed traffic

23  violations and the agents in this case had authority, whether

24  the defense likes that authority or not, they had the authority

25  to make those traffic stops.

1          Second, there was reasonable suspicion that immigration

2    offenses or offenses within the purview of the mission of the

3    Border Patrol were, in fact, occurring.

4          And, third, there was a significant safety concern caused

5    by the defendant's driving behavior.  All three of these

6    reasons, Your Honor, independently establish reasonable

7    suspicion for the stop in this case and makes the stop in this

8    case valid and lawful.

9          I'd like to start with addressing the cross-certification

10   issue with regard to the traffic violations.  The agents had --

11   the agents had the authority, as conferred to them by the

12   sheriff of Pima County, to enforce state laws.  13-3875

13   specifically says a federal peace officer who is employed by an

14   agency of the United States and who has completed the basic

15   training curriculum for the officer's agency shall possess and

16   exercise all the law enforcement officers and peace officers of

17   this state for one year.  There's no question this was in the

18   one year.  In fact, it was exactly, I believe, three weeks

19   after the certification was obtained.  There's no question that

20   both Agent Bullock and Agent Hermansen were federal peace

21   officers employed by the United States Border Patrol and that

22   they'd completed the basic training curriculum for their

23   agencies.  They were, therefore, based on this grant by the

24   sheriff, whether, again, the defense likes that ability of the

25   sheriff or not, they had that authority to make the traffic

1    stop.

2        Now, granted, we heard from both Agent Hermansen and Agent

3    Bullock, they did not seek this cross-designation to be able to

4    conduct traffic stops.  They sought that cross-designation and

5    exercised that cross-designation authority to be able to

6    further the mission of Border Patrol and that is why the

7    defendant's argument is faulty.

8        The defense finds it perhaps offensive that Border Patrol

9    agents be able to conduct -- conduct any sort of investigations

10   outside of the scope of the mission of the Border Patrol, which

11   is primarily immigration and drug offenses, border-related

12   crimes.  As both agents testified, that's why they obtained

13   this cross-certification authority and that's exactly what they

14   were investigating on March 31st, 2017.

15       They -- the fact that there are also avenues within state

16   law that would allow them to complete that mission does not

17   render anything that they were doing offensive or questionable

18   or outside of the scope of their federal power.  There is

19   nothing in Section 8, for instance, saying that Border Patrol

20   agents may only investigate violations of federal law.  Their

21   powers are conferred to them by federal regulations but

22   oftentimes, Your Honor, as I know this court is aware, federal

23   agents may pursue state offenses for crimes that are well

24   within their purview.

25       And as we heard both agents testify, there are narcotic

1    trafficking offenses in -- that are violations of Arizona state

2    law, there are human smuggling offenses that are violations of

3    Arizona state law, as well as violations of federal law.  And

4    sometimes there are nuances of federal law or sometimes there

5    are issues with the prosecuting agency, the federal prosecuting

6    agency, that cause a federal agency to proceed with state

7    charges.  That does not mean that they're acting outside of the

8    scope of their abilities, Your Honor.

9        Now, had the -- the agents here been investigating, for

10   instance, a domestic violence assault and pursuing state

11   charges for something like that that is completely outside the

12   mission of Border Patrol, the defense's argument might carry a

13   bit of weight.  It still doesn't mean they didn't have the

14   authority.  They still would have certainly had the authority

15   as conferred on them by the cross-designation.  But, perhaps,

16   that -- that exercise of that authority would be a little bit

17   subject to question.

18       But, again, that authority exists, the authority to conduct

19   the traffic stop still exists, especially on occasions like

20   this where they conducted a traffic stop while investigating

21   and following up on leads regarding immigration offenses.  And

22   that's the information that we heard, that's the testimony that

23   we heard, and it was uncontroverted, that they had received

24   information and numerous times in numerous meetings and

25   numerous -- from numerous partner agencies about a prolific

1    issue involving alien smuggling, stash houses in this area of

2    town.  In fact, the day before, they had arrested two illegal

3    aliens in the area and they believed that area to be -- to

4    contain a stash house for humans, for human smuggling,

5    specifically for immigration offenses that they are

6    specifically tasked with enforcing.

7        To suggest that this happened away from the border is -- is

8    a very faulty argument, Your Honor.  As this court is well

9    aware, the immigration offenses extend beyond the physical

10   border with Mexico.  In fact, I believe Phoenix, Arizona, has

11   become one of the worst areas of the entire country with regard

12   to stash houses for alien smuggling.

13       But certainly we hear about large cities in the Midwest, in

14   the East Coast, far, far from the border where these crimes

15   extend.  Certainly they extend to Tucson.  As both agents

16   testified, these crimes, they investigate crimes in Tucson, in

17   South Tucson, in Pima County all the time.  And that's why that

18   cross-designation helps them to -- to -- to execute their duty

19   and to investigate such crimes.

20       They were acting within the scope of just what we, as

21   citizens, would expect them to do.  They were investigating

22   offenses within the mission of the United States Border Patrol.

23   They were conducting surveillance in furtherance of

24   investigation of those crimes, as well as for officer safety

25   purposes, and furthering that investigation.  And, in doing so,

1   they see traffic violations that they have the authority to

2   enforce.  Again, whether we agree with that authority or not,

3   it's on the books in the state of Arizona.

4       They had appropriately received that authority.  Whether

5   it's later found to be unconstitutional by this court, by

6   another court is of no moment because on March 31st, 2017,

7   ARS 3875 was, in fact, good law, is still, in fact, good law.

8   And they had complied with it.

9       The defense finds fault with the submission by Agent

10  Hermansen to Sheriff Napier and Sheriff Napier's subsequent

11  designation of cross -- I'm sorry -- subsequent designation of

12  cross-certification authority.  I would submit to the court

13  that in Exhibit 53, there is, in fact, compliance with the

14  state statute in that Agent Hermansen avows that all of the

15  agents contained here are, in fact, certified federal law

16  enforcement agents and part of the disrupt unit, and certainly

17  while it doesn't go through every single thing that these

18  officers are allowed to do or authorized to do, it certainly is

19  enough information to lead Sheriff Napier to make the valid

20  conclusion that they are, in fact, certified peace officers

21  authorized to enforce violations of federal law because it

22  talks about the duties of the disrupt unit and that certainly

23  has to do with enforcing violations of federal law.

24      So I would submit that this letter by Agent Hermansen does,

25  in fact, submit -- comply with the requirements of

1   13-3875(B)(1) and (2).  And that's all that's required under

2   federal statute for submission of cross-certification.  And I

3   would submit that Sheriff Napier, in conferring that

4   cross-designation, did, in fact, lawfully comply with that

5   statute.

6       In any event, both Agent Hermansen and Agent Bullock had a

7   good faith basis to rely on that cross-designation.  As the

8   court points out, even if it's later to be found

9   unconstitutional, they had a good faith reliance on this letter

10  by Sheriff Napier which is all that's needed, as we heard from

11  Director Lane, to confer that cross-designation.  So they had a

12  good faith basis to believe that they could, in fact, enforce

13  state laws, they could enforce -- they could, in fact, make a

14  traffic stop.

15      Now, as we heard the defense argue with regard to

16  pretextual stops, here, this stop, traffic stop could have been

17  a pretext stop.  The agents set forth articulable facts of

18  reasonable suspicion of immigration offenses as well and I'll

19  get back to that.  But had they not articulated those facts,

20  this pretextual stop could, in fact, be valid because there

21  were traffic violations.

22      It's undisputed that running a stop sign is a traffic

23  violation, that speeding, traveling at a higher than the posted

24  speed limit is, in fact, a traffic violation.  And the -- both

25  witnesses testified that they observed those violations.  So

1    even absent any other suspicion of immigration violations,

2    there was reasonable suspicion to make a traffic stop.

3        They had the authority to do so.  Whether or not they had

4    the ability to make -- to make a citation for it is of no

5    moment because they could have made this completely pretextual

6    stop based on the traffic violations that they observed even if

7    they had never intended to cite for a traffic violation.  That

8    is exactly what a pretextual stop is.

9        Just as is, for instance, DPS is asked by a federal agent

10   who doesn't have cross-certification authority is asked by a

11   federal agent, if you see this vehicle on the highway, conduct

12   it -- making a traffic violation, please pull them over and let

13   us know.  That vehicle may never be cited for a traffic

14   violation and it may never be the intent or the intent of DPS

15   to cite it but if DPS actually sees a valid traffic violation,

16   DPS has the authority to pull that traffic -- that vehicle over

17   and the federal agents may respond and conduct their

18   investigation.

19       Here this situation is analogous but here the difference is

20   we have the federal agents that themselves have the authority

21   to make that traffic stop as well.  So there --

22           THE COURT:  Based on the immigration violations?

23           MS. WOOLRIDGE:  Based on the traffic violations.

24           THE COURT:  Right.  But, I mean, the distinction is

25   the DPS officer can issue -- the DPS officer can issue a

1    warning even, he can make the stop or he or she can make the

2    stop even though he or she had no intention on issuing a

3    traffic infraction.

4        But here you have a situation where the ability to stop is

5    given to Border Patrol agents based on traffic violations but

6    they've completely said we're not going to -- we don't want

7    citation books, we're never going to enforce that -- that --

8    we're never going to enforce state law with traffic violations,

9    we just want the ability to stop folks for traffic violations

10   but we don't even -- don't even give us a citation book to let

11   us, you know, cite these folks for it.

12       So it is distinguishable.  Whether that matters, I mean,

13   it's the ultimate pretext, right?  Because there's no way

14   anybody -- there's no way -- if Mr. Jones didn't have a gun,

15   there was no way he was going to get cited for a traffic

16   infraction by the Border Patrol.

17            MS. WOOLRIDGE:  So let me further develop my analogy,

18   Your Honor.  DPS makes a stop based on a traffic violation on

19   the highway.  Again, with no intention of issuing a traffic

20   citation but with -- but to refer it over.  Again, that stop's

21   valid.  If there is a valid traffic violation, the stop is

22   valid even if that individual is never cited.

23            THE COURT:  Right.

24            MS. WOOLRIDGE:  And -- but, of course, if the

25   investigation is to continue, there must be reasonable

1   suspicion for another violation.

2       Here, that's exactly what happened except you have the same

3   agents because the agents have the lawful authority to pull

4   over for a traffic violation even if they never intended to

5   cite for a traffic violation based on it being pretextual.

6   They developed suspicion of other offenses.

7       In this case, you have an individual who's making furtive

8   movements, who admits that there's a weapon in the car, and you

9   have the federal violation of a weapons offense that is then

10  turned over to -- to -- to ATF.

11      So, again, you have a valid traffic stop because the agents

12  have the authority to do so.  You then have reasonable

13  suspicion that's developed for a weapons violation and is

14  turned over for that offense.  So you have -- you have lawful

15  authority to continue that investigation based on the traffic

16  -- based on this lawful traffic stop, then the reasonable

17  suspicion that immediately develops of a federal firearms

18  violation.

19      So, Your Honor, I would submit to you that the first basis,

20  being the traffic violation, is a valid basis.  But there are

21  two other bases, and there are articulable facts for reasonable

22  suspicion of immigration violations.  You have agents testify

23  that in that exact area that they had seen -- they had -- they

24  had received information that there were offenses occurring,

25  that there were specifically alien smuggling offenses

1    occurring.  We have just the previous day offenses occurring in

2    that area.  We have a vehicle that is acting incredibly

3    suspicious.

4        Whether or not they -- whether or not Mr. Jones saw that

5    they were Border Patrol agents or not, whether or not he

6    believed they were law enforcement agents or not, that's beside

7    the point.  You have very suspicious behavior, someone who's

8    driving basically who, based on the report and the testimony,

9    takes a longer than usual time staring at the agents.  That --

10   first of all, just the honking behind them when it's a multiple

11   lane highway and he could have -- multiple lane, I'm sorry, not

12   highway but multiple lane roadway, he could have driven around

13   them.  The fact that he honked at them and then took an

14   abnormal time looking at them in and of itself is odd.

15       In fact, Agent Bullock said he didn't remember exactly what

16   he said to Agent Hermansen but he remembers saying something

17   about, okay, that was weird or that was odd and I think Agent

18   Hermansen testified accordingly that both immediately felt this

19   is really weird behavior, something isn't quite right here.

20           THE COURT:  Yeah, but how's that indicative of alien

21   smuggling?  I know it's hard to abandon an argument as an

22   attorney but I really thought you were going to abandon this

23   reasonable suspicion for alien smuggling based upon you devoted

24   very little attention in your brief and even the questioning of

25   the witnesses, you know, I think if I found there was

1    reasonable suspicion for alien smuggling, I'd be reversed in a

2    heartbeat.

3         MS. WOOLRIDGE:  And I probably shouldn't have

4    qualified it as being alien smuggling but as being some sort of

5    illegal activity going on and whether or not that was -- again,

6    whether or not it was exactly an alien smuggling offense or an

7    offense that Border Patrol regularly investigates, there

8    certainly -- and so I probably should not have qualified that

9    argument but there is reasonable suspicion that there's

10   criminal activity afoot, Your Honor, aside from traffic

11   violations.

12        THE COURT:  But what's the articulable criminal

13   activity if it's not alien smuggling?

14        MS. WOOLRIDGE:  I don't think that -- I don't think

15   that any law enforcement officer is -- must say this is exactly

16   what I -- what I believe is going on if they're going to

17   conduct a violation, especially when they see a traffic

18   infraction and have the lawful authority to stop the car.

19        THE COURT:  Well, I agree with you on the traffic

20   infraction but if they're stopping somebody for -- usually

21   there's a suspicion of some crime, you know, usually it's

22   agents will articulate the car was heavily loaded, we had

23   suspicion that it was loaded with drugs or aliens.  I mean,

24   there's always some type of -- the articulable suspicion goes

25   to some crime, not general criminality.

1        MS. WOOLRIDGE:  I understand the court's point.  I

2   would just submit, though, that there's certainly suspicious

3   driving behavior going on here, evasive driving behavior right

4   from the get-go that the agents think is odd, the fact that

5   it's then driving through stop signs trying to take evasive

6   actions.  I do think they at least had reason to be suspicious

7   that something else was going on.

8        That, coupled with the traffic violations, certainly made

9   this -- and I guess -- I guess the reason to bring this up,

10  Your Honor, perhaps goes back not to -- not so much to create a

11  suspicion of a specific violation but to -- to counter the

12  defense's argument that they had -- that the agents had no

13  business doing what they were doing there and I guess that's

14  really what my argument goes more towards, Your Honor.

15        THE COURT:  Okay.

16        MS. WOOLRIDGE:  That they did, in fact, have business

17  being there, that they were furthering the Border Patrol

18  mission by seeing the suspicious activity, and having the

19  authority to stop the vehicle exercised that authority.

20        But, Your Honor, I think perhaps the most compelling

21  argument is just the dangerousness of this behavior.  We heard

22  from both Agent Hermansen and Agent Bullock, and even Bullock

23  was, I think, even was the most adamant about this, he is the

24  person that was driving the Border Patrol vehicle and did, in

25  fact, eventually turn on his lights and sirens and effectuate

1    the stop because he was very concerned that someone was going

2    to be hurt.

3        You have an individual that's not stopping for stop signs,

4    that is making abrupt turns, that is engaging in what he felt

5    was very dangerous driving behavior, and he felt that it was

6    his duty as a sworn law enforcement officer to stop that

7    behavior before someone got hurt.  And he felt that he would be

8    remiss in his behavior if he did not do so.

9        We heard Agent Hermansen say the same thing, and that is,

10   as a patrol agent in charge, he would absolutely expect

11   everyone that worked under his chain of command to make a

12   traffic stop under those circumstances to protect the public.

13   The agent's authority doesn't -- the agent's responsibility to

14   protect us doesn't stop at the border, Your Honor.

15       I think that what they did, we would expect of any law

16   enforcement officer be it state, local, or federal when they

17   see -- observe -- when they observe behavior that puts our

18   community at risk, especially when they were in that area

19   initially executing their duties.  But if they see something

20   like that, to not look the other way, to not say:  Well, I'm

21   not a local law enforcement officer so I don't care if this

22   person, you know, runs someone off the road or runs a stop sign

23   and hurts someone or kills someone.  I think that this is

24   exactly what we would expect from law enforcement, Your Honor.

25       I'm sorry.  Does the court have any more questions?

1              THE COURT:  No, thank you.

2              MS. WOOLRIDGE:  Thank you.

3              THE COURT:  Appreciate that.

4         Mr. Costales, you get the last word if you want it.

5              MR. COSTALES:  Yes, absolutely.  I will not say no to

6    the last word.

7              THE COURT:  No lawyer can.

8              MR. COSTALES:  I know.  It's irresistible.

9         Your Honor, just a couple -- couple brief points and I

10   think that the safety exception thing is something that came up

11   in the hearing.  I don't think that was in the government's

12   response anywhere but I'd like to address it because it's --

13   the government made a really big point of it's a way that we

14   expect law enforcement to behave, any law enforcement officer

15   to behave.  And I think I would disagree with that

16   wholeheartedly.

17        Mr. Jones is driving down the street and, according to the

18   agents, he honked at them, they pulled over, and he passed

19   them.  Now, I won't get into the credibil -- well, I guess I

20   can; it will only take me five seconds to do it.  That's how

21   long Agent Hermansen said -- claimed took for Mr. Jones to pass

22   him on the side of the road.  That is -- it's not -- it kind of

23   belies credibility that that is, in fact, what happened but I'm

24   not going to question him on his recollection.  He was

25   referring often to his notes and I know this happened over a

1    year ago.

2        But for the government to argue public safety when the

3    agents chased Mr. Jones in an unmarked car, like a lifted Tahoe

4    with tinted windows, where they went at least at whatever speed

5    Mr. Jones was going or probably 15 to 20 miles farther, higher

6    than that speed, the public safety exception falls flat.  If

7    they were concerned about public safety, there was a numerous

8    set of courses that they could have taken, like calling Pima

9    County sheriffs, the actual professionals.

10       Neither agent -- or I think it was Agent Hermansen, and I

11   believe also Agent Bullock, both showed no familiarity with the

12   Pima County sheriff's policy manual.  If they're out there

13   enforcing state law, they're doing so without any guidance or

14   understanding of the purposes.

15       Now, I don't know of any particular all-arching duty that

16   trumps the Fourth Amendment here that would allow an agent or

17   an officer or anyone to pull someone over and restrict their

18   liberty and do so because of some immeasurable law enforcement

19   sense of duty.  There always has to be a basis for doing it.

20       And I think the court's mentioned before the good faith

21   basis and I'm not -- I'm not going to say -- I'm not going to

22   go as far as to say these agents were acting in bad faith.  I

23   think perhaps in many of the cases where suppression has been

24   granted, the agents were doing what they perhaps thought was

25   right.

1        But the fact is they did not have the authority to do so.

2   If we were just talking about, let's say, Border Patrol agents,

3   ordinary Border Patrol agents, certainly Border Patrol agents

4   prior to 2013, I think the inquiry would have been done.  This

5   was a bad stop.

6        So I think that the issue then is was there -- was it

7   appropriate for them to do so, to stop Mr. Jones for a traffic

8   infraction?  Now, I didn't perhaps quite expect that it would

9   extend so far as Agent Hermansen went out of his way, he was

10  offered a citation pad and he said:  No, I do not want that.  I

11  don't ever want to write someone a ticket.  Never has written

12  someone a ticket, neither has Agent Bullock.  This -- this goes

13  far beyond Whren, Your Honor, and I think that it does not fit

14  square -- firmly within the Whren exceptions.

15       We're in a situation where it was just -- it was not going

16  to happen.  They were never, ever going to be able to or

17  trained to or were going to write Mr. Jones a traffic citation.

18       So those are the two points.  And I'll -- what happened

19  that day was not what law enforcement should have done.  It's

20  not something that I would hope ever happens again because

21  essentially Mr. Jones was driving down the road and he honked

22  at the wrong person essentially.  He thought he was honking at

23  someone who -- both agents testified they were going slower

24  than normal on the road, did so according to the law because

25  there's no law against honking at someone, and then ends up

1    getting chased by a gold Tahoe which was getting close enough

2    to read the license plate, which wouldn't let up after one stop

3    sign after another, kept coming after the U-turn, and kept

4    coming until they finally identified themselves as law

5    enforcement and finally pulled him over.  I would hope that

6    never happens again.

7         And in this case, Your Honor, I don't think it was

8    appropriate.  I think it would have been questionable even for

9    a state officer to have done what the Border Patrol agents did.

10   I think it's especially questionable when Border Patrol agents

11   did so without any authority to enforce traffic violations.

12        And I think I'll leave it at that.  I've made my points

13   very clear as far as why I believe that this stop was not based

14   on reasonable suspicion either for immigration grounds or

15   appropriately under traffic violation grounds, and I leave it

16   to the court.  I think suppression's the proper remedy and I

17   thank the court for listening to arguments

18             THE COURT:  Okay.  Thank you.  Well, this has no

19   bearing on anything, and don't read anything into it, but I got

20   the sense when I read the pleadings, and to the extent or maybe

21   a lesser extent that the agents got a little angry with

22   Mr. Jones for honking at them and the reason I get this

23   impression 'cause it happens to me all the time driving a

24   minivan.  They were going too slow, Mr. Jones honks, they get

25   mad, they follow him to look for traffic infractions, and

1   Mr. Jones arguably commits those infractions and that's why

2   we're here.

3       So I just -- that's just how I kind of read into it but --

4   but, at the end of the day, it's going to come down, I think,

5   to these traffic infractions.  So, if you want to submit any

6   supplemental pleadings on the constitutionality issue and/or

7   why Sheriff Napier's delegation of authority was unlawful, I'd

8   be happy to see it.  I'm going to be doing some pretty broad

9   Westlaw searches myself.  I've done some and I can't find much,

10  at least I haven't gone beyond the Ninth Circuit but I haven't

11  found much in the way of doing a very broad search on

12  cross-certification.

13      But I do find the issue very interesting, which just means

14  -- which doesn't mean much because it just means one of you two

15  are going to lose so -- but it is interesting and I thought the

16  briefs were very good and I thought you both -- both sides did

17  a really nice job at the hearing.  So thank you for your hard

18  work and professionalism.  And I'll take it under advisement.

19      If you want to file supplemental briefs, try to do that in

20  the next 10 days or so.  We'll order a transcript but I don't

21  think that anything that's on the transcript's going to be --

22  I'm looking for case law so in the next 10 days or so file the

23  supplemental briefs and I'll take it under advisement and get

24  out a report and recommendation to Judge Soto.  Thank you all.

25  Appreciate it.

1          MS. WOOLRIDGE:  Thank you, Your Honor.  May we be

2    excused?

3          THE COURT:  Yes.  Thank you all.

4       (Whereupon, the matter was concluded at 3:31 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4          I, Cindy J. Shearman, court-approved transcriber,

5     certify that the foregoing is a correct transcript from the

6     official digital sound recording of the proceedings in the

7     above-entitled matter to the best of my ability.

8

9

10     __s/Cindy J. Shearman_____          September 27, 2018_
       Cindy J. Shearman, RDR, CRR, CRC          Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT