IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, )<br>    Plaintiff, )<br>    )<br>  vs. )<br>    )<br> Anthony Delbert Jones, Jr., )<br>    Defendant. )<br>_____ ) | CR 18-00032-TUC-JAS (EJM)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is the defendant's motion to suppress evidence obtained from an illegal traffic stop. [Doc. 21.]  The defendant first argues that Border Patrol agents did not have a reasonable suspicion of alien smuggling to stop his vehicle.  The defendant also maintains that the Border Patrol agents had no authority to stop the vehicle based only on state traffic violations, especially given that agents never intended to issue a traffic citation; moreover, even if they had that authority, they lacked a reasonable suspicion for a stop on that basis.

The government argues that because the Border Patrol agents involved in the traffic stop were cross-certified as Arizona peace officers, the agents had the authority to stop the defendant based only on their reasonable suspicion of traffic infractions.  The government also argues that agents had a reasonable suspicion of alien smuggling.  [Doc. 25.]

The Court concludes that the agents did not have a reasonable suspicion of alien smuggling to justify the stop of the defendant's vehicle.  However, the Court concludes the cross-certification of the Border Patrol agents as Arizona peace officers provided these agents with the authority to stop the defendant based on the suspected traffic infractions; and

1  that authority existed regardless of whether the agents intended to issue a traffic citation.
2  Because there was a reasonable suspicion for the stop based on the traffic infractions, it is
3  recommended that the motion to suppress evidence be denied.

4  **FACTUAL BACKGROUND**

5  On June 5, 2017, a criminal complaint was filed against the defendant charging him
6  with the felony offense of being a felon in possession of a firearm, in violation of 18 U.S.C.
7  §§ 922(g)(1) and 924(a)(2).  [Doc. 1.]  The criminal complaint sets forth the following facts
8  that form the basis for this charge.  On March 31, 2017, the defendant was driving a vehicle
9  that was stopped by law enforcement for traffic violations.  When asked if any weapons were
10  in the vehicle, the defendant stated that he had a firearm, which belonged to him, hidden in
11  the center rear seat.  Because the defendant had a prior felony conviction, he was prohibited
12  from possessing a firearm.  Agents with the Bureau of Alcohol, Tobacco, and Firearms
13  ("ATF")" confirmed that this firearm traveled in interstate commerce.

14  On January 3, 2018, a federal grand jury sitting in Tucson, Arizona returned an
15  Indictment against the defendant charging him with a violation of  18 U.S.C. §§ 922(g)(1)
16  and 924(a)(2). [Doc. 3.]  The defendant had his Initial Appearance on February 7, 2018, and
17  was temporarily detained pending his detention hearing and arraignment on February 9,
18  2018.  At that hearing, the defendant was detained pending trial.

19  On August 10, 2018, the defendant filed the instant motion to suppress evidence
20  obtained as a result of the traffic stop.   As noted above,  the defendant argues that Border
21  Patrol agents did not have a reasonable suspicion of alien smuggling to stop his vehicle.  The
22  defendant also argues that the Border Patrol agents had no authority to stop the vehicle based
23  only on state traffic violations, and even if they had that authority, they lacked a reasonable
24  suspicion for a stop on that basis.  The government argues that because the Border Patrol
25  agents involved in the traffic stop were cross-certified as Arizona peace officers, the agents
26  had the authority to stop the defendant based only on their reasonable suspicion of traffic
27  infractions.  The government also argues that agents had a reasonable suspicion of alien
28  smuggling.

1     An evidentiary hearing on the motion to suppress was held on September 19, 2018.

2   The government called two witnesses: retired Border Patrol Agent Peter Hermansen, Jr., and

3   Border Patrol Agent Christopher Bullock.   The defense also called two witnesses: Jack Lane

4   and Martin Pesqueira.   The testimony of these witnesses is set forth below.[1]

5     **1.    Peter Hermansen, Jr.**

6     Mr. Hermansen testified as follows on direct examination.  Mr. Hermansen is a retired

7   Border Patrol agent who currently works as a SETA (Science, Engineering, and Technical

8   Advisor) contractor under the assistant secretary of defense.  (9/19/18 Tr. at 26.)   He was

9   hired for his current position in June of 2017; he testified that he obtained that position

10  because of the work he did while in the Border Patrol.  (*Id*.)  He was a Border Patrol Agent

11  for 21 years prior to his retirement.  (*Id*.)

12     Mr. Hermansen started his career as a reserve officer for the city of East Detroit,

13  Michigan. (*Id.* at 27.)  He was in that position for three years and then joined the Border

14  Patrol.  (*Id*.)   During his career with the Border Patrol, he was stationed in El Paso, Texas;

15  Washington, D.C.;  Douglas, Arizona; Casa Grande, Arizona; and Tucson, Arizona.  (*Id*.)

16   In his time with the Border Patrol, he served with their national tactical team (BORTAC),

17  including being the director of that organization, as well as serving in Central and South

18  America. *(Id*.)

19     When he retired from the Border Patrol, his title was Patrol Agent in Charge for the

20  Tucson Sector Intelligence Unit.  *(Id.)*     In that position, he ran the sector intelligence

21  program for the State of Arizona.  Specifically, that unit gathered information and produced

22  intelligence for agents in the field to use in their patrol duties.  (*Id.*)   In terms of his

23  day-to-day duties, he had a leadership role which was probably five to six levels removed

24  from agents in the field.  (*Id*.)  Nevertheless, he still was involved with the day-to-day "boots

25  on the ground operations of the Border Patrol."  (*Id*. at 28.)

26     Mr. Hermansen's testimony then turned to the cross-certification of Border Patrol

27

28     [1] Citation to "9/19/18 Tr." followed by the page number is to the transcript of the
suppression hearing held on September 19, 2018.

1   agents as state peace officers.    (*Id*.) He explained that the Border Patrol obtains
2   cross-certifications for its agents with many sheriff's departments across the State of Arizona
3   so agents can work cases with state and county law enforcement.  (*Id*.)  He testified that the
4   Border Patrol does not seek cross-certifications in order to enforce state law *per se*.  (*Id*.)  He
5   explained that counties offered the Border Patrol "ticket books" to cite for violations of the
6   Arizona Revised Statutes, but the Border Patrol declined the offer.  (*Id*.)  Mr. Hermansen
7   testified that the cross-certification furthers the mission of the Border Patrol because agents
8   can work with state law enforcement generally as well as on task forces.  (*Id*. at 29.)  But he
9   emphasized that the Border Patrol's primary mission is "to defend the homeland."  (*Id*.)

10          Mr.  Hermansen  was  personally  involved  with  the  process  of  obtaining
11   cross-certification  of  Border  Patrol  agents.    (*Id*.)    Specifically,  he  would  request  the
12   cross-certification of agents assigned to task forces from sheriff's departments.  (*Id*.)  He
13   explained that his superiors restricted the cross-certification requests to agents "assigned to
14   task forces or agents in critical positions at stations that wanted to work and interact with
15   state, local agencies at the time."  (*Id*. at 30.)  In terms of the cross-certification process, he
16   testified that he would complete a memorandum requesting cross-certification of certain
17   agents and submit it to the sheriff's department.  (*Id*.)   As part of that process, he would
18   ensure that the agents requested for cross-certification are federal peace officers that are in
19   good standing with the Border Patrol. (*Id*. at 31.)  The sheriff would review the request and
20   then decide whether to authorize the cross-certification.  (*Id*. at 30.)

21          Mr. Hermansen testified that shortly before his retirement, he submitted a memo dated
22   March 1, 2017 to Sheriff Napier requesting cross-certification of sixty Border Patrol agents.
23   (*Id*. at 32-33; Def. Ex. 53.)  That request for cross-certification included Agent Christopher
24   Bullock.  (*Id*. at 33.)  In a letter dated March 10, 2017, Sheriff Napier granted the request for
25   the cross-certification of these sixty Border Patrol agents pursuant to A.R.S.  13-3875.  (*Id*.
26   at 34-35; Def. Ex. 53.) The cross-certification was effective for one year.  (Def. Ex. 53.) [2]

27   _____

28          [2]  Mr. Hermansen testified that he did not request cross-certification for himself in the
     March 1, 2017 letter, but he was cross-certified in Pima County, Pinal County, and Maricopa

1    Mr. Hermansen's testimony then turned to the traffic stop on March 31, 2017. (*Id*. at

2   36.) He testified that on that date, he was working as part of a Disrupt team that goes into

3   the community and looks for illegal activity based on "verbal reporting or intelligence-type

4   information." (*Id*.) On or around March 31, 2017, Border Patrol received information from

5   the Tucson Police Department and the South Tucson Police Department about "a lot of

6   activity in those areas in relation to aliens and narcotics." (*Id*.) He testified that Border

7   Patrol's authority to investigate alien and drug cases extends beyond the border and into

8   communities like South Tucson. (*Id*. at 37.) He explained that alien and drug activity

9   permeates into urban centers and, as a result, investigations by Border Patrol agents extend

10   into the Tucson area. (*Id*.) Mr. Hermansen testified that he and Agent Bullock wanted to

11   go into the South Tucson area in an unmarked vehicle before sending marked Border Patrol

12   units to the area because Border Patrol is often seen in a negative light by individuals in that

13   area. (*Id*. at 38.) He testified that the specific area they were looking at was the Santa Rita

14   Skate Park on Curtis and Euclid Streets. (*Id*. at 40.)

15    On March 31, 2017, Mr. Hermansen and Agent Bullock were conducting surveillance

16   near the park. (*Id*. at 41.) They had arrived at the park around noon. (*Id*.) They were in an

17   unmarked Chevy Tahoe and Agent Bullock was driving. (*Id*. at 42.) Both agents were in

18   plainclothes, but Agent Bullock was wearing a Border Patrol vest and Mr. Hermansen had

19   on a jacket that said "CBP" with a badge on the front and "police" across the back. (*Id*. at

20   43.) He described the area around the park as a residential area, "people walking around,

21   stores, businesses on some of the roads, and vehicular traffic in the area as well." (*Id*. at 41.)

22    At about 1 p.m., Agent Bullock slowed the vehicle down "to take a look at some

23   subjects in the park and a vehicle approached from behind . . . and honked its horn and then

24   sped around us." (*Id*.) He testified that the vehicle then slowed at a stop sign but

25   immediately sped across the intersection; "that piqued a concern . . . because it was either

26

27   ─────────────────

28   County. (*Id*. at 35.) He explained that Border Patrol management felt that an individual
     should not make the cross-certification determination for themselves. (*Id*.) So his superior(s)
     would have submitted the cross-certification request. (*Id*.)

1   attempting to evade us or attempting to get out of the area." (*Id*. at 43.)  Agent Bullock sped

2   up and started following the vehicle in order to get the license plate.  (*Id*. at 44.)   After the

3   vehicle sped through the stop sign, the agents were able to get the license plate.  They called

4   the plate number in to dispatch via the radio; the vehicle was a rental.   (*Id*.)   Agents

5   continued to follow the vehicle which went into a residential area; the vehicle was exceeding

6   the posted speed limit of twenty-five miles per hour and continued to roll through stop signs.

7   (*Id*. at 44-45.)  The vehicle eventually did a quick U-turn at a T intersection at the end of the

8   street; the vehicle also made quick turns and rolled through stop signs, which he interpreted

9   as attempts to evade law enforcement.  (*Id*. at 47.)  He also noticed the subject in the vehicle

10   making suspicious furtive movements; movements behind, movements to the side, looking

11   like he was attempting to hide something.  (*Id*. at 47.)   Mr. Hermansen estimates that they

12   observed this erratic driving behavior for about three to five minutes. (*Id*. at 48.)

13        Mr. Hermansen testified that he and Agent Bullock had safety concerns based on the

14   driving behavior, given that they were in a residential area and there were people in the area.

15   (*Id*. at 45.)  He testified that Border Patrol agents are still responsible for the safety of the

16   public even though they are federal officers tasked with enforcing federal immigration and

17   narcotics laws.  (*Id*. at 45.)  Based on these concerns, agents decided to stop the vehicle.  (*Id*.

18   at 47.)  Eventually, Agent Bullock activated the emergency lights on his vehicle.  (*Id*. at

19   47-48).  The driver of the vehicle did not immediately stop; he "continued to drive at a higher

20   speed going through stop signs."   (*Id*. at 49.)   Agent Bullock had to pull along side the

21   vehicle, activate the siren, and roll down his window to instruct the driver to pull over to the

22   side of the road.  (*Id*. at 49-50.)  Ultimately, the driver pulled the vehicle over to the side of

23   the road.  (*Id*. at 50.)

24        Once the vehicle stopped, Agent Bullock approached the vehicle to speak with the

25   driver, and Mr. Hermansen approached the passenger side of the vehicle.  (*Id*. at 50.) Agents

26   noticed a small child in a car seat in the backseat of the vehicle.  (*Id*. at 51.)   The defendant

27   was the driver of the vehicle.   Both the defendant and his passenger were very animated as

28   to why they were pulling them over.  (*Id*. at 50.)   The defendant was very nervous, and the

passenger kept demanding to know why they were pulled over.  (*Id*. at 51.)   Agent Bullock asked the defendant to exit the vehicle, and they went to the back of the vehicle.  (*Id*. at 51.) Agent Bullock advised Mr. Hermansen that there was a weapon in the vehicle.  (*Id*. at 52.) The defendant provided his consent for agents to search the vehicle.  (*Id*.)   Mr. Hermansen searched the vehicle and found a firearm underneath the back seat where the child was seated.  (*Id*.)   The firearm was a revolver which was loaded with ammunition.  (*Id*. at 53.) The defendant told officers he had prior convictions and that he had drugs on him and in the vehicle.  (*Id*. at 53-54.) Agents found what they believed was heroin hidden in the defendant's underwear and in the vehicle.  Agents could not immediately determine if the defendant was a convicted felon, although he admitted as much, so they told him that he would have to come to the station so they could run a records check.  (*Id*. at 54.)

In response to the prosecutor's question about why the vehicle was stopped, Mr. Hermansen testified that a stop was performed because of "the notoriety of the area, the manner and travel of the vehicle, the furtive movements of the subject, and the record checks coming back to it being a rental vehicle, which is very common in narcotics and alien smuggling events."   (*Id*. at 60.)  He further testified that it is common for alien and drug smuggling subjects to disobey traffic laws.  (*Id*. at 61.)

On cross-examination, Mr. Hermansen agreed that 8 CFR § 287.5 denotes the Border Patrol's authority, which includes the authority to investigate and make immigration arrests, as well as execute immigration warrants.  (*Id*. at 63.)  Mr. Hermansen conceded that this code provision does not give Border Patrol agents authority to stop someone for a traffic violation.  (*Id*. at 63-64.)  He also agreed that Border Patrol agents normally do not stop individuals for traffic violations, and this stop did not occur on federal land.  (*Id*. at 64.)

With respect the cross-certification as an Arizona peace officer, Mr. Hermansen agreed that he did not have a citation pad or a radar gun because that is not his job.  (*Id*.) And he had no intention of writing the defendant a ticket for speeding, blowing through a stop sign, or making a U-turn.  (*Id*.)   In fact, Mr. Hermansen has never cited someone for a traffic infraction while working as a Border Patrol agent.  (*Id*. at 65.)

As to the safety concerns about the defendant's driving behavior, Mr. Hermansen agreed that Agent Bullock pulled to the side of the road to let the defendant pass; that Agent Bullock sped up to get behind the defendant's vehicle; that the defendant was driving about 40-45 miles per hour and Agent Bullock was driving faster than that through a residential area to catch up to the defendant; and that the Chevy Tahoe that Agent Bullock was driving is a big vehicle. (*Id*. at 65-66.) Mr. Hermansen testified that both the driver and passenger "took a long look" (about five seconds) at him and Agent Bullock as they passed them. Mr. Hermansen got a good look at the passenger who was an African-American female in her 30's and heavier set; he only got a glimpse of the driver. (*Id*. at 67-68.) Mr. Hermansen reiterated that he and Agent Bullock thought it seemed out of the ordinary for the driver to speed up after he passed them and looked at them, so they decided to follow the vehicle. (*Id*. at 68.) Mr. Hermansen did not see anyone get into or out of the defendant's vehicle, and the vehicle did not have Mexican plates. (*Id*. at 68, 70.) He also agreed that the defendant was pulled over about a block from Tucson Auto Rentals, which is where the vehicle was registered. (*Id*. at 70.)

The testimony then turned to the cross-certification under A.R.S. 13-3875. Mr. Hermansen agreed that certain steps are required for a federal agent to be cross-certified by a sheriff. (*Id*. at 73.) Mr. Hermansen also agreed that the first step is that the federal agency has to write a letter to the sheriff; the second step is that you have to submit evidence that the federal agents are certified as federal peace officers; the third step is that the federal agency has to submit evidence that the agents have been authorized under federal law to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of federal law; and lastly, that the agent is authorized by federal law to make arrests, serve warrants, and carry firearms. (*Id*. at 73-74.) Mr. Hermansen confirmed that the only information that was sent to Sheriff Napier was the March 1, 2017 letter. (*Id*. at 74-75; Def. Ex. 53.) Defense counsel asked Mr. Hermansen whether he submitted any evidence that Agent Bullock is authorized to make arrests, serve warrants, investigate violations of federal law, or carry firearms; Mr. Hermansen testified that he only submitted the letter.

1      With respect to the initial encounter with the defendant, Mr. Hermansen testified that
2 Agent Bullock brought the vehicle to almost a complete stop at the time the defendant
3 honked the horn and passed the agents. (*Id*. at 76.) He does not know how fast the defendant
4 was going when he passed the agent's vehicle; he only heard an acceleration of the engine.
5 (*Id*.)

6      Finally, Mr. Hermansen agreed that most undocumented individuals that he
7 encounters are generally identifiable as Hispanic. (*Id*. at 77.) He also agreed that most of
8 the undocumented aliens that he encounters are not African-American. (*Id*. at 78.)

9      On re-direct examination, Mr. Hermansen explained that he encounters individuals
10 who are engaged in alien or drug smuggling who are not undocumented and/or Hispanic.
11 (*Id*. at 78-79.) In fact, he has encountered African-American individuals engaging in those
12 crimes. (*Id*. at 79.) And these criminal violations are within the purview of the Border
13 Patrol. (*Id*. at 79.)

14      Mr. Hermansen reiterated that he requested that Sheriff Napier cross-certify sixty
15 Border Patrol agents as Arizona peace officers. (*Id*. at 79-80.) He testified that in submitting
16 this letter, he was certifying that all of these agents were in compliance with A.R.S. 13-3875.

17      Mr. Hermansen acknowledged that Agent Bullock was speeding to catch up to the
18 defendant's vehicle. But he does not believe that Agent Bullock put the public at risk
19 because agents are trained to drive at speeds greater than normal. (*Id*. at 81-82.) He also
20 believes that their "duty to catch up to the vehicle and ascertain what was going on with that
21 vehicle was more important." (*Id*. at 82.) He testified that the defendant put the public at
22 risk by his driving behavior. (*Id*.)

23      **2.**     **Border Patrol Agent Christopher Bullock**

24      Agent Christopher Bullock testified on direct examination as follows. Agent Bullock
25 is the Deputy Patrol Agent in Charge for the Border Patrol at the Tucson Sector Intelligence
26 Unit. (*Id*. at 87.) He has been in that position since November 2014. Agent Bullock has
27 been employed by the Border Patrol for twenty years. (*Id*. at 88.) He has also been stationed
28 in El Centro, California; Brownsville, Texas; and Imperial Beach, California. (*Id*.)

1    Agent Bullock is cross-certified as a Deputy Sheriff with the Pima County Sheriff's

2    Department. (*Id*. at 89.) That cross-certification was valid on March 31, 2017. (*Id*.) He

3    testified that the purpose of cross-certification was so that agents could work on task forces

4    with state law enforcement. (*Id*.) He testified that agents who are cross-certified are not

5    seeking to enforce violations of state law, but rather, the same type of offenses that Border

6    Patrol agents enforce in their federal capacity. (*Id*. at 89-90.)

7    Agent Bullock's testimony then turned to information that he received in March 2017

8    about suspected alien and narcotics smuggling in South Tucson. (*Id*. at 90.) He described

9    Tucson and South Tucson as notorious staging locations for illegal aliens and narcotics to be

10   transferred to other locations in the United States. (*Id*.) As a result, Border Patrol agents

11   regularly investigate drug and illegal alien activity in these areas of Arizona. (*Id*. at 91.)

12   Agent Bullock testified that he did not "have any specific information that led us

13   specifically" to the Santa Rita Skate Park on March 31, 2017. (*Id*.) Agent Bullock and Mr.

14   Hermansen were in the area of the skate park that day based on information that South

15   Tucson "was notorious for illegal activity and stash houses." (*Id*. at 91-92.)

16   On March 31, 2017, Agent Bullock was driving an unmarked Chevy Tahoe and

17   patrolling the area near the skate park along with Mr. Hermansen. (*Id*. at 92-93.) The

18   purpose was to "surveil the area" based on information that they got about illegal activity

19   in the Tucson area. (*Id*. at 92.) As they were driving slowly on a road adjacent to the park,

20   a vehicle approached from behind and the driver honked the horn. (*Id*. at 93.) Agent Bullock

21   pulled to the side of the road to allow the vehicle to pass. (*Id*.) He testified that the vehicle

22   passed "very slowly and the driver and passenger very obviously looked hard" at the agents

23   in an apparent attempt to identify who they were. (*Id*.) He further testified that immediately

24   after it passed them, it accelerated significantly at a speed higher than the posted speed limit

25   in this residential area. (*Id*.) Agent Bullock decided to follow the vehicle and "had to

26   exceed the speed limit in order to catch up to the vehicle in order to acquire the license plate

27   to run the tag through dispatch." (*Id*. at 93-94.) As Agent Bullock got closer to the vehicle,

28   he observed the driver making furtive movements (*e.g*., "leaning over" and "looking in the

1  mirror to see what we were doing") and "then accelerat[ed] through stop signs without

2  stopping in an apparent attempt to evade." (*Id*. at 94.)   He also testified that "[t]here were

3  times where [the vehicle] came to intersections and made abrupt turns as if to have made the

4  decision to turn at the last moment prior to the turn." (*Id*. at 94.)   The vehicle also made an

5  unlawful U-turn at a high rate of speed. (*Id*. at 95.)  Agent Bullock testified that the vehicle

6  was traveling at a speed that he considered reckless; he was concerned that the driver would

7  lose control of the vehicle and strike a pedestrian or another vehicle. (*Id*. at 95.)   Agent

8  Bullock testified that there was not an excessive amount of people in front of the homes that

9  day, but there were people in the park and vehicle traffic in the area. (*Id*. at 96.)

10  Agent Bullock testified that he decided to stop the vehicle because the defendant's

11  driving behavior was endangering the public. (*Id*. at 96-97.)   Additionally, Agent Bullock

12  testified that the driver's behavior was consistent with people who try to evade law

13  enforcement because they are engaged in illegal activity or there is something they want to

14  hide, like an outstanding warrant. (*Id*. at 97.)  Agent Bullock testified that after the driver

15  performed the U-turn, he activated his vehicle's emergency lights because he had decided

16  that the driving behavior needed to be stopped.  (*Id*. at 97-98.)   The driver did not

17  immediately stop his vehicle; "[h]e continued to drive erratically, running stop signs, making

18  abrupt turns." (*Id*. at 98.) Agent Bullock continued to follow the vehicle with the emergency

19  lights on and eventually activated the siren. (*Id*. at 98.)  Agent Bullock testified that it took

20  the driver "a long time to stop even after I turned on my siren." (*Id*.)   Agent Bullock

21  estimates that the entire encounter -- from the honk until the stop -- took "a matter of a few

22  minutes." (*Id*. at 98.)

23  Once the vehicle stopped, Agent Bullock made contact with the driver, who was

24  identified as the defendant, as well as a front seat passenger and a toddler in the back seat.

25  (*Id*. at 98-99.)  Both the defendant and the  passenger were yelling out their open windows

26  that they were not doing anything wrong and questioned why they were stopped. (*Id*. at 99.)

27  The defendant appeared to be nervous -- he kept questioning why he was being stopped,

28  denied that he did anything wrong, and appeared to be hiding something between the seat and

center console. (*Id*. at 99-100.)  Agent Bullock was concerned that the defendant might have been reaching for or hiding a weapon, so he asked the defendant to exit the vehicle.  (*Id*. at 100.)   The defendant complied and admitted that he had a firearm in the vehicle.  (*Id*.)  The firearm was found under the rear seat cushion, under the toddler's seat.  (*Id*.)  Narcotics were also found on the defendant and in the vehicle.  (*Id*. at 101.)

Agent Bullock reiterated that he stopped the defendant's vehicle because of the "excessively reckless manner in which he was driving" and the risk that the driving behavior would hurt someone.  (*Id*. at 102.)   Agent Bullock also testified that "[w]e were building suspicion to stop the vehicle." The defendant took a "hard look" at the agents when he passed and Agent Bullock was wearing a law enforcement vest with a big yellow badge on it.  (*Id*. at 102.) Agent Bullock testified that he assumes that the defendant "was able to see that and after seeing that, speeding off, it immediately made me suspicious that he may have been doing something that he didn't want me to know about."  (*Id*.)

On cross- examination, Agent Bullock agreed that 8 CFR § 287.5 (which enumerates the powers of Border Patrol agents) does not give Border Patrol agents the authority to exercise authority as a state peace officer.  (*Id*. at 105.)   Agent Bullock has never issued a traffic citation or referred  a case for prosecution based on a traffic infraction.  (*Id*.)  In the case at hand, Agent Bullock did not call the Tucson Police Department or the Pima County Sheriff's Department to come and issue a traffic citation.  (*Id*. at 105-106.)  Agent Bullock testified that although he is cross-certified as a Pima County Deputy Sheriff, he is not familiar with that department's policy on pursuits.  (*Id*. at 106.)  Agent Bullock agreed that as a Border Patrol agent and as a cross-certified state peace officer, he is "required to radio in or communicate, for example, location, speed, or direction of travel of an individual that [he is] pursuing."  (*Id*. at 108.)   Mr. Hermansen was responsible for radio communication on March 31, 2017.  (*Id*.)

Agent Bullock confirmed that he did not activate his vehicle's emergency lights until the defendant had committed several traffic infractions.  (*Id*. at 111.)  He agreed that the Chevy Tahoe that he was driving sits higher up than the sedan that the defendant was driving.

1   (*Id.*)  He confirmed that after the defendant honked the horn, he pulled the Tahoe to the side

2   of the road.  (*Id*. at 112.)  Agent Bullock testified that he was driving slowly, maybe less than

3   the speed limit.  (*Id*. at 113.)   He brought his vehicle to a complete stop while the defendant

4   passed the Tahoe.  (*Id*.)  He testified that his window was partially open and the occupants

5   of the sedan looked at him when they passed; he cannot recall if the sedan's windows were

6   open.  (*Id*. at 114.)

7          Agent Bullock confirmed that the defendant eventually stopped his vehicle after the

8   emergency lights were activated.  (*Id*. at 116.)  He reiterated that the entire incident took only

9   a few minutes.  (*Id*. at 117.)    Agent Bullock confirmed that the defendant's vehicle was

10  registered to Tucson Auto Rental; but he was not aware that this company was located a few

11  blocks from where the traffic stop occurred. (*Id*. at 118.)  He also confirmed that he did not

12  see anyone enter or exit the defendant's vehicle, and the vehicle did not seem to be "riding

13  low."  (*Id*. at 118.)  Agent Bullock conceded that his report does not indicate whether he told

14  the defendant the reason he was stopped; although it does reflect that he asked the defendant

15  if there were any illegal people, drugs, or weapons in the vehicle.  (*Id*. at 119-120.)

16         On  re-direct  examination,  Agent  Bullock  testified  that  the  purpose  of

17  cross-certification is to be able to pursue state law violations; however, if state law violations

18  are pursued, they are still related to border crime (*e.g.*, drugs and firearms violations).  (*Id*.

19  at 121-122.)    Agent Bullock also made clear that 8 CFR § 287.5 is not the only source of

20  authority for Border Patrol agents; there are other federal statutes that provide this authority.

21  (*Id*. at 122.)  He testified that when Border Patrol agents are cross-certified, they are not

22  given any limitations on their ability to enforce state law.  (*Id*.)  He confirmed that he could

23  see in the defendant's vehicle even though the Tahoe is higher off the ground than a sedan.

24  (*Id*. at 123.)  Finally, while he does not recall if he told the defendant why he was being

25  stopped, his practice is "to first ask about immigration and take it from there."  (*Id*.)

### 3.    Jack Lane

27         The defense called Jack Lane as the Custodian of Records for AZPOST.  The defense

28  sought to admit an exhibit that reflected that AZ POST did not have records of Sheriff

1    Napier's cross-certification of Border Patrol agents on March 10, 2017.  (Def. Ex. 68.)

2    Because the government objected to the relevancy of this document, it was agreed that

3    government counsel would question Mr. Lane first about his duties and the document at

4    issue.

5         Mr. Lane spent over thirty-five years with the Arizona Department of Public Safety.

6    (*Id.* at 9-10.)  He is currently the executive director for the Arizona Peace Officers Standards

7    and Training Board ("AZPOST").  (*Id.* at 8.)   That organization is responsible for setting

8    standards for all Arizona peace officers that are certified under state statutes.  (*Id.* at 8-9.)

9    Specifically, he testified that AZPOST has several functions: (1) setting minimum standards

10   for basic academy training and advanced training; (2) auditing of background investigations

11   for peace officers; and (3) handling officer misconduct cases.  (*Id.* at 9.)  The best analogy

12   he can draw is that his organization is "kind of the state bar for the police officers in

13   Arizona." (*Id.* at 9.)

14        Mr. Lane is familiar with the various regulations and Arizona state statutes that govern

15   the conduct of peace officers as well as organizations such as police departments and sheriff's

16   departments.  (*Id.* at 9.)  He explained that AZPOST does not have oversight over a law

17   enforcement agency's policies, but it has oversight over each individual peace officer's

18   certification in the state.

19        Mr. Lane is familiar with Arizona Revised Statute 13-3875, which allows each county

20   sheriff to cross-certify federal peace officers as Arizona peace officers for a one-year term.

21   (*Id.* at 11; Gov. Ex. 3.)   Mr. Lane explained the requirements for a federal peace officer to

22   become cross-certified by a sheriff's department.  (*Id.* at 12.)  A federal officer must have "at

23   least completed their law enforcement academy or training required for their federal job;" a

24   request for cross-certification is made to the sheriff and "then the sheriff handles that from

25   his end."  (*Id.* at 12.)  Mr. Lane believes "the last requirement is just that [the sheriff] send

26   [AZPOST] notification of who they have cross-certified."  (*Id.*)   Mr. Lane explained that

27   AZPOST has no involvement in cross-certifying federal officers other than maintaining the

28   records that are sent to AZPOST from the sheriff's department.  (*Id.* at 13.)

1    Mr. Lane testified that AZPOST retains the physical letters from the sheriff's

2  department granting cross-certification, but it does not maintain any electronic database of

3  everyone who has ever been cross-certified.  (*Id*.)  The physical letters are purged after one

4  year because that is how long the cross-certification is allowed by statute.  (*Id*.)  Mr. Lane

5  testified that some sheriff's departments do not provide AZPOST with the cross-certification

6  letters.  But he has never had a problem with the Pima County Sheriff's Department doing

7  so; they are probably one of the better agencies in that respect.  (*Id*. at 14.)

8    Mr. Lane testified that, to his knowledge, if a sheriff fails to provide AZPOST with

9  notification of federal officers who have been cross-certified, that failure does not negate

10 those peace officers having cross-certification.  (*Id*. at 15.)  That portion of A.R.S. 13-3875

11 just deals with record-keeping, and had nothing to do with the cross-certification process

12 with the sheriff.  (*Id*. at 15.)   He testified that the sheriff has the sole authority to

13 cross-certify federal peace officers; AZPOST has no authority to confer or revoke such a

14 certification.  (*Id*. at 15-16.)

15    Mr. Lane testified that he was served with a subpoena on September 17, 2018,

16 requesting records relating to the cross-certification of Border Patrol Agents Bullock and

17 Hermansen on March 10, 2017.  (*Id*. at 16.)  He testified that AZPOST did not have any

18 responsive records.  (*Id*.)  He explained that AZPOST most likely did not have any such

19 records because the March 10, 2017 cross-certification occurred over a year before the

20 request made in the subpoena.  (*Id*. at 16-17.)  The absence of documents does not suggest

21 that the cross-certification was not granted; rather, AZPOST "probably purged that record

22 after the one-year period."  (*Id*. at 17.)  Mr. Lane testified that the sheriff could best handle

23 the question of whether cross-certification occurred.  (*Id*.)

24    On cross-examination, Mr. Lane confirmed that he prepared an affidavit in response

25 to the subpoena which represented that AZPOST did not have records associated with the

26 March 10, 2017 cross-certification by Sheriff Napier.  (*Id*.  at 17-18; Def. Ex. 68.)  Mr. Lane

27 agreed with defense counsel that it is not easy to become a certified Arizona state peace

28 officer; there are certain standards that must be met,  trainings to be completed, and

1  certifications to be obtained.  (*Id*. at 18-19.)  Mr. Lane conceded that the process for a federal
2  agent to be cross-certified as an Arizona peace officer is easier; however, he pointed out that
3  he is not familiar with the requirements to become a federal agent. (*Id*. at 19-20.)  And he
4  testified that any federal officer who applies for cross-certification also must have completed
5  all the federal requirements to become a peace officer.  (*Id*. at 23.)

6        In terms of record retention, Mr. Lane is not familiar with the specific record retention
7  law that allows AZPOST to purge cross-certification records after a year.  (*Id*. at 21.)   But
8  he is also not aware of any law that prevents AZPOST from purging these records after a
9  year.  (*Id*. at 23.)  He also has no idea why AZPOST is charged with maintaining the
10 cross-certification records given that it has no role in the cross-certification process.  (*Id*. at
11 22.)

12       **4.    Martin Pesqueira**

13       Mr. Pesqueira has worked as a criminal investigator for the Federal Public Defender's
14 Office for the past three-and-a-half years.  (*Id*. at 125.)  Previously, he was a Tucson Police
15 Officer ("TPD") for over 25 years.  (*Id*. at 126.)  While employed by TPD, Mr. Pesqueira
16 spent the majority of his time patrolling the south side of Tucson.  (*Id*. at 126.)

17       With respect to the case at hand, Mr. Pesqueira went to the scene of the pursuit and
18 the traffic stop to try to determine the length of time to drive the entire route.  (*Id*. at 127.)
19 In order to re-create the route traveled, he used the agent's reports provided by the
20 government and also spoke with the defendant.  (*Id*. at 127-128.)   He re-created the route
21 several times and ultimately filmed his final re-creation of the route.  (*Id*. at 128.)  He is
22 familiar with this area of town because he grew up in the area and patrolled the area while
23 with TPD.  (*Id*. at 129-130.)

24       Mr. Pesqueira testified about where he believes the agents first encountered the
25 defendant at the skate park, as well as the route to where the traffic stop occurred.  (*Id*. at
26 142.)  He testified that the speed limit in the area is twenty-five miles per hour.  He further
27 testified that while traveling east bound, the defendant would have encountered stop signs
28 at three intersections prior to making a U-turn.  (*Id*. at 143-146.)  Mr. Pesqueira testified that

1    there are no signs prohibiting U-turns at the T-intersection.  (*Id*. at 145.)   He testified that

2    Tucson Auto Rentals is about 120 yards from where the traffic stop occurred.  (*Id*. at 146.)

3         Mr. Pesqueira then testified about the video of the route that he re-created.  (*Id*. at

4    148.)  He used vehicles similar in height to the subject vehicles to demonstrate whether the

5    defendant could see the clothes that the Border Patrol agents were wearing.  (*Id*. at 148.)  He

6    testified that the vehicle which was portraying the defendant's vehicle passed the would-be

7    Border Patrol vehicle at twenty-five miles per hour.  (*Id*. at 153, 157.)   The driver could only

8    see a man dressed in black in the would-be Border Patrol vehicle.  The government pointed

9    out, and Mr. Pesqueria conceded, that Agent Bullock testified that the defendant passed his

10    vehicle slowly – it took about five seconds.  (*Id*. at 155-156.)  Mr. Pesqueira then described

11    the intersections that the defendant and the Border Patrol agents would have proceeded

12    through, as well as where the U-turn occurred.  He testified that it would have been very

13    difficult for the defendant to "roll through the stop sign on Park Avenue" because traffic is

14    almost always heavy at that intersection.  (*Id*. at 159.)  He testified that he located the precise

15    location of the traffic stop because the GPS coordinates were specified in the Border Patrol

16    reports.  (*Id*. at 160.)   It took eight seconds to drive from the spot of the stop to Tucson Auto

17    Rentals.  (*Id*.)  He testified that his research revealed that Tucson Auto Rentals is a legitimate

18    business registered under the Department of State.  (*Id*. at 161.)

19         On cross-examination, Mr. Pesqueira agreed that it is a traffic infraction in Arizona

20    to proceed through a stop sign without coming to a complete stop.  (*Id*. at 163.)  He disputed

21    whether it is a traffic infraction to fail to use a turn signal when making a turn at an

22    intersection; he testified that traffic had to be affected for it to be a violation.  (*Id*.)  He agreed

23    that failure to stop at stop signs and making abrupt turns could be considered evasive driving

24    behavior.  (*Id*. at 164.)   He conceded that he did not know how fast the defendant was going

25    when he passed the Tahoe.  (*Id*. at 165.)   He also agreed that he does not know how fast

26    either vehicle was traveling while the defendant was being pursued by the agents.  (*Id*. at

27    166.)   Based on the video he created, he believes the length of the pursuit - - from the honk

28    to the stop - - took about three-and-a-half minutes.  (*Id*. at 171.)

# DISCUSSION

"The Fourth Amendment's prohibition against unreasonable searches and seizures extends to the investigatory stop of a vehicle."  *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002).  The Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops.  *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).  "'Reasonable suspicion is formed by specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  *Lopez-Soto*, 205 F.3d at 1105.

> The reasonable-suspicion standard is not a particularly high threshold to reach. Although a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. Reasonable suspicion is a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Valdes-Vega*, 738 F.3d 1074 (9th Cir. 2013) (internal quotations and citations omitted).

In reviewing a determination of reasonable suspicion, a court must look at the "totality of the circumstances" surrounding the stop.  *Sigmond-Ballesteros*, 285 F.3d at 1121; *Valdes-Vega*, 738 F.3d at 1078.  The approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078.  "It also precludes a 'divide and conquer analysis' because even though the suspect's acts was perhaps innocent in itself . . . taken together, they may warrant further investigation."  (*Id*.)

Officers on roving border patrols, like the one at issue here, may conduct "brief investigatory stops" without violating the Fourth Amendment "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  However, "[a]s federal officers, Border Patrol agents are limited to their statutory powers."  *United States v. Juvenile Female*, 566 F.3d 943, 948 (9th Cir. 2009); *see Ortiz v. U.S. Border Patrol*, 39 F. Supp.2d 1321, 1326 (D.N.M.

1999) ("Border Patrol agents are not general law enforcement officers.  Instead, . . . their authority and duties are circumscribed by statute and limited in scope."); *United States v. Santa Maria*, 15 F.3d 879, 881 (9th Cir. 1994) ("Section 1327(a)(3) only authorizes the Border Patrol to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."); *United States v. Diamond*, 471 F.2d 771, 773 (9th Cir. 1973) ("[C]ustoms agents are not general guardians of the public peace, as are state and local police.  Their powers . . . to search and arrest persons are limited by statute.").   "To hold otherwise would grant Border Patrol agents unfettered discretion to investigate suspected violations of any and all cognizable criminal laws[;] it would, in effect, give to the Border Patrol the general police power that the Constitution reserves to the States."   *Juvenile Female*, 566 F.3d at  948.

Here, the Border Patrol agents clearly had the statutory authority to investigate alien smuggling.  However, as discussed below, the agents did not have a reasonable suspicion that the defendant was engaged in alien smuggling.  The more difficult issue is whether the Border Patrol agents had the authority to conduct a stop based solely on state traffic infractions when they had no intention of ever issuing a traffic citation.  As discussed below, the Court concludes that the agents had the authority to conduct a stop based on traffic infractions because they were cross-certified as state law enforcement officers.  The Court also concludes that the stop was lawful based on the traffic infractions observed by the agents, regardless of whether the agents intended to issue a citation.  As such, the Court recommends that the motion to suppress evidence be denied.

**A.     There was no reasonable suspicion of alien smuggling.**

In the context of Border Patrol stops, the factors to be considered in determining whether "reasonable suspicion" exists to justify stopping a vehicle include: (1) the characteristics of the area; (2) the proximity to the border; (3) usual patterns of traffic and the time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience.  *United States v. Garcia-Barron*, 116

F.3d 1305, 1307 (9th Cir. 1997). Not all of these factors must be present or highly probative in every case to justify reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

In the case at hand, the government argues that there was reasonable suspicion of alien smuggling because Border Patrol agents had information of such activity at the park; the defendant attempted to evade the agents; and the vehicle the defendant was driving was rented from a company that regularly rents vehicles to alien smugglers. The defense points out that this stop did not occur near the border, the agents did not have any specific information about alien smuggling on the date in question, the agents did not see anyone enter or exit the defendant's vehicle, and the rental company is a legitimate business catering to low income individuals.

The Court concludes that the stop was based on a hunch and not on a reasonable suspicion of alien smuggling. The traffic stop did not occur near the border or in an area notorious for alien smuggling, the agents only had general information about undocumented individuals at this park, and agents did not observe anyone enter or exit the vehicle or anyone concealed in the vehicle. The only factor arguably weighing in the government's favor is the defendant's purported attempts to elude law enforcement. But it is not even clear whether the defendant actually knew that the agents were law enforcement. For these reasons, the Court concludes that there was no reasonable suspicion for the stop based on alien smuggling.

**B.    The agents had the authority to perform a stop for traffic infractions and there was a reasonable suspicion for the stop.**

As discussed above, Border Patrol agents do not have the unfettered discretion to investigate suspected violations of any and all cognizable criminal laws. *See Juvenile Female*, 566 F.3d at 948. Rather, Border Patrol agents are limited to their statutory powers. (*Id*.) The government does not assert that there is any federal statutory authority for Border Patrol agents to perform a vehicle stop for state traffic infractions. But the government argues that the State of Arizona provided these specific Border Patrol agents with the authority to perform such a stop when they cross-certified these agents under A.R.S.

13-3875.

As set forth below, A.R.S. 13-3875 permits the sheriff of each county in Arizona to cross-certify federal agents as peace officers who possess all the law enforcement powers as state officers.  A.R.S. 13-3875 provides as follows:

> A.    The sheriff of each county shall develop and adopt a policy on cross-certification of federal peace officers, including whether cross-certification shall be permitted in that county.
>
> B.    A federal peace officer who is employed by an agency of the United States and who has completed the basic training curriculum for the officer's agency shall possess and exercise all law enforcement powers of peace officers in this state for one year, including, if directed by the officer's employer, the capability to enforce the criminal laws of this state if the federal peace officer:
>
>> 1.  Submits to the sheriff a written request for certification as a peace officer in this state.
>>
>> 2.  Submits evidence that the officer has been certified as a federal peace officer, is authorized by federal law to engage in or supervise the prevention, detection, investigation or prosecution of a violation of federal law and is authorized by federal law to make arrests, serve warrants and carry firearms.
>
> C.    Each federal peace officer who requests cross-certification may submit to the sheriff a written request for certification as a peace officer in this state pursuant to subsection B. The cross-certification remains in effect for one year from the date on which the certification was authorized by the sheriff.
>
> D.    Neither the state nor any political subdivision is liable for any acts or failure to act by a federal peace officer.
>
> E.    The Arizona peace officer standards and training board shall maintain records of all federal peace officers who are certified as peace officers in this state.[3]

A.R.S. 13-3875.

In the case at hand, Border Patrol Agent Hermansen sent a letter dated March 1, 2017 to Pima County Sheriff Napier requesting the cross-certification of sixty Border Patrol

---

[3] Mr. Lane testified that AZPOST does not have a copy of Sheriff Napier's March 10, 2017 letter as is required by ARS 13-3875(E).  However, Mr. Lane also explained that the absence of that letter does not mean that the Border Patrol agents were not cross-certified. AZPOST is merely a document custodian and it is solely up to the sheriff to grant cross-certification.  And he also testified that these cross-certification letters are purged after the one-year cross-certification period expires, which, here, was on March 17, 2018 (six months after the subpoena was issued to AZPOST).

agents. (Def. Ex. 53 at Bates #58-60.)   In a letter dated March 10, 2017, Sheriff Napier granted the request and cross-certified the listed Border Patrol agents as Arizona Peace Officers. (Def.Ex.53 at Bates #57.)  The cross-certification was effective for one year from the date of Sheriff Napier's letter.  Agent Bullock was one of those agents cross-certified and that cross-certification was effective on March 31, 2017, the date of the traffic stop.  (*Id*.)

At first blush, it appears odd that a state could enlarge the powers of a federal agent and/or agency.  However, the defense has not cited to, and this Court has not found, any authority to support an argument that the Constitution or any federal law expressly prohibits states from sharing their authority with federal agents.  In fact, the lawfulness of a state sharing its authority with federal agents is supported by the limited case law addressing this issue.

In *United States v. Samuels*, 2004 WL 2823079 (S.D.N.Y. 2004), agents with the Drug Enforcement Administration ("DEA") stopped the defendant for a traffic infraction and found marijuana in the trunk of the vehicle.  *Samuels*, 2004 WL 2823079, at *1-2.  The defendant moved to suppress this evidence arguing that New York law does not authorize DEA agents to make warrantless arrests for traffic violations. (*Id*. at *2.)  The court denied the motion to suppress because New York law provided DEA agents the power to act as peace officers, which included the power to make warrantless arrests for traffic infractions. (*Id*. at *3.) The court noted that New York law expressly granted twenty-two types of federal law enforcement officials the power to make arrests based on state law. (*Id*).  Thus, the court concluded that the traffic stop did not violate the Fourth Amendment because the DEA agent had the authority under state law to stop the defendant's vehicle for a traffic infraction.  (*Id*.)[4]

*Samuels* is obviously very similar to the case at hand.  To be sure, unlike in *Samuels,*

---

[4] A similar conclusion was reached in *Evans v. Solomon*, 681 F. Supp.2d 233 (E.D.N.Y. 2010).  In that case, the defendant argued that the U.S. Park Police had no authority to stop him, search him, and issue traffic citations on a New York City street.  *Evans*, 681 F. Supp.2d at 241.  The court found that New York state law expressly provided the U.S. Park Police (and other federal agencies) with the powers of state peace officers, including the authority to stop a motorist for a traffic infraction and issue a citation. (*Id*. at 241-242.)

1   Arizona law does not expressly grant federal law enforcement agencies with the power of
2   state peace officers.  However, Arizona law does provide a mechanism for local sheriffs to
3   grant state peace officer status to federal agents, specifically, A.R.S. 13-3875.  Pursuant to
4   this state statute, Sheriff Napier bestowed peace officer status on Border Patrol Agent
5   Bullock three weeks prior to the traffic stop.  As a result, Agent Bullock had the authority
6   under Arizona state law to stop the defendant for a traffic infraction.

7          The defense argues that Sheriff Napier's grant of peace officer status to the Border
8   Patrol agents was deficient because the Border Patrol did not fully comply with A.R.S.
9   13-3875 by proving that the agents: (1) completed the basic training curriculum for the
10  officers' agency; (2) have been certified as federal peace officers and are authorized by
11  federal law to engage in or supervise the prevention, detection, investigation or prosecution
12  of a violation of federal law; and (3) are authorized by federal law to make arrests, serve
13  warrants and carry firearms.  The defense has not demonstrated that the Border Patrol and/or
14  Sheriff Napier failed to comply with A.R.S. 13-3875.  For instance, the defense did not offer
15  evidence that the Border Patrol agents lacked the federal law enforcement powers which are
16  prerequisites to cross-certification under A.R.S. 13-3875.  Nor did the defense present
17  evidence from the Pima County Sheriff's Department that would show that the
18  cross-certification was defective under state law.  Moreover, even if the cross-certification
19  was somehow defective under state law, suppression would not be warranted because the
20  Border Patrol agents relied in good faith on the validity of the cross-certification under ARS
21  13-3875; thus, the agents reasonably believed that they possessed all the powers of state
22  peace officers, including the power to stop a vehicle for traffic infractions.  *See Illinois v.*
23  *Krull*, 480 U.S. 340, 349-350 (1987) (exclusionary rule does not apply when there is good
24  faith reliance on a state statute later declared unconstitutional).

25         Additionally, contrary to the defense's contention, the fact that Agent Bullock never
26  intended to exercise his authority under state law and issue a citation for a traffic infraction
27  does not mean that the stop was unlawful, provided there was a legal basis for the stop.  *See*
28  *Whren v. United States*,  517 U.S. 806, 813 (1996) (the constitutional reasonableness of

traffic stops does not depend on the actual motivations of the individual officers involved). The Ninth Circuit has held that *Whren* requires that "the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations." *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005). "Indeed, in *Whren*, the plainclothes officer who stopped the defendant for a traffic infraction testified that 'he did not intend to issue a ticket to the driver for stopping too long at the stop sign, but he wished to stop the [vehicle] to inquire why it was obstructing traffic and why it sped off without signaling in a school area.'" *Willis*, 431 F.3d at 717 n. 8 (quoting *United States v. Whren*, 53 F.3d 371, 373 (D.C. Cir. 1995), aff'd 517 U.S. 806 (1996)). Thus, the fact that the agents never intended to issue a traffic citation to the defendant does not, in itself, render the stop unlawful.

The defense also argues that *Whren* leaves the door open for a court to invalidate reasonable searches and seizures when there is extraordinary evidence of pretext. [Doc. 43 at 3.] The defense seizes on the Supreme Court's comment in *Whren* that the facts of that case made it a "run-of-the-mine case," which presupposes that there is some set of cases where a search and seizure cannot be justified on reasonable suspicion. However, the Ninth Circuit has rejected that argument for two reasons. *See United States v. Ibarra*, 345 F.3d 711 (9th Cir. 2003). First, *Whren* foreclosed the possibility that a search or seizure may be invalidated solely because of the subjective intentions of the officer. *Ibarra*, 345 F.3d at 714. Second, "the only set of cases the Supreme Court identified in *Whren* where probable cause alone did not justify a search or seizure were those cases where 'search or seizures [were] conducted in an extraordinary manner, usually harmful to an individual's privacy or even physical interests - such as, for example, seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body.'" *(Id*. at 715) (*quoting Whren*, 517 U.S. at 818.). Therefore, "it was this category of cases to which the Supreme Court referred to as not 'run-of-the-mine.'" *(Id*.)

In the case at hand, the traffic stop was not conducted in "an extraordinary manner." Indeed, the stop was akin to the pre-textual traffic stop in *Whren*. As such, the Court rejects the defense argument that his is not a "run-of-the-mine" case. Thus, if the traffic stop was

1   lawful, then evidence obtained as a result of that stop (*i.e.*, the gun) is admissible in this

2   federal prosecution regardless of whether the agents intended to issue a traffic citation.

3         Agent Bullock obviously needed to have a reasonable suspicion of a traffic infraction

4   in order for the stop to be lawful under the Fourth Amendment.  The Court finds that the

5   credible and unrefuted testimony of Agent Bullock and Mr. Hermansen establishes a

6   reasonable suspicion of several traffic infractions, specifically, speeding and failure to

7   completely stop at stop signs.  Because this traffic stop was lawful under the Fourth

8   Amendment, the evidence obtained as a result of that stop is admissible.  Accordingly, it is

9   recommended that the motion to suppress evidence be denied.

10         Pursuant to 28 U.S.C. § 636(b) and Rule 59(b)(2) of the Federal Rules of Criminal

11   Procedure, any party may serve and file written objections within fourteen (14) days after

12   being served with a copy of this Report and Recommendation.  No reply shall be filed unless

13   leave is granted from the District Court.  If  objections are filed, the parties should use the

14   following case number:  **CR 18-00032-TUC-JAS.**

15         Failure to file timely objections to any factual or legal determination of the Magistrate

16   Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

17         DATED this 5th day of October, 2018.

18

19

20   _____

21   Eric J. Markovich
     United States Magistrate Judge

22

23

24

25

26

27

28

- 25 -